**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JACQUELINE HALBIG<br>204 Guthrie Avenue<br>Alexandria, Virginia 22305; | )<br>)<br>)<br>) |
| DAVID KLEMENCIC<br>1780 Long Run Road<br>Cairo, West Virginia 26337; | )<br>)<br>)<br>) |
| CARRIE LOWERY<br>305 South 14th Street, Apt. A<br>Nashville, Tennessee 37206; | )<br>)<br>)<br>) |
| SARAH RUMPF<br>1500 South Lamar Boulevard<br>Austin, Texas 78704; | )<br>)<br>)<br>) |
| INNOVARE HEALTH ADVOCATES<br>9915 Kennerly Road, Suite J<br>St. Louis, Missouri 63128; | )<br>)<br>) Civ. No. 13-623<br>) |
| GC RESTAURANTS SA, LLC<br>OLDE ENGLAND'S LION & ROSE, LTD<br>OLDE ENGLAND'S LION & ROSE AT<br>CASTLE HILLS, LTD<br>OLDE ENGLAND'S LION & ROSE<br>FORUM, LLC<br>OLDE ENGLAND'S LION & ROSE AT<br>SONTERRA, LTD<br>OLDE ENGLAND'S LION & ROSE AT<br>WESTLAKE, LLC<br>16109 University Oak<br>San Antonio, Texas 78249; and | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| COMMUNITY NATIONAL BANK<br>210 Main Street<br>Seneca, Kansas 66538, | )<br>)<br>)<br>) |
| *Plaintiffs,*<br>(continued on next page) | )<br>)<br>)<br>)<br>) |

| | |
|---|---|
| *v.* | ) |
| | ) |
| KATHLEEN SEBELIUS, in her official | ) |
| capacity as U.S. Secretary of Health and | ) |
| Human Services; and the | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES | ) |
| 200 Independence Avenue SW | ) |
| Washington, District of Columbia 20201; | ) |
| | ) |
| JACOB LEW, in his official capacity as U.S. | ) |
| Secretary of the Treasury; and the | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| TREASURY | ) |
| 1500 Pennsylvania Avenue NW | ) |
| Washington, District of Columbia 20220; and | ) |
| | ) |
| STEVEN MILLER, in his official capacity as | ) |
| Acting Commissioner of Internal Revenue; | ) |
| and the | ) |
| INTERNAL REVENUE SERVICE | ) |
| 1111 Constitution Avenue NW | ) |
| Washington, District of Columbia 20004, | ) |
| | ) |
| *Defendants.* | ) |

## COMPLAINT

1. One of the pillars of the Patient Protection and Affordable Care Act ("ACA" or "the Act") is its creation of new health insurance "Exchanges"—state-level clearinghouses for standardized insurance products, where insurers will be regulated and individuals can satisfy the individual mandate, the new statutory obligation to purchase comprehensive insurance policies.

2. To encourage states to establish Exchanges, Congress used carrots, such as start-up grants to help fund the creation of Exchanges; and sticks, such as prohibiting states from tightening Medicaid eligibility standards before setting up Exchanges. The biggest carrot was the offer of premium-assistance subsidies from the Federal Treasury—refundable tax credits to help a state's low- and moderate-income residents buy insurance—if that state set up its own Exchange.

States rejecting the offer got a stick instead: the imposition of a federally-established, federally-operated Exchange in the state, with no subsidies at all.

3. As it turns out, a majority of states have declined to establish Exchanges. That choice has left the federal government with the burden of establishing Exchanges in those states, but without the burden of paying for premium-assistance subsidies to the residents of those states—just the balance that Congress struck.

4. Notwithstanding express statutory language limiting premium-assistance subsidies to Exchanges established by states, the Internal Revenue Service ("IRS") has promulgated a regulation ("the IRS Rule" or "the Subsidy Expansion Rule") purporting to authorize subsidies even in states with only federally-established Exchanges, thereby disbursing monies from the Federal Treasury in excess of the authority granted by the Act. The IRS Rule squarely contravenes the express text of the ACA, ignoring the clear limitations that Congress imposed on the availability of the federal subsidies. And the IRS promulgated the regulation without any reasoned effort to reconcile it with the contrary provisions of the statute.

5. While most subsidies benefit recipients, the ACA's subsidies actually serve to financially injure and restrict the economic choices of certain individuals. Some individuals would, but for their eligibility for federal subsidies, be exempt from the Act's individual mandate penalty under an exemption applicable to low- or moderate-income individuals for whom insurance is "unaffordable." For these people, the Subsidy Expansion Rule, by making insurance less "unaffordable," subjects them to the individual mandate's requirement to purchase costly, comprehensive health insurance that they otherwise would forgo. (The Act's subsidies do not usually cover 100% of insurance premiums.)

6. Furthermore, many employers would, but for their employees' eligibility for subsidies, be effectively exempt from the "assessable payments" imposed for failure to adhere to the Act's "employer mandate." That provision of the ACA imposes an assessable payment on certain businesses that do not offer their full-time employees the chance to enroll in employer-sponsored coverage that satisfies various statutory requisites. Critically, that payment is triggered only if such employees receive federal subsidies by purchasing coverage on an Exchange. Thus, the IRS Rule also has the effect of triggering the employer mandate payment for businesses in states that declined to establish their own Exchanges.

7. The IRS Rule's unauthorized subsidies would trigger these mandates and payments against Plaintiffs, who are individuals and businesses residing in states that have opted not to establish Exchanges. The Rule would block the individual Plaintiffs from satisfying the unaffordability exemption, thereby forcing them to purchase comprehensive, costly insurance that they do not want. And the Rule would expose the business Plaintiffs to payments under the employer mandate, thereby requiring them to offer comprehensive, ACA-compliant insurance that they do not want to sponsor. The IRS Rule thus injures all of these Plaintiffs.

8. Accordingly, Plaintiffs seek a declaratory judgment that the IRS Rule is illegal under the Administrative Procedure Act, and injunctive relief barring its enforcement.

## I. JURISDICTION AND VENUE

9. Because this action arises under the federal Administrative Procedure Act ("APA"), 5 U.S.C. § 706, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

10. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, Federal Rule of Civil Procedure 57, and Federal Rule of Civil Procedure 65.

11. Venue is proper in this Court under 28 U.S.C. § 1391(e)(l), because the defendants are officers and agencies of the United States and reside in this district.

## II.     PARTIES

12.    Plaintiff Jacqueline Halbig is a resident of the Commonwealth of Virginia, which has opted not to establish its own insurance Exchange.  She derives her income from her one-woman consulting practice.  Absent the IRS Rule, Halbig would (based on any realistic estimate of her expected income) fall within the unaffordability exemption to the individual mandate penalty in 2014.  But because the Subsidy Expansion Rule makes her eligible for a premium-assistance subsidy, she will be disqualified from that exemption and subject to the individual mandate penalty.  As a result, Halbig will be forced to either pay a penalty or purchase more insurance than she wants.  She is therefore injured by the IRS Rule, because it has the effect of either subjecting her to monetary sanctions or requiring her to alter her behavior to avoid those sanctions.  Further, either way, Halbig's financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

13.    Plaintiff David Klemencic is a resident of the State of West Virginia, which has opted not to establish its own insurance Exchange.  He derives his income from Ellenboro Floors, his sole proprietorship.  Absent the IRS Rule, Klemencic would (based on any realistic estimate of his expected income) fall within the unaffordability exemption to the individual mandate penalty in 2014.  But because the Subsidy Expansion Rule makes him eligible for a premium-assistance subsidy, he will be disqualified from that exemption and subject to the individual mandate penalty.  As a result, Klemencic will be forced to either pay a penalty or purchase more insurance than he wants.  He is therefore injured by the IRS Rule, because it has the effect of either subjecting him to monetary sanctions or requiring him to alter his behavior to avoid those sanctions.  Further, either way, Klemencic's financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

14. Plaintiff Carrie Lowery is a resident of the State of Tennessee, which has opted not to establish its own insurance Exchange. She derives her income as a freelance legal researcher. Absent the IRS Rule, Lowery would (based on any realistic estimate of her expected income) fall within the unaffordability exemption to the individual mandate penalty in 2014. But because the Subsidy Expansion Rule makes her eligible for a premium-assistance subsidy, she will be disqualified from that exemption and subject to the individual mandate penalty. As a result, Lowery will be forced to either pay a penalty or purchase more insurance than she wants. She is therefore injured by the IRS Rule, because it has the effect of either subjecting her to monetary sanctions or requiring her to alter her behavior to avoid those sanctions. Further, either way, Lowery's financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

15. Plaintiff Sarah Rumpf is a resident of the State of Texas, which has opted not to establish its own insurance Exchange. She derives her income as a public-relations consultant. Absent the IRS Rule, Rumpf would (based on any realistic estimate of her expected income) fall within the unaffordability exemption to the individual mandate penalty in 2014. But because the Subsidy Expansion Rule makes her eligible for a premium-assistance subsidy, she will be disqualified from that exemption and subject to the individual mandate penalty. As a result, Rumpf will be forced to either pay a penalty or purchase more insurance than she wants. She is therefore injured by the IRS Rule, because it has the effect of either subjecting her to monetary sanctions or requiring her to alter her behavior to avoid those sanctions. Further, either way, Rumpf's financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

16.     Plaintiff Innovare Health Advocates ("Innovare") is a Missouri professional corporation headquartered in Missouri, which has opted not to establish its own insurance Exchange.  Innovare is an internal medicine practice with 55 full-time employees committed to providing both care (to its patients) and insurance (to its employees) that improve health by devolving power and responsibility to individuals.  Absent the IRS Rule, Innovare would not be threatened by the employer mandate, because Missouri employees would not be eligible for federal subsidies and businesses in that State would therefore not be subject to assessable payments under the employer mandate.  Were it not subject to such payments, Innovare would be preparing to expand its consumer-driven health insurance plan to cover all full-time employees, which would very likely not comply with the ACA.  Innovare is therefore injured by the IRS Rule, because it has the effect of either exposing it to monetary sanctions or requiring it to alter its behavior in order to avoid those sanctions.  Innovare intends to avoid the sanctions by complying with the employer mandate.  Further, either way, Innovare's financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

17.     Plaintiffs GC Restaurants SA, LLC, Olde England's Lion & Rose, LTD, Olde England's Lion & Rose at Castle Hills, LTD, Olde England's Lion & Rose Forum, LLC, Olde England's Lion & Rose at Sonterra, LTD, and Olde England's Lion & Rose at Westlake, LLC, are Texas limited liability companies or limited partnerships headquartered in Texas, which has opted not to establish its own insurance Exchange.  These businesses ("the Restaurants") are under the common control of a single individual, J. Allen Tharp, so for purposes of the ACA they are treated (together with another corporation under Tharp's control) as a single employer with over 350 full-time employees.  Absent the IRS Rule, the Restaurants would not be threatened by the employer mandate, because Texas employees would not be eligible for federal subsidies and

6

businesses in that State would therefore not be subject to assessable payments under the employer mandate.  The Restaurants do not offer health insurance to many full-time employees and do not want to offer it to them in 2014, but that choice will expose the Restaurants to assessable payments under the employer mandate, given the IRS Rule.  The Restaurants are therefore injured by the IRS Rule, because it has the effect of either subjecting them to monetary sanctions or requiring them to alter their behavior to avoid those sanctions.  The Restaurants intend to avoid the sanctions by complying with the employer mandate.  Further, either way, the Restaurants' financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

18. Plaintiff Community National Bank ("the Bank") is an association headquartered in Kansas, which has opted not to establish its own insurance Exchange.  The Bank employs approximately 80 full-time employees.  Absent the IRS Rule, the Bank would not be threatened by the employer mandate, because Kansas employees would not be eligible for federal subsidies and businesses in that State would therefore not be subject to assessable payments under the employer mandate.  The Bank's directors object to certain morally offensive provisions of the ACA (such as its definition of contraceptive and abortifacient drugs as "preventive services") and have determined that the Bank would rather drop the health insurance it offers to its full-time employees than comply with those provisions.  However, such action would expose the Bank to assessable payments under the employer mandate, given the IRS Rule.  The Bank is therefore injured by the IRS Rule, because it has the effect of either subjecting it to monetary sanctions or requiring it to alter its behavior to avoid those sanctions.  The Bank intends to avoid the sanctions by complying with the employer mandate.  Further, either way, the Bank's financial strength and fiscal planning are immediately and directly affected by this exposure to costs and/or liabilities.

19. Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services. She is sued in her official capacity.

20. Defendant Jacob Lew is the Secretary of the U.S. Department of the Treasury. He is sued in his official capacity.

21. Defendant Steven Miller is the Acting Commissioner of Internal Revenue. He is sued in his official capacity.

22. Defendant U.S. Department of Health and Human Services ("HHS") is an executive agency of the United States within the meaning of the APA.

23. Defendant U.S. Department of the Treasury is an executive agency of the United States within the meaning of the APA.

24. Defendant Internal Revenue Service is an executive agency of the United States within the meaning of the APA.

25. Absent a declaration resolving the validity of the IRS Rule, Plaintiffs will be forced to either purchase or sponsor specific insurance that they otherwise would not purchase or sponsor, or expose themselves to financial penalties. The decision to purchase or sponsor ACA-compliant insurance for 2014 must be made this year, and so Plaintiffs' injuries are impending.

### III. STATUTORY AND REGULATORY BACKGROUND

#### A. The ACA Offers Subsidies Through State-Run Insurance Exchanges

26. The ACA regulates the individual market for health insurance primarily through insurance Exchanges organized along state lines. HHS describes an Exchange as "a mechanism for organizing the health insurance marketplace to help consumers and small businesses shop for coverage in a way that permits easy comparison of available plan options based on price, benefits and services, and quality." *Initial Guidance to States on Exchanges*, http://www.healthcare.gov/law/resources/regulations/guidance-to-states-on-exchanges.html (last visited May 1, 2013).

Participation in Exchanges also facilitates federal regulation of both insurers (who are subjected to numerous rules and requirements in order to sell their products on Exchanges) and individuals (who are required by the individual mandate to purchase comprehensive insurance policies).

27.     The Act provides that, by January 1, 2014, "[e]ach State shall . . . establish" an insurance exchange to "facilitate[] the purchase of qualified health plans." ACA § 1311(b)(1). But, under the Constitution's core federalism commands, the federal government cannot *compel* sovereign states to create Exchanges. The Act therefore also recognizes that some states may not be "electing State[s]," because they may not "elec[t] . . . to apply" HHS regulations for the "establishment and operation of Exchanges"; or they might otherwise "fai[l] to establish [an] exchange," ACA § 1321(a)–(c). It provides that if a state is "not an electing State" or if the HHS Secretary determines, "on or before January 1, 2013," that an "electing State . . . will not have any required Exchange operational by January 1, 2014," then the Secretary "shall . . . establish and operate such Exchange within the State." *Id.* § 1321(c). The federal government is therefore responsible for establishing and operating Exchanges in states that decline to do so.

28.     The Act encourages states to establish Exchanges with a variety of incentives, chiefly the premium-assistance subsidy for state residents purchasing individual health insurance through State-established Exchanges. The subsidy takes the form of a refundable tax credit paid directly by the Federal Treasury to the taxpayer's insurer as an offset against his premiums. *See* ACA §§ 1401, 1412. Targeted at low- and moderate-income individuals and families, the subsidy is available to households with incomes between 100 percent and 400 percent of the federal poverty line. *See* ACA § 1401(c)(1)(a). Under the 2013 federal poverty guidelines published by HHS, a single person with annual income between $11,490 and $45,960 would qualify for the subsidy. *See* Annual Update of the HHS Poverty Guidelines, 78 Fed. Reg. 5182 (Jan. 24, 2013).

29.     The payment of the subsidy is conditioned on the individual purchasing insurance through an Exchange established by a state.  The Act provides that a tax credit "shall be allowed" in a particular "amount," 26 U.S.C. § 36B(a), with that amount based on the monthly premiums for a "qualified health pla[n] offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent . . . of the taxpayer *and which were enrolled in through an Exchange established by the State under [§] 1311 of the Patient Protection and Affordable Care Act*," *id.* § 36B(b)(2)(A) (emphasis added).  Therefore there is no premium-assistance subsidy under the Act unless the citizen pays for insurance obtained through a State-established Exchange.  Confirming the point, the statute calculates the subsidy by looking to "coverage months," defined as months in which the taxpayer "is covered by a qualified health plan described in subsection (b)(2)(A) *that was enrolled in through an Exchange established by the State under section 1311 of the Patient Protection and Affordable Care Act*." 26 U.S.C. § 36B(c)(2)(A)(i) (emphasis added).  Again, unless the citizen has enrolled in a plan through a State-created Exchange established under § 1311 of the ACA, he gets no subsidy.

**B.     Federal Subsidies Trigger the Individual and Employer Mandate Payments**

30.     The availability of the subsidy triggers the Act's individual mandate penalty for many otherwise-exempt individuals.  That mandate requires all "applicable" individuals to obtain "minimum essential coverage."  ACA § 1501(d); 26 U.S.C. § 5000A(a).  Failure to comply with that requirement triggers a penalty.  26 U.S.C. § 5000A(b).  But that penalty does not apply to those "who cannot afford coverage."  *Id.* § 5000A(e)(1).  For an individual to fall within the unaffordability exemption, the annual cost of health insurance must exceed eight percent of his annual household income.  *Id.* § 5000A(e)(1)(A).  That cost is calculated as the annual premium for the cheapest insurance plan available in the Exchange in that person's state, minus "the credit allowable under section 36B [ACA § 1401(a)]."  *Id.* § 5000A(e)(1)(B)(ii).  In states that do not

establish their own Exchanges, no tax credit is "allowable." *Id.* Thus, by purporting to make the credit allowable in such states, the IRS Rule increases the number of people in those states subject to the individual mandate's penalty. Those persons would otherwise be free to buy inexpensive, high-deductible, catastrophic insurance (which is otherwise restricted by the Act to individuals under age 30) or to forgo insurance entirely, without being exposed to any penalties.

31. The availability of the subsidy also effectively triggers the assessable payments under the employer mandate. Specifically, the Act provides that any employer with 50 or more full-time employees will be subject to an "assessable payment" if it does not offer them the opportunity to enroll in affordable, employer-sponsored coverage. But the payment is only triggered if at least one full-time employee enrolls in a plan, offered through an Exchange, for which "an applicable premium tax credit … is allowed or paid." 26 U.S.C. § 4980H(a), (b). Thus, if no federal subsidies are available in a state because the state has not established its own Exchange, then employers in that state may offer their employees non-compliant insurance, or no insurance at all, without being exposed to any assessable payments under the Act.

### C. Thirty-Three States Decline To Establish Their Own Exchanges

32. Exercising the option granted by the Act (and required by the Constitution), thirty-three states have decided not to establish Exchanges. *See State Decisions For Creating Health Insurance Exchanges*, Kaiser State Health Facts, http://www.statehealthfacts.org/comparemaptable.jsp?ind=962&cat=17 (last visited May 1, 2013). Twenty-six states—including Kansas, Missouri, Tennessee, Texas, and Virginia—have opted out of the Exchange regime completely, *see id.*, while another seven—including West Virginia—have opted only to assist the federal government with its operation of federally-established Exchanges, *see id.*; *see also* Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans;

11

Exchange Standards for Employers, 77 Fed. Reg. 18,310, 18,325 (Mar. 27, 2012) (categorizing "partnership" Exchanges as federally-established).

### D. The IRS Promulgates a Regulation Ignoring the ACA's Limitations on Subsidies

33. Under the text of the Act, premium-assistance subsidies are not available in the thirty-three states with federally-established Exchanges. But the IRS has promulgated a rule requiring the Treasury to disburse subsidies in those states regardless. Specifically, the Rule states that subsidies shall be available to anyone "enrolled in one or more qualified health plans through an Exchange," and then defines "Exchange" to mean "a State Exchange, regional Exchange, subsidiary Exchange, *and Federally-facilitated Exchange*." *See* Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,378, 30,387 (May 23, 2012) (emphasis added). (Regional and subsidiary Exchanges are, like ordinary state Exchanges, established by states under § 1311 of the Act.)

34. The IRS justified its regulation with only the following short explanation:

> The statutory language of section 36B and other provisions of the Affordable Care Act support the interpretation that credits are available to taxpayers who obtain coverage through a State Exchange, regional Exchange, subsidiary Exchange, and the Federally-facilitated Exchange. Moreover, the relevant legislative history does not demonstrate that Congress intended to limit the premium tax credit to State Exchanges. Accordingly, the final regulations maintain the rule in the proposed regulations because it is consistent with the language, purpose, and structure of section 36B and the Affordable Care Act as a whole.

*Id.* at 30,378.

35. Under the IRS Rule, premium-assistance subsidies are thus available in the thirty-three states that declined to establish their own Exchanges. In turn, those subsides trigger the employer mandate payment for employers within those states and expand the reach of the individual mandate penalty for individuals residing in those states.

IV. **CLAIMS**

**COUNT I:**
**Rulemaking in Violation of the Administrative Procedure Act ("APA")**

36. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

37. The APA forbids agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). It further forbids agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

38. The ACA unambiguously restricts premium-assistance subsidies to state-established insurance Exchanges. The plain text of the statute makes subsidies available only to individuals who enroll in insurance plans "through an Exchange established by the State under [§] 1311 of the [Act]." 26 U.S.C. § 36B(b)(2)(A). But an exchange established by the federal government under the authority of § *1321* of the Act is not "an Exchange established by the State under [§] *1311* of the [Act]." The IRS's reading is contrary to the Act's plain language.

39. Congress understood the distinction between Exchanges established by a state under § 1311 of the Act and Exchanges established under other authority in the Act, and consciously distinguished between the two. For example, ACA § 1312(d)(3)(D) provides that

> after the effective date of this subtitle, the only health plans that the Federal Government may make available to Members of Congress and congressional staff with respect to their service as a Member of Congress or congressional staff shall be health plans that are—(I) created under this Act (or an amendment made by this Act); or (II) offered through *an Exchange established under this Act* (or an amendment made by this Act). (Emphasis added.)

40. By authorizing federal premium-assistance subsidies to individuals who do not qualify under the statute, the IRS Rule exceeds the agency's statutory authority and is arbitrary, capricious, and contrary to law.

41. Even assuming *arguendo* that the Act grants the IRS the discretion to authorize federal subsidies for individuals enrolled in plans from Exchanges not established by a state, the

13

statutory interpretation offered by the IRS in support of the Rule is arbitrary, capricious, unsupported by a reasoned basis, and contrary to law.

42. Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

43. Plaintiffs have no adequate remedy at law.

44. Defendants' action in promulgating the Subsidy Expansion Rule imposes a certainly impending harm on Plaintiffs that warrants relief.

V. **REQUESTS FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1. Enter a declaratory judgment that the IRS Rule violates the APA;

2. Enter a preliminary and permanent injunction prohibiting the application or enforcement of the IRS Rule; and

3. Award all other relief as the Court may deem just and proper, including any costs or fees to which Plaintiffs may be entitled by law.

Dated: May 2, 2013
Washington, District of Columbia

Respectfully submitted,
/s/ Michael A. Carvin
Michael A. Carvin (D.C. Bar No. 366784)
   macarvin@jonesday.com
Jacob M. Roth (D.C. Bar No. 995090)
   yroth@jonesday.com
Jonathan Berry (*application for admission pending*)
   jberry@jonesday.com

JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700

*Attorneys for Plaintiffs*