**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JACQUELINE HALBIG**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-00623-PLF |
| | ) | |
| **KATHLEEN SEBELIUS,** in her official capacity | ) | |
| as U.S. Secretary of Health and Human Services, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Page

Introduction...........................................................................................................................1

Argument ..............................................................................................................................3

I.     A Preliminary Injunction May Only Be Awarded Upon a Clear
Showing that the Plaintiff Is Entitled to Such Relief ...........................................................3

II.    Threshold Barriers Bar Klemencic from Seeking a Preliminary
Injunction ..............................................................................................................................4

      A.     Klemencic Lacks Article III Standing .....................................................................4

      B.     Additional Threshold Barriers Bar Klemencic's Claims .........................................6

III.   Klemencic Is Not Likely to Succeed on the Merits ..............................................................6

      A.     The Treasury Regulation Is Entitled to *Chevron* Deference...................................6

      B.     The Affordable Care Act Is Best Read to Provide that Participants
            in Federally-Facilitated Exchanges Are Eligible for Federal
            Premium Tax Credits ...............................................................................................7

            1.     Section 36B, When Read Together with 42 U.S.C. §§ 18031
                  and 18041, Provides that Participants in Federally-Facilitated
                  Exchanges Are Eligible for Federal Premium Tax Credits .........................7

            2      The Structure of the Affordable Care Act Confirms that
                  Participants in Federally-Facilitated Exchanges Are Eligible
                  for Federal Premium Tax Credits ..............................................................13

            3.     The Legislative History of the Affordable Care Act Confirms
                  that Participants in Federally-Facilitated Exchanges Are Eligible
                  for Federal Premium Tax Credits ..............................................................20

            4.     The Purposes of the Affordable Care Act Confirms that
                  Participants in Federally-Facilitated Exchanges Are Eligible
                  for Federal Premium Tax Credits ..............................................................23

      C.     The Treasury Department Has Reasonably Interpreted Section 36B
            to Provide for Tax Credits for Participants in Federally-Facilitated
            Exchanges Premium Tax Credits............................................................................27

IV.   Klemencic Suffers No Irreparable Injury from the Treasury Regulation .........................27

V.      The Public Interest and the Balancing of the Equities Weigh Heavily
        Against Issuing a Preliminary Injunction ..........................................................................30

Conclusion .........................................................................................................................32

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page**

\* *Adoptive Couple v. Baby Girl*,
    133 S. Ct. 2552 (2013) ......................................................................................13, 18

*Alliance 3PL Corp. v. New Prime, Inc.*,
    614 F.3d 703 (7th Cir. 2010) ........................................................................10

*Apache Bend Apartments, Ltd. v. United States*,
    987 F.2d 1174 (5th Cir. 1993) ......................................................................31

*Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*,
    548 U.S. 291 (2006)......................................................................................11

*Bloomberg L.P. v. CFTC*,
    --- F. Supp. 2d ---, 2013 WL 2458283 (D.D.C. June 7, 2013) ...........................4

*Bob Jones Univ. v. Simon*,
    416 U.S. 725 (1974).....................................................................................29

\* *Burnet v. Harmel*,
    287 U.S. 103 (1932).......................................................................................8

*Califano v. Yamasaki*,
    442 U.S. 682 (1979).....................................................................................30

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006).....................................................................29

\* *Chevron U.S.A. Inc. v. Natural Resources Defense Council*,
    467 U.S. 837 (1984)..................................................................................6, 27

*Chisom v. Roemer*,
    501 U.S. 380 (1991).....................................................................................19

\* *City of Arlington v. FCC*,
    133 S. Ct. 1863 (2013)..............................................................................7, 27

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995).........................................................................4

\* *Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013)...................................................................................5

*Clarke v. OFHEO*,
    355 F. Supp. 2d 56 (D.D.C. 2004) ......................................................................28

*Coalition for Common Sense in Gov't Procurement v. United States*,
    576 F. Supp. 2d 162 (D.D.C. 2008) ....................................................................27

*Cornish v. Dudas*,
    540 F. Supp. 2d 61 (D.D.C. 2008) ......................................................................30

*Davenport v. Int'l Bhd. of Teamsters*,
    166 F.3d 356 (D.C. Cir. 1999) ...............................................................................3

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .............................................................................3

*Estate of Hutchinson v. Commissioner*,
    765 F.2d 665 (7th Cir. 1985) ...............................................................................23

*Fed. Power Comm'n v. Memphis Light, Gas & Water Div.*,
    411 U.S. 458 (1973) ............................................................................................23

\* *Fund for Animals, Inc. v. Kempthorne*,
    472 F.3d 872 (D.C. Cir. 2006) ....................................................................12, 14

*Gatlin Oil Co. v. United States*,
    169 F.3d 207 (4th Cir. 1999) ...............................................................................10

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010) ..............................................................................................9

*Grocery Mfrs. Ass'n v. EPA*,
    693 F.3d 169 (D.C. Cir. 2012), *reh'g denied*, 704 F.3d 1005 (D.C. Cir. 2013),
    *cert. denied*, 133 S. Ct. 2880 (2013) ...................................................................5

*Gulf Oil Corp. v. Dep't of Energy*,
    514 F. Supp. 1019 (D.D.C. 1981) ......................................................................28

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ..............................................................................................9

*Henderson v. United States*,
    133 S. Ct. 1121 (2013) ........................................................................................12

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008) ........................................................................28

iv

*Holiday CVS, L.L.C. v. Holder,*
    839 F. Supp. 2d 145 (D.D.C. 2012)................................................................29

*Jerome v. United States,*
    318 U.S. 101 (1943)................................................................................8

*Judicial Watch, Inc. v. Dep't of Homeland Security,*
    514 F. Supp. 2d 7 (D.D.C. 2007)................................................................28

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
    543 U.S. 50 (2004)................................................................................19

* *Maracich v. Spears,*
    133 S. Ct. 2191 (2013)........................................................................13, 24

*Marx v. General Revenue Corp.,*
    133 S. Ct. 1166 (2013)........................................................................11

*Mayo Found. for Med. Educ. & Research v. United States,*
    131 S. Ct. 704 (2011)................................................................................6

* *Miller v. Clinton,*
    687 F.3d 1332 (D.C. Cir. 2012)................................................................10

*Miller v. United States,*
    65 F.3d 687 (8th Cir. 1995)................................................................23

* *Mississippi Band of Choctaw Indians v. Holyfield,*
    490 U.S. 30 (1989)................................................................................8, 24

*NLRB v. Hearst Publications, Inc.,*
    322 U.S. 111 (1944)................................................................................24

*Nat'l Fed'n of Indep. Business v. Sebelius,*
    132 S. Ct. 2566 (2012)........................................................................17

*Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.,*
    435 F.3d 326 (D.C. Cir. 2006)................................................................30

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976)................................................................................5

*Plaut v. Spendthrift Farm, Inc.,*
    514 U.S. 211 (1995)................................................................................14

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ...................................................................................3

*\* United States v. Irvine,*
    511 U.S. 224 (1994) ...........................................................................................8, 13, 23

*United States v. Joseph,*
    716 F.3d 1273 (9th Cir. 2013) ......................................................................10, 11

*United States v. Pelzer,*
    312 U.S. 399 (1941) ...........................................................................................8

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am.,*
    508 U.S. 439 (1993) ...........................................................................................13

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) ...........................................................................................3, 4, 30

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ......................................................................4, 28

**Statutes:**

\* 26 U.S.C. § 36B .............................................................................................*passim*

26 U.S.C. § 36B(b) ...........................................................................................8, 9, 11

26 U.S.C. § 36B(c) ...........................................................................................8

\* 26 U.S.C. § 36B(f) ...........................................................................................11, 12

26 U.S.C. § 4980H ...........................................................................................17

26 U.S.C. § 5000A ...........................................................................................3, 17, 29

26 U.S.C. § 7422 ...........................................................................................29

26 U.S.C. § 7805(b) ...........................................................................................31

\* 42 U.S.C. § 300gg-91(d) ...........................................................................................10, 16

42 U.S.C. § 1320b-23(a) ...........................................................................................18

42 U.S.C. § 1396a(a) ...........................................................................................16

\* 42 U.S.C. § 1396a(gg) ...........................................................................................17

42 U.S.C. § 1396w-3(b) ............................................................................................18

42 U.S.C. § 1397ee(d) ..............................................................................................18

42 U.S.C. § 18023(a) ................................................................................................16

* 42 U.S.C. § 18031 .......................................................................................... *passim*

42 U.S.C. § 18031(b) ..................................................................................................9

* 42 U.S.C. § 18031(d) ..............................................................................................15

42 U.S.C. § 18031(f) .................................................................................................11

42 U.S.C. § 18032(a) ................................................................................................13

42 U.S.C. § 18032(d) ................................................................................................14

* 42 U.S.C. § 18032(f) ..............................................................................................14

* 42 U.S.C. § 18041 .......................................................................................... *passim*

* 42 U.S.C. § 18041(c) .................................................................................2, 9, 11, 12

42 U.S.C. § 18044 ....................................................................................................17

42 U.S.C. § 18051(d) ................................................................................................19

42 U.S.C. § 18052(a) ................................................................................................17

42 U.S.C. § 18052(b) ................................................................................................17

42 U.S.C. § 18054(c) ................................................................................................18

42 U.S.C. § 18081(a) ................................................................................................15

42 U.S.C. § 18083(b) ................................................................................................15

42 U.S.C. § 18083(e) ................................................................................................15

* 42 U.S.C. § 18111 ..............................................................................................11, 16

Pub. L. No. 111-148, § 1563(a), 124 Stat. 119, 270-71 (2010) ...................................21

Pub. L. No, 111-152, § 1001(a), 124 Stat. 1029, 1030-31 (2010) ...............................20

**Rules and Regulations:**

\* 26 C.F.R. § 1.36B-1(k) ....................................................................................4, 6, 27

\* 77 Fed. Reg. 30,377 (May 23, 2012) ..................................................................27

**Miscellaneous:**

\* Black's Law Dictionary (9th ed. 2009) ................................................................9

Brief for Private Petitioners on Severability, *Nat'l Fed'n of Indep. Business v. Sebelius*,
132 S. Ct. 2566 (2012) (Nos. 11-393 & 11-400), 2012 WL 72440..................................26

\* Congressional Budget Office, *An Analysis of Health Insurance Premiums Under the*
*Patient Protection and Affordable Care Act* (Nov. 30, 2009) ...........................................21

Congressional Budget Office, *Effects on Health Insurance and the Federal Budget for the*
*Insurance Coverage Provisions in the Affordable Care Act: May 2013 Baseline*
(May 14, 2013)......................................................................................................24

Congressional Budget Office, *Expanding Health Insurance Coverage and Controlling*
*Costs for Health Care: Testimony Before the S. Comm. on the Budget* (Feb. 10,
2009) ....................................................................................................................25

155 Cong. Rec. S12,358 (Dec. 4, 2009) (Sen. Bingaman) ...........................................22

155 Cong. Rec. S12,543 (Dec. 6, 2009) (Sen. Coburn)...............................................22

155 Cong. Rec. S12,764 (Dec. 9, 2009) (Sen. Baucus)...............................................21

155 Cong. Rec. S13,375 (Dec. 17, 2009) (Sen. Johnson)............................................22

155 Cong. Rec. S13,559 (Dec. 20, 2009) (Sen. Durbin) ............................................21

155 Cong. Rec. S13,733 (Dec. 22, 2009) (Sen. Landrieu) ..........................................22

156 Cong. Rec. H2207 (Mar. 22, 2010) (Rep. Burgess) ............................................22

Editorial, *Don't Trust States to Create Health Care Exchanges*, USA Today, Jan. 4, 2010,
available at 2010 WLNR 148256 ...................................................................22

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H.*
*Comm. on Ways and Means*, 111th Cong. (Apr. 22, 2009) ..............................................25

\* H.R. 3962, 111th Cong. (2009):

    § 301........................................................................................................19

    § 308........................................................................................................19

    § 341........................................................................................................19

\* *H.R. 4872, the Reconciliation Act of 2010: Hearing Before the H. Comm. on Rules*

    (Mar. 20, 2010) ..................................................................................26

\* H.R. Rep. No. 111-443 (2010)...........................................................................14, 24

\* Joint Committee on Taxation, *Technical Explanation of the Revenue Provisions of the*

    *"Reconciliation Act of 2010," as Amended, in Combination with the "Patient*

    *Protection and Affordable Care Act"* (Mar. 21, 2010)......................................22

Jonathan Gruber, *Health Care Reform Is a "Three-Legged Stool": The Costs of Partially*

    *Repealing the Affordable Care Act* (Center for American Progress Aug. 2010)...............25

Letter from Douglas W. Elmendorf, Director, Congressional Budget Office, to Rep.

    Darrell Issa, Chairman, Committee on Oversight and Government Reform, U.S.

    House of Representatives (Dec. 6, 2012)........................................................21

\* 2 New Shorter Oxford English Dictionary (4th ed. 1993).............................................10

\* Random House Dictionary of the English Language (2d ed. 1987)...........................................10

\* S. Rep. No. 111-89 (2009).............................................................................20, 24

Thomas Buchmueller, Colleen Carey, and Helen G. Levy, *Will Employers Drop Health*

    *Insurance Coverage Because of the Affordable Care Act?*, 32 Health Affairs 1522

    (Sept. 2013)...............................................................................32

\* Webster's Third New International Dictionary (1961)..............................................10

**Introduction**

The Affordable Care Act provides for federal premium tax credits that will assist millions of low- and moderate-income Americans in the purchase of health insurance through the newly-created Exchanges.   26 U.S.C. § 36B.   The movant here, David Klemencic, argues that the Act does not provide for tax credits for those individuals who obtain health insurance through federally-facilitated Exchanges.   Klemencic now seeks a preliminary injunction that would prevent the Treasury Department from awarding Section 36B tax credits to persons, such as himself, who would participate in a federally-facilitated Exchange.   He is not entitled to this extraordinary relief.

As an initial matter, for the reasons that the defendants have explained in prior briefing, Klemencic lacks standing to bring this claim.   After applying the federal premium tax credit for which he is eligible, he would pay less than twenty dollars a month for qualifying comprehensive coverage on the Exchange.   He asserts that he would prefer instead to pay hundreds of dollars more per month for less generous coverage under a catastrophic plan, because he opposes the receipt of government subsidies.   But this assertion does not state any injury to anything other than his ideological opposition to such government benefits, and that is not a legally cognizable injury.   Given his lack of standing, as well as the numerous additional threshold barriers to his claim that the defendants have previously discussed, his complaint should be dismissed.

In any event, Klemencic is not entitled to a preliminary injunction, because he is not likely to succeed on the merits.   Instead, he is certain to fail.   He admits that, if a state runs an Exchange, individuals can obtain federal tax credits for the insurance they purchase on the Exchange.   But he asserts that, if the *federal* government itself runs an Exchange, the same

1

individuals cannot receive these *federal* tax credits.   That assertion defies common sense, and ignores Congress's specification in 42 U.S.C. § 18041(c)(1) that the federally-facilitated Exchange would be the *same* entity as the Exchange that the Act contemplated that the state would create.   Treasury's reading of the Act gives effect to this provision, and avoids a series of anomalies that would be created if Klemencic's theory were accepted.   Most notably, under his theory, not only would federal premium tax credits be unavailable on the federally-facilitated Exchange, but no person could meet the statutory definition for eligibility to buy coverage (subsidized or not) under a plan offered on the federally-facilitated Exchange.   Congress plainly did not intend this result.

Moreover, the relevant legislative history reveals that Congress intended the Section 36B premium tax credits to be available nationwide; indeed, Klemencic fails to cite any evidence that his contrary theory was ever contemplated by any legislator.   Most fundamentally, his theory runs contrary to the basic purpose of the ACA, which is to expand the availability of affordable health coverage.   Federal premium tax credits are a central feature of the system that Congress established to achieve this goal, and it is simply not plausible to contend that Congress intended these tax credits to be available in some states but not in others.   Treasury, then, adopted a permissible construction of Section 36B to provide for eligibility for tax credits for participants on any Exchange, and this Court should defer to that construction.

In any event, Klemencic cannot satisfy the remaining elements for a preliminary injunction.   He has not shown that he suffers any injury at all, let alone the great and certain injury required for a preliminary injunction.   And he has an available remedy, namely, the pursuit of a tax refund action to contest any potential liability he might incur under the ACA's

minimum coverage provision, 26 U.S.C. § 5000A.   Moreover, the public interest and the balance of the equities weigh heavily against granting the relief that Klemencic requests, that is, an order that would interfere with the process of tax administration by attempting to adjudicate the tax liabilities of millions of individuals not present in this suit.[1]

<u>Argument</u>

## I.    A Preliminary Injunction May Only Be Awarded Upon a Clear Showing that the Plaintiff Is Entitled to Such Relief

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."   *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).   "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest."   *Id.* at 20.   Before the Supreme Court's decision in *Winter*, some courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another.   *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).   The D.C. Circuit has reasoned, without directly deciding, that the "sliding scale" test is no longer valid in light of *Winter*, and that plaintiffs now face a "more demanding burden" requiring them to independently demonstrate both a likelihood of success on the merits and irreparable harm.   *See Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

---

[1]   The defendants respectfully refer the Court to their motion to dismiss for a discussion of the background of the relevant provisions of the ACA and of this lawsuit.   *See* Defs.' Mem. in Supp. of Mot. to Dismiss at 4-15 (ECF 23-1).

Even under the "sliding scale" test, however, it is well established that, if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.   *See Winter*, 555 U.S. at 22; *see also CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*) ("We believe that analysis of the [irreparable harm] factor disposes of these motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").   In addition, before considering whether to award a preliminary injunction, the court must first assure itself that the plaintiff has standing to sue, and that no other threshold barriers bar his claim for relief. *See, e.g.*, *Bloomberg L.P. v. CFTC*, --- F. Supp. 2d ---, 2013 WL 2458283, at *18 (D.D.C. June 7, 2013).

Here, Klemencic lacks standing, and numerous additional threshold barriers preclude him from pursuing his claims in this action.   Nor could he satisfy any of the elements required for a preliminary injunction.   He is not likely to succeed on his legal theory; instead, he is certain to fail.   He suffers no injury at all, irreparable or otherwise, from the regulation that he challenges. And the public interest and the balance of the equities weigh heavily against injunctive relief.

## II.   Threshold Barriers Bar Klemencic from Seeking a Preliminary Injunction

### A.   Klemencic Lacks Article III Standing

The defendants have previously explained that Klemencic lacks constitutional standing to challenge the Treasury regulation at issue here, 26 C.F.R. § 1.36B-1(k).   He argues that he would be harmed by the federal premium tax credits that are available to him under Treasury's interpretation of the ACA.   He reasons that his eligibility for those tax credits would make

insurance affordable for him, thereby depriving him of eligibility to purchase a catastrophic insurance plan, instead of the more comprehensive plans available to him under the ACA.   But one such comprehensive coverage plan, a bronze-level plan on West Virginia's Exchange, would cost Klemencic no more than $18 per month, after the application of the federal premium tax credit.   Declaration of Donald Moulds, ¶¶ 4-5 (attached as Exhibit 1).   Klemencic's desire to spend far more – about $340 per month – to obtain less generous coverage in a catastrophic plan, rather than spending less money to gain more comprehensive coverage in a bronze plan, is not a legally cognizable injury.   *See, e.g., Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).   *See also* Defs.' Reply Mem. in Supp. of Mot. to Dismiss ("MTD Reply") at 4 (ECF 29).

In his preliminary injunction briefing, Klemencic attempts to defend his standing by arguing that the amount of the subsidy he would receive under Section 36B is "speculative." Mot. for Prelim. Inj. at 9 (ECF 30).   But it is not the defendants' burden to prove that harm could not possibly occur; instead, the plaintiff bears the burden to show that his claimed injury is not "speculative."   *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012), *reh'g denied*, 704 F.3d 1005 (D.C. Cir. 2013), *cert. denied*, 133 S. Ct. 2880 (2013).   In other words, the "threatened injury must be *certainly impending* to constitute injury in fact."   *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis in original).   Klemencic can allege no such certainly impending injury.   He accordingly lacks standing to seek a preliminary injunction, or to proceed on his complaint at all.

### B.    Additional Threshold Barriers Bar Klemencic's Claims

Article III standing is not the only barrier to Klemencic's claims here.   As the defendants have explained, additional threshold barriers prohibit him from challenging the

5

Treasury regulation.   He lacks prudential standing to raise such a challenge, given that his purpose in doing so, to make insurance unaffordable, is diametrically at odds with Congress's purpose in enacting Section 36B.   Further, his claims are not ripe, given that the regulation that he challenges has not yet been applied to his circumstances, and he suffers no hardship from the deferral of the adjudication of his claims.   In addition, insofar as he protests about his potential liability under the minimum coverage provision, he must proceed under the form of action that Congress provided, a federal tax refund action, to dispute that liability.   And to the extent he seeks a certificate of exemption from the Exchange, he must at a minimum exhaust his administrative remedies before bringing an APA action.   The defendants respectfully refer the Court to their briefing on their motion to dismiss for a fuller discussion of these points.   *See* Defs.' Mem. in Supp. of Mot. to Dismiss at 22-35 (ECF 23-1); MTD Reply at 8-20.

**III.      Klemencic Is Not Likely to Succeed on the Merits**

**A.      The Treasury Regulation Is Entitled to *Chevron* Deference**

The Treasury Department has interpreted 26 U.S.C. § 36B to provide that participants in any of the Exchanges, whether state-operated or federally-facilitated, may be eligible for federal premium tax credits.   26 C.F.R. § 1.36B-1(k).   The regulation is entitled to deference so long as the Treasury Department did not exceed the expansive scope of its rulemaking authority.   *See Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 714 (2011).   The familiar two-step framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), governs the Court's resolution of this question.

Under this test, "[f]irst, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue.   If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."   *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (internal quotation omitted).   "But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."   *Id.* (internal quotation omitted).   In other words, no matter whether the case involves a "big, important" issue or a "humdrum, run-of-the-mill" one, "the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*."   *Id.* (emphasis in original).

Here, Congress did not express any intent to deprive residents of states with federally-facilitated Exchanges of federal premium tax credits.   Instead, the better reading of the Affordable Care Act – and certainly, at minimum, a permissible reading of the Act – is that Congress provided that participants in any of the Exchanges could be eligible for these tax credits.   Klemencic, then, is unlikely to prevail on the merits of his claim.

**B.    The Affordable Care Act Is Best Read to Provide that Participants in Federally-Facilitated Exchanges Are Eligible for Federal Premium Tax Credits**

**1.    Section 36B, When Read Together with 42 U.S.C. §§ 18031 and 18041, Provides that Participants in Federally-Facilitated Exchanges Are Eligible for Federal Premium Tax Credits**

Klemencic contends that 26 U.S.C. § 36B conditions a taxpayer's eligibility for federal premium tax credits on whether that taxpayer's state government has created a state-operated Exchange; in his view, participants in federally-facilitated Exchanges are ineligible for these federal tax credits.   But, "in the absence of a plain indication to the contrary," it must be

7

assumed that "Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (internal quotation omitted).   The courts presume that "federal statutes are generally intended to have uniform nationwide application," *id.*, so as to avert "the danger that 'the federal program would be impaired if state law were to control,'" *id.* at 44 (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943)).   This principle applies with special force to federal taxation statutes such as Section 36B.   "'[T]he revenue laws are to be construed in the light of their general purpose to establish a nationwide scheme of taxation uniform in its application.'" *United States v. Irvine*, 511 U.S. 224, 238 (1994) (quoting *United States v. Pelzer*, 312 U.S. 399, 402-03 (1941)).   Thus, "[s]tate law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Burnet v. Harmel*, 287 U.S. 103, 110 (1932); *see also Irvine*, 511 U.S. at 238-39.

Klemencic purports to find "express language" in support of his theory in 26 U.S.C. § 36B(b)(2)(A), which limits the amount of the credits to no more than the amount of premiums for a qualified health plan in which the taxpayer (or a spouse or family member) is "enrolled in through an Exchange established by the State under [42 U.S.C. § 18031, *i.e.*, Section] 1311 of the Patient Protection and Affordable Care Act."   26 U.S.C. § 36B(b)(2)(A); *see also* 26 U.S.C. § 36B(c)(2)(A).   Because the federal government will operate the Exchange in West Virginia in collaboration with state officials, Klemencic reasons, he will not enroll in an "Exchange established by the State," and the amount of his tax credit under the Section 36B(b)(2)(A) formula will necessarily be zero.

But "[c]ourts have a 'duty to construe statutes, not isolated provisions.'"   *Graham Cnty.*

*Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)).   Klemencic errs by reading Section 36B(b)(2)(A) in isolation.   Section 36B, read in full and in conjunction with other provisions in the Affordable Care Act, leaves no doubt that federal premium tax credits are available both for state-operated Exchanges and for federally-facilitated Exchanges.   The provision referenced in Section 36B(b)(2)(A), 42 U.S.C. § 18031, declares that "[e]ach State shall … establish an American Health Benefit Exchange (referred to in this title as an 'Exchange') for the State" that meets certain statutory requirements.   42 U.S.C. § 18031(b)(1). Despite this use of the term "shall," however, the Act does not impose any sanction if a state elects not to establish an Exchange that complies with federal standards.   Instead, the Act directs that, if a state will "not have any required Exchange operational by January 1, 2014, … the Secretary shall (directly or through agreement with a not-for-profit entity) establish and operate *such Exchange* within the State[.]"   42 U.S.C. § 18041(c)(1) (emphasis added).   This language makes clear that Congress intended the federally-facilitated Exchange to constitute the referenced state-operated Exchange.   In other words, the federal government would stand in the shoes of the state when operating "such Exchange."

Klemencic disputes this point, arguing that "[i]f an entity is 'stepping into the shoes' of another entity, they are necessarily separate."   No.   Congress's use of the phrase "such Exchange" *does not* mean that the federally-facilitated Exchange and the state-operated Exchange are "necessarily separate."   The phrase means, instead, that the federally-facilitated Exchange is the *same entity* as the earlier-referenced Exchange, that is, the Exchange contemplated under 42 U.S.C. § 18031.   *See* Black's Law Dictionary 1570 (9th ed. 2009)

9

("such" means "[t]hat or those; having just been mentioned"); *see also* Webster's Third New International Dictionary 2283 (1961) ("something previously characterized or specified"); Random House Dictionary of the English Language 1899 (2d ed. 1987) ("being the person or thing or the persons or things indicated"); 2 New Shorter Oxford English Dictionary 3129 (4th ed. 1993) ("the person(s) or thing(s) specified or implied contextually; spec. the aforesaid thing or things; it, they, them; that, those").

"Read in context," then, the federally-facilitated Exchange "*must be the same* ['Exchange'] mentioned at the beginning of [the provision] ….   Indeed, because there are no other ['Exchanges'] mentioned in the section, there is no other antecedent to which the word 'such' could refer."   *Miller v. Clinton*, 687 F.3d 1332, 1344 (D.C. Cir. 2012) (emphasis added). Indeed, Congress frequently uses the term "such" to show that a person or thing is the same entity as the person or thing that it had described before.   *See, e.g.*, *United States v. Joseph*, 716 F.3d 1273, 1278 (9th Cir. 2013) ("'such' means 'the specific'"); *Alliance 3PL Corp. v. New Prime, Inc.*, 614 F.3d 703, 707 (7th Cir. 2010) ("such" is "legalese for the proposition that 'this use of the word "traffic" refers to the same "traffic" that this clause already mentioned'"); *Gatlin Oil Co. v. United States*, 169 F.3d 207, 210-11 (4th Cir. 1999) (agency's treatment of "the term 'such incident' to mean the same incident previously mentioned in statutory text … is permissible because it is grammatically correct and it accommodates the purpose of the Act").

If there were any doubt on this score, the ACA's definitional provisions would resolve that doubt.   For each use of the term "Exchange" in Title I of the ACA (which includes 42 U.S.C. § 18041), that term "means an American Health Benefit Exchange established under [42 U.S.C. § 18031]."   42 U.S.C. § 300gg-91(d)(21) (defining term for purpose of Public Health

Services Act); *see* 42 U.S.C § 18111 (incorporating this definition for Title I of ACA).    Thus, in

light of the fact that "Exchange" is a defined term of art in the ACA, Section 18041(c)(1) reads,

"the Secretary shall … establish and operate such [American Health Benefit Exchange

established under 42 U.S.C. § 18031]."    42 U.S.C. § 18041(c)(1).    The Exchange established

by the federal government, then, *is* the Section 18031 Exchange.    Klemencic's contrary reading

fails to give effect either to the ACA's definitional provisions, or to Section 18041's use of the

term "such," and that reading should be rejected.    *See Joseph*, 716 F.3d at 1278 (rejecting

interpretation that would render the term "such" superfluous).[2]

Further confirmation is provided within 26 U.S.C. § 36B itself.    That provision directs

"each Exchange (or any person carrying out 1 or more responsibilities of an Exchange under [42

U.S.C. § 18031(f)(3) or 42 U.S.C. § 18041(c)])" to provide certain information to the Treasury

Department and to taxpayers, including "the aggregate amount of any advance payment" of tax

credits or cost-sharing reductions that the taxpayer receives under the ACA, and "any

information provided to the Exchange, including any change of circumstances, necessary to

determine eligibility for, and the amount of, such credit."    26 U.S.C. § 36B(f)(3).[3]    This

---

[2]   Klemencic's theory relies almost entirely on the canon against surplusage.    He contends that
an isolated reading of Section 36B(b)(2)(A) is necessary to give effect to that provision's use of
the phrase "established by a State under [42 U.S.C. § 18031]."    P.I. Mem. at 7.    But, as the
Supreme Court has noted with considerable understatement, "instances of surplusage are not
unknown" in federal statutes.    *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291,
299 n.1 (2006).    In any event, "the canon against surplusage assists only where a competing
interpretation gives effect to every clause and word of a statute."    *Marx v. General Revenue
Corp.*, 133 S. Ct. 1166, 1177 (2013) (internal quotation omitted).    Klemencic does not offer
such an interpretation, so the canon does not help his argument here.    *See also* note 4, *infra*.

[3]   42 U.S.C. § 18031(f)(3), referenced in the text quoted above, permits an Exchange to contract
with an outside entity to perform one or more of the Exchange's responsibilities.    Likewise, 42
U.S.C. § 18041(c) permits the Secretary of Health and Human Services to contract with a

provision's cross-reference to 42 U.S.C. § 18041(c) makes clear that Congress used the term "Exchange" to include the Exchange operated by the federal government under that provision, and that it intended that taxpayers would receive federal tax credits and cost-sharing reductions when purchasing insurance on that Exchange.

Under Klemencic's reading, by contrast, Section 36B(f)(3) would direct the federally-facilitated Exchange to perform an empty act; in his view, the "amount of such credit," and "the aggregate amount of any advance payment" of such credit to be reported would necessarily always be zero.   It is not plausible to contend that Congress intended to require the federally-facilitated Exchange to report information that it thought would not exist.   "That plaintiffs interpret [Section 36B(f)(3)] to be an empty gesture is yet another indication that their submission is erroneous."   *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 878 (D.C. Cir. 2006).   *See also Henderson v. United States*, 133 S. Ct. 1121, 1131 (2013) (Scalia, J., dissenting) ("A rudimentary principle of textual interpretation – so commonsensical that it scarcely needs citation – is that if one interpretation of an ambiguous provision causes it to serve a purpose consistent with the entire text, and the other interpretation renders it pointless, the former prevails.").

In sum, Section 36B must be read in its entirety, and it must also be read in conjunction with the provisions of the ACA describing the Exchange, 42 U.S.C. §§ 18031 and 18041, as well as the ACA's definitional provisions.   When these provisions are read together and as a whole, they make plain that Congress envisioned the federally-facilitated Exchange to be the same entity as the state-operated Exchange, and that it intended Section 36B "to establish a nationwide

---

non-profit entity to perform the Exchange's responsibilities.

scheme of taxation uniform in its application," *Irvine*, 511 U.S. at 238 (internal quotation omitted), in which participants in any Exchange in any of the states would be eligible to receive federal premium tax credits.

> **2.    The Structure of the Affordable Care Act Confirms that Participants in Federally-Facilitated Exchanges Are Eligible for Federal Premium Tax Credits**

The larger structure of the ACA confirms this result.    The Supreme Court has repeatedly stressed that "an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning."    *Maracich v. Spears*, 133 S. Ct. 2191, 2203 (2013).    Statutory construction, then, "at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter."    *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 455 (1993).    In other words, "statutory construction is a holistic endeavor," and "a provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme."    *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2563 (2013) (internal quotation and alteration omitted).    In this case, the larger structure of the ACA confirms that Congress intended that the federally-facilitated Exchange would constitute the state-operated Exchange, and that participants in either version of the Exchange would be eligible for federal premium tax credits.    Klemencic's contrary reading would upset the framework of the ACA in a number of ways.

*First*, under Klemencic's theory, no individual could meet the statutory definition for eligibility to buy insurance offered on the federally-facilitated Exchange.    The ACA provides that "[a] qualified individual may enroll in any qualified health plan available to such individual and for which such individual is eligible."    42 U.S.C. § 18032(a)(1).    For this purpose,

however, a "qualified individual" is defined to mean an individual "who resides in the State that

established the Exchange."   42 U.S.C. § 18032(f)(1)(A)(ii).   Under Klemencic's reading, then,

nobody would be a "qualified individual" in a state with a federally-facilitated Exchange.[4]

Obviously, Congress did not intend this result.   It designed the Exchange, after all, to serve "as

an organized and transparent marketplace for the purchase of health insurance."   H.R. Rep. No.

111-443, pt. II, at 976 (2010).   Congress certainly would not have gone to the trouble of

directing the Secretary of Health and Human Services to create a federally-facilitated Exchange,

if that Exchange could serve only as a Potemkin marketplace.   "[C]ourts presume that Congress

has used its scarce legislative time to enact statutes that have some legal consequence."   *Fund*

*for Animals*, 472 F.3d at 877; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 216 (1995)

(interpretation that would leave a statutory provision "utterly without effect" is "a result to be

avoided if possible").[5]

*Second*, even if it were to be assumed that health coverage could be purchased by

qualified individuals on the federally-facilitated Exchange under Klemencic's theory, that

Exchange still would not be able to perform a number of the functions that Congress charged it

with.   The ACA sets forth a number of responsibilities that Exchanges must fulfill, and a

---

[4]  It would follow, moreover, that the language in Section 36B that Klemencic relies upon is surplusage even under his theory.   If residents of a state with a federally-facilitated Exchange could not enroll for coverage in their Exchange, they could not obtain tax credits for that coverage, and it would be unnecessary for Congress to specify also that the applicant must enroll in a plan on an Exchange "established by the State under [42 U.S.C. § 18031]."   An interpretation that compounds, rather than resolves, any surplusages in the Act is not a reading that is compelled by the Act's plain language.   *See* note 2, *supra*.

[5]  Moreover, Klemencic could enroll in catastrophic coverage in West Virginia's federally-facilitated Exchange only if he were a "qualified individual."   42 U.S.C. § 18032(d)(3)(C).   He thus could not obtain the relief that he seeks even under his own theory, further demonstrating (if any further proof is needed) that he lacks standing to bring this suit.

number of those functions would be meaningless under Klemencic's reading.   Under 42 U.S.C. § 18031(d)(4)(G), for example, the Exchange is required to make available an electronic calculator for purchasers to compare the cost of different coverage options, after the application of federal premium tax credits and cost-sharing subsidies.   If Klemencic's theory were correct, this calculator could only perform a meaningless (and potentially misleading) computation for purchasers in states with a federally-facilitated Exchange.   Under 42 U.S.C. § 18031(d)(4)(I), the Exchange is also required to send information to the IRS concerning individuals who are determined to be eligible for federal premium tax credits.   If Klemencic's theory were correct, the federally-facilitated Exchange would be required to send blank pieces of paper to the Treasury under this provision.   And under 42 U.S.C. § 18083, the Exchange is required to use a "single, streamlined form" that facilitates applicants to qualify for "health subsidy programs," which the statute expressly defines to include Section 36B tax credits.   42 U.S.C. § 18083(b)(1), (e)(1).   If Klemencic's theory were correct, applicants in states with a federally-facilitated Exchange would fill out paperwork for financial assistance that they could never qualify for.   It is not plausible to claim that Congress intended any of these results.   Rather, a straightforward reading of these provisions makes clear that federal tax credits are to be available to participants on any Exchange, including the Exchange operated by the federal government.

In addition, 42 U.S.C. § 18081 directs the Exchange to collect information to determine an applicant's eligibility for federal premium tax credits.   In particular, the Exchange is required to collect information regarding the applicant's citizenship, income level, health coverage options, and the availability of employer-sponsored coverage.   42 U.S.C. § 18081(a)(1)-(3). The statute does not identify the applicant's state of residence, or what type of Exchange is

operating in that state, as one of the factors determining eligibility for federal premium tax credits.   If Congress had considered the applicant's state of residence to be determinative, however, it presumably would have included that item in its list of eligibility factors.

*Third*, Klemencic's theory would upset the carefully-calibrated compromise that Congress reached regarding the availability of coverage for abortions on the Exchanges.   The ACA provides that "[a] State may elect to prohibit abortion coverage in qualified health plans offered through an Exchange in such State if such State enacts a law to provide for such prohibition."   42 U.S.C. § 18023(a)(1).   This authorization would not apply in states where a federally-facilitated Exchange operates, under Klemencic's theory, given that (as discussed above), "Exchange" is a defined term meaning "an American Health Benefit Exchange established under [42 U.S.C. § 18031]."   42 U.S.C. §§ 300gg-91(d)(21), 18111.   Given the close attention that was paid to the issue of abortion coverage during the enactment of the ACA, it is highly unlikely that Congress intended to carve out an implicit exemption for federally-facilitated Exchanges on this issue.

*Fourth*, Klemencic's reading would create an unanticipated additional obligation for states in the operation of their Medicaid plans.   The ACA expands the scope of eligibility for the Medicaid program, beginning January 1, 2014.   42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).[6]   As a bridge until that date, the ACA provides, as a condition of continued federal funding, that states that participate in the Medicaid program shall maintain their then-existing eligibility standards, until the effective date of the ACA's Medicaid eligibility expansion provision.   In particular,

---

[6]   The Supreme Court has held that HHS may not withdraw existing Medicaid funds for a state's failure to comply with this eligibility expansion provision.   *Nat'l Fed'n of Indep. Business v. Sebelius*, 132 S. Ct. 2566, 2607 (2012) (plurality opinion).

Case 1:13-cv-00623-PLF   Document 38   Filed 09/27/13   Page 27 of 42

this "maintenance of effort" provision directs states, as a condition for the receipt of federal Medicaid funds, not to impose any "eligibility standards, methodologies, or procedures" under their Medicaid state plan, or any applicable waiver, that are "more restrictive" than the standards that the state had in place as of the date the ACA was enacted.   42 U.S.C. § 1396a(gg)(1). This condition applies until "the date on which the Secretary determines that an Exchange established by the State under [42 U.S.C. § 18031] is fully operational."   *Id.*   As Klemencic himself acknowledges, Mot. for S.J. (ECF 17) at 6, under his reading of the ACA, a state with a federally-facilitated Exchange would *never* be relieved of this maintenance-of-effort requirement.   It is not plausible that Congress intended this result; if it had so intended, it certainly would have expressed its intent more directly.

*Fifth,* Klemencic's theory would undermine the ACA's process for state innovation waivers.   The ACA enacts a procedure for a state to seek a waiver from some of the Act's provisions.   42 U.S.C. § 18052.   Beginning in 2017, if a state has enacted legislation that provides coverage that is "at least as comprehensive," "at least as affordable," and "that reaches at least a comparable number of its residents" as does the coverage provided for under the ACA, and if that legislation would not increase the federal deficit, that state may seek a waiver of certain provisions of the Act.   42 U.S.C. § 18052(a), (b)(1).   In particular, the state could seek to opt out of provisions relating to Exchanges, the distribution of premium tax credits and cost-sharing subsidies, and the large employer tax provision (26 U.S.C. § 4980H) and the minimum coverage provision (26 U.S.C. § 5000A).   *Id.*   The amount of any foregone premium tax credits would then be distributed directly to the state to administer its alternative plan.   42 U.S.C. § 18052(a)(3).   Under Klemencic's theory, however, for a state that has not established

17

its own Exchange, the amount of this funding would always be zero.   Moreover, this waiver procedure would be an empty formality if, as Klemencic would have it, a state already had the power to prevent the application of significant portions of the ACA within its borders, simply by declining to establish its own Exchange.   Congress intended a state to be eligible for this waiver procedure only after a showing that the state could provide comprehensive and affordable health coverage.   Congress certainly did not intend, then, that a state could prevent the application of central provisions of the Act simply by declining to operate an Exchange.[7]

In sum, the "statutory scheme," *Adoptive Couple*, 133 S. Ct. at 2563, confirms further that Congress intended the federally-facilitated Exchange and the state-operated Exchange to be the same entity, and that federal premium tax credits would be available under either version of the Exchange.   Klemencic's contrary theory is fundamentally inconsistent with the intended operation of the Exchanges and with numerous other features of the Act.   Treasury's interpretation avoids the incongruities that Klemencic's reading would create.   That interpretation is the better reading of the Act, and it is certainly, at minimum, a permissible one.

---

[7]  This list of anomalies in Klemencic's reading of the ACA is far from exhaustive.   Other examples abound.   *See, e.g.*, 42 U.S.C. § 1320b-23(a)(2) (pharmacy benefits managers would be obligated to provide certain pricing information to HHS if the plan is offered on a state-operated Exchange, but not on a federally-facilitated Exchange); 42 U.S.C. § 1396w-3(b)(1)(E) (federally-facilitated Exchange would not be subject to provisions concerning coordination of Medicaid and CHIP benefits); 42 U.S.C. § 1397ee(d)(3)(B) (federally-facilitated Exchange would not have any obligation to enroll children in CHIP program in the Exchange, as states would in certain circumstances); 42 U.S.C. § 1397ee(d)(3)(C) ("[w]ith respect to *each State*," HHS must review and certify whether qualified health plans offer benefits for children that are at least comparable to those offered in the state's CHIP plan, but this review extends only to plans "offered through an Exchange established by the State under [42 U.S.C. § 18031]"; thus, HHS could not fulfill this obligation in "each State" with a federally-facilitated Exchange) (emphasis added); 42 U.S.C. § 18054(c)(3)(A) (individual enrolled in a multi-state health plans in a federally-facilitated would not be eligible for federal premium tax credit, contrary to statutory direction that such individual "*shall be eligible* for credits under section 36B of Title 26") (emphasis added).

### 3. The Legislative History of the Affordable Care Act Confirms that Participants in Federally-Facilitated Exchanges Are Eligible for Federal Premium Tax Credits

If Congress had intended to prohibit participants in the federally-facilitated Exchange from receiving federal premium tax credits, presumably one or more members of Congress would have stated that intent at some point during the legislative deliberations. After all, this condition on the availability of federal premium tax credits would have been a fairly central feature of Congress's reform legislation. But there is not a word in the legislative history that anybody in Congress contemplated such a result. "Congress' silence in this regard can be likened to the dog that did not bark." *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991); *see also Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 63 (2004) ("common sense suggests, by analogy to Sir Arthur Conan Doyle's 'dog that didn't bark,' that an amendment having the effect petitioner ascribes to it would have been differently described by its sponsor, and not nearly as readily accepted by the floor manager of the bill").

Instead, the legislative history consistently points to the conclusion that Congress meant federal premium tax credits to be available in every state. *First*, the House passed a bill that explicitly so provided. Its bill created a federal Exchange that would operate as the default Exchange, unless a state received a waiver to operate its own Exchange. H.R. 3962, 111th Cong., §§ 301, 308 (2009). The bill provided for federal premium tax credits for participants in any of the Exchanges. *Id.*, §§ 308(b)(1)(A)(iv), 341(a). If the bill that eventually became the ACA had changed this scheme to provide for tax credits in some states but not others, one would expect members of the House to have noticed this change. There is no indication, however, that any member of Congress believed that the two bills differed with respect to this issue.

19

Indeed, the House paid careful attention to the amount of federal premium tax credits that would be available under the ACA.  As a condition to the enactment of the ACA, the Senate accepted the House's amendments to Section 36B in contemporaneously-enacted legislation, the Health Care and Education Reconciliation Act of 2010 (HCERA), Pub. L. No, 111-152, 124 Stat. 1029.  HCERA increased the income cut-off for eligibility for federal premium tax credits to 400 percent of the federal poverty level, in the amount that the House had initially provided for but that had been reduced in the Senate's version of the legislation.  *Id.*, § 1001(a), 124 Stat. at 1030-31.  It is doubtful that the House would have paid such close attention to the *amount* of federal premium tax credits, while at the same time silently acceding to legislation that would have foreclosed federal premium tax credits *entirely* in some states.

*Second*, although the language that became 26 U.S.C. § 36B was developed in the Senate Finance Committee, that Committee did not at any time express any intent to condition the availability of federal premium tax credits on the existence of a state-operated Exchange.  To the contrary, to the extent that the issue arose at all, the Finance Committee expressed its understanding that the federally-facilitated Exchange would be the *same entity* as the state-operated Exchange.  Its bill provided that, if a state did not establish an operational Exchange (in the bill's parlance, an "interim exchange") within the time contemplated in the bill, then "*the Secretary* would be required to contract with a nongovernmental entity to establish *state exchanges* during this interim period."  S. Rep. No. 111-89, at 19 (2009) (emphasis added).  The Senate Finance Committee would not have used such language in its report if it believed the Secretary-established Exchange was a different entity from the "state exchange."

20

*Third*, the Congressional Budget Office's ("CBO") cost analyses provide further proof that Congress understood that the federal premium tax credits would apply nationwide. CBO played a central role in Congress' deliberations on the ACA. CBO, along with the Joint Committee on Taxation ("JCT"), prepared analyses that estimated the cost of premiums in the Exchanges and the numbers of individuals who would enroll in the Exchanges; these analyses assumed that tax credits would be available in every state. *See, e.g.*, CBO, *An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act* 6-7 (Nov. 30, 2009).[8]   Congress relied heavily on these estimates in debating the merits of the ACA; indeed, Congress recited in the Act itself that it had adopted CBO's findings. Pub. L. No. 111-148, § 1563(a), 124 Stat. 119, 270-71 (2010). There is no indication anywhere in the legislative record, however, that any member of Congress took issue with CBO's assumption that tax credits would be available nationwide. *See* 155 Cong. Rec. S12,764 (Dec. 9, 2009) (Sen. Baucus) (discussing CBO's finding that most participants in "the exchange" would receive federal premium tax credits, reducing their overall costs); 155 Cong. Rec. S13,559 (Dec. 20, 2009) (Sen. Durbin) (describing comprehensive availability of federal tax credits).

To the contrary, when members of Congress discussed the availability of federal premium tax credits, they consistently expressed their understanding that these credits would be

---

[8]  *See also* Letter from Douglas W. Elmendorf, Director, CBO, to Rep. Darrell Issa, Chairman, Committee on Oversight and Government Reform, U.S. House of Representatives at 1 (Dec. 6, 2012) ("To the best of our recollection, the possibility that those subsidies would only be available in states that created their own exchanges did not arise during the discussions CBO staff had with a wide range of Congressional staff when the legislation was being considered. Nor was the issue raised during consideration of earlier versions of the legislation in 2009 and 2010, when CBO had anticipated, in its analyses, that the credits would be available in every state."), available at http://www.cbo.gov/publication/43752.

available in every state.   For example, Senator Landrieu quoted a poll question describing the ACA as legislation in which "[l]ower and middle income people would receive subsidies to help them afford" insurance purchased on a "[n]ational [i]nsurance Exchange," and declared that description to be "very accurate."   155 Cong. Rec. S13,733 (Dec. 22, 2009) (Sen. Landrieu). Senator Johnson noted that the ACA would "form health insurance exchanges in every State" and would "provide tax credits to significantly reduce the cost of purchasing" coverage on the Exchanges.   155 Cong. Rec. S13,375 (Dec. 17, 2009) (Sen. Johnson).   Similarly, Senator Bingaman recited that the ACA would create "a new health insurance exchange in each State which will provide Americans … refundable tax credits to ensure that coverage is affordable." 155 Cong. Rec. S12,358 (Dec. 4, 2009).[9]

*Fourth*, the JCT prepared a report summarizing the tax provisions in the ACA, and its report provides further confirmation that Congress intended federal premium tax credits to be available for the purchase of insurance on the federally-facilitated Exchange.   That report stated that the Section 36B premium tax credit "subsidizes the purchase of certain health insurance plans through an exchange," without specifying that the entity that operates the exchange would be relevant in any way to the calculation of the credit.   JCT, *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the*

---

[9]   Nor could these statements be explained away by asserting that Congress assumed that every state would establish an Exchange.   It was well known that some states would decline to do so. *See* 156 Cong. Rec. H2207 (Mar. 22, 2010) (Rep. Burgess) (noting that as many as 37 states "may not set up the State-based exchange"); 155 Cong. Rec. S12,543 (Dec. 6, 2009) (Sen. Coburn) (submitting letter from Oklahoma Insurance Commissioner, who indicated that his state was unlikely to create an Exchange); *see also* Editorial, *Don't Trust States to Create Health Care Exchanges*, USA Today, Jan. 4, 2010, available at 2010 WLNR 148256 (noting that "[s]ome state officials hostile to reform are already trying to block implementation," and that such states would likely not create their own Exchanges).

"Patient Protection and Affordable Care Act" 12 (Mar. 21, 2010).   To be sure, a JCT report is prepared by committee staff, not legislators.   But, because that staff is closely involved in the formulation of taxing provisions such as Section 36B, the courts have recognized that the JCT's reports are "'highly indicative of what Congress did, in fact, intend.'"   *Miller v. United States*, 65 F.3d 687, 690 (8th Cir. 1995) (quoting *Estate of Hutchinson v. Commissioner*, 765 F.2d 665, 669–70 (7th Cir. 1985)); *see also Fed. Power Comm'n v. Memphis Light, Gas & Water Div.*, 411 U.S. 458, 472 (1973) (JCT report is a "compelling contemporary indication" of the effect of a statutory provision).   If Congress had intended federal premium tax credits to be available only in states with state-operated Exchanges, one would expect the JCT report to have made note of that fact.

In sum, all of the available legislative history points to the same conclusion; Congress intended that the federal premium tax credits would be available for the participants in every Exchange, as part of "a nationwide scheme of taxation uniform in its operation," *Irvine*, 511 U.S. at 238.   There is absolutely nothing in the legislative history that supports Klemencic's contrary theory.   But if Congress had intended such a result, surely some member of Congress would have made note of that fact during at some point during the legislative deliberations.   Some dog, somewhere, would have barked.   That silence is a powerful indication that Klemencic's reading of the Act is incorrect.

> **4.      The Purpose of the Affordable Care Act Confirms that Participants in Federally-Facilitated Exchanges Are Eligible for Federal Premium Tax Credits**

Most fundamentally, Klemencic errs by suggesting a reading of the ACA that would undermine Congress's basic goals in passing that legislation.   His interpretation is in tension

with the principle that a law must be interpreted in light of its "object and policy": "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Maracich v. Spears*, 133 S. Ct. at 2203 (internal quotation omitted). In other words, in evaluating Klemencic's theory, the court must guard against "the danger that the federal program would be impaired if state law were to control," and thus must "look to the purpose of the statute to ascertain what is intended." *Mississississippi Band of Choctaw Indians*, 490 U.S. at 44 (internal quotation omitted).

When it enacted the ACA, Congress "'intended to solve a national problem on a national scale.'" *Id.* (quoting *NLRB v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 123 (1944)). Congress's basic goal in enacting Section 36B was "[t]o ensure that health coverage is affordable," and "to help offset the cost of private health insurance premiums." S. Rep. No. 111-89, at 4 (2009); *see also* H. Rep. No. 111-443, vol. II, at 989 (2010). Indeed, Congress recognized that the Section 36B tax credits "are *key* to ensuring people affordable health coverage." H.R. Rep. No. 111-443, vol. I, at 250 (emphasis added). Congress's goal would be undermined if Klemencic were to prevail here; many individuals would find it difficult (if not impossible) to obtain affordable health coverage if they were to be deprived of tax credits worth, on average, more than $5,000 annually.[10] But the effects of Klemencic's theory would be even broader. It would give rise to a substantial adverse selection effect, because healthier individuals would lose a powerful incentive to purchase coverage. According to the calculations of one expert in health care economics, if an Exchange could offer only unsubsidized premiums, premiums for

---

[10]   *See* CBO, *Effects on Health Insurance and the Federal Budget for the Insurance Coverage Provisions in the Affordable Care Act: May 2013 Baseline*, tbl. 1 (May 14, 2013) (estimating that federal premium tax credits will amount on average to $5,290 per person in 2014, rising to $7,900 in 2023).

single individuals would be *double* the amount anticipated under the ACA.   Jonathan Gruber, *Health Care Reform Is a "Three-Legged Stool": The Costs of Partially Repealing the Affordable Care Act* at 5 (Center for American Progress Aug. 2010) (analyzing effect of proposed repeal of minimum coverage provision, and additional effect of proposed repeal of that provision and of subsidy provisions).   The result would be "essentially no increase" in the number of persons enrolled in individual coverage.   *Id.*

Indeed, Congress heard testimony that this adverse selection effect would undermine the ability of the Exchanges to offer affordable coverage.   As Director Elmendorf put the issue, "[i]f no subsidies were provided, the total premiums charged to nonfederal enrollees would probably be much higher than those observed in the program today – so the number of new enrollees would probably be limited."   CBO, *Expanding Health Insurance Coverage and Controlling Costs for Health Care: Testimony Before the S. Comm. on the Budget*, at 19 (Feb. 10, 2009) (written testimony of Douglas W. Elmendof, Director, CBO) (discussing proposal to allow uninsured persons to enroll in federal employees' plans without subsidies), available at http://www.cbo.gov/publication/41761.   *See also Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 13 (Apr. 22, 2009) (statement of Uwe Reinhardt, Professor of Economics, Princeton Univ.) (noting importance of "adequate public subsidies" to full achievement of Congress's purposes in enacting health reform legislation); *id.* at 50 (statement of Linda Blumberg, Principal Research Associate, Urban Inst.) (same).

In other words, as Representative Andrews put it the day before the House voted to enact the ACA:

> [W]e've heard almost universally across the House that people say they want to avoid discrimination based on pre-existing conditions.   It's hard to find a member who says he or she is not for that.   In order to accomplish that and not spike premiums for insured people, you have to have a larger pool of people that are covered eventually.   …   [P]eople say, well, why do you have to have the subsidies?   Well, to get people into this marketplace, if somebody's making $25,000, $35,000, $40,000 a year, you can have all the marketplace you want, but they can't buy in without the subsidies. … [T]his easy answer, which is so glibly stated by people, 'Let's just take care of the pre-existing condition problem,' it doesn't fit together if you don't take the next step and the next step and the next step and make it work."

*H.R. 4872, the Reconciliation Act of 2010: Hearing Before the H. Comm. on Rules* 71 (Mar. 20, 2010) (statement of Rep. Andrews) (commercial transcript of hearing).[11]

Indeed, Klemencic himself once agreed with this point.   Klemencic was one of the petitioners before the Supreme Court in the *NFIB* litigation.   As he put the issue in his brief to the Supreme Court only last year, he believed that, "[w]ithout the subsidies driving demand within the exchanges, insurance companies would have absolutely no reason to offer their products through exchanges ….   [T]he insurance exchanges cannot operate *as intended by Congress* absent [the Section 36B tax credits and additional provisions]."   Brief for Private Petitioners on Severability at 51-52, *Nat'l Fed'n of Indep. Business v. Sebelius*, 132 S. Ct. 2566 (2012) (Nos. 11-393 & 11-400), 2012 WL 72440 at *51-*52 (emphasis added).   Yet Klemencic now asserts that Congress had the opposite intent when it enacted Section 36B.

In sum, when Congress enacted the ACA, it did not enact a statute that would be at war with itself.   It did not enact comprehensive reform legislation for the purpose of expanding the availability of affordable health insurance, and at the same time hide a provision in the text that would undermine the possibility that that goal could be achieved.   Klemencic's reading of the ACA to allow for affordable health insurance in some states but not others is implausible, and

---

[11]   A copy of the cited portion of the transcript is attached as Exhibit 2 to this memorandum.

should be rejected.   At the very minimum, Klemencic's reading of the ACA is not compelled under *Chevron* Step One.

### C.   The Treasury Department Has Reasonably Interpreted Section 36B to Provide for Tax Credits for Participants in Federally-Facilitated Exchanges

It follows from the foregoing that 26 C.F.R. § 1.36B-1(k) "is based on a permissible construction of the statute" under *Chevron* Step Two.   *City of Arlington*, 133 S. Ct. at 1868. When it promulgated the regulation, the Treasury Department recited that "[t]he statutory language of section 36B and other provisions of the Affordable Care Act support the interpretation that credits are available to taxpayers who obtain coverage through a … Federally-facilitated Exchange," and that this conclusion was supported by the "relevant legislative history" as well as "the language, purpose, and structure of section 36B and the Affordable Care Act as a whole."   77 Fed. Reg. 30,377, 30,378 (May 23, 2012).   Treasury, certainly, arrived at a permissible construction of the ACA.   Given Congress's direction in the statute to treat the federally-facilitated Exchange and the state-operated Exchange as the same entity; the long list of anomalies that a contrary reading would create in the operation of the ACA's provisions; the utter absence of legislative history that would support that contrary reading; and the Congressional purpose to expand the availability of affordable health coverage, the Treasury Department reasonably concluded that Section 36B premium tax credits are available for participants in federally-facilitated Exchanges.

## IV.   Klemencic Suffers No Irreparable Injury from the Treasury Regulation

"The irreparable injury requirement erects a very high bar for a movant."   *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008). "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more

than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'"  *Hi–Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).   The "alleged injury must be certain, great, actual, and imminent."   *Hi–Tech Pharmacal Co.*, 587 F. Supp. 2d at 11.   Courts will not grant injunctive relief "against something merely feared as liable to occur at some indefinite time."   *Wisconsin Gas*, 758 F.2d at 674 (internal quotation omitted).   The "movant must demonstrate that the injury is of such 'imminence' that there is a clear and present need for equitable relief to prevent irreparable harm."   *Judicial Watch, Inc. v. Dep't of Homeland Security*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007) (quoting *Wisconsin Gas*, 758 F.2d at 674). Moreover, where, a plaintiff seeks an injunction that would alter the status quo rather than preserve it, that party "must meet a higher standard than in the ordinary case" by showing that "extreme or very serious damage will result from the denial of the injunction."   *Clarke v. OFHEO*, 355 F. Supp. 2d 56, 63 (D.D.C. 2004) (internal quotations omitted).

Klemencic argues that he would suffer irreparable injury if he could purchase only comprehensive coverage, such as a bronze-level plan in the Exchange, instead of the less generous catastrophic coverage that he asserts he would prefer to purchase.   Mot. for Prelim. Inj. at 4.   As discussed above, however, he does not suffer any injury at all from the Treasury regulation, let alone an irreparable one, given that (subsidized) bronze-level coverage would be far cheaper for him than (unsubsidized) catastrophic coverage.   But even, if he had made a showing of some economic loss, it is well settled in the D.C. Circuit that "economic loss does not, in and of itself, constitute irreparable harm."   *Wisconsin Gas*, 758 F.2d at 674.   "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the

absence of [emergency relief] are not enough." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation omitted).

Klemencic argues that his (non-existent) economic injury is irreparable because he could not gain any monetary recovery from the government.   Mot. for Prelim. Inj. at 12.   But this is simply wrong.   He has a readily available remedy.   If he believes that he should not be subject to liability under the minimum coverage provision, 26 U.S.C. § 5000A, he may pay that assessment and bring a tax refund action for the recovery of the assessment.   *See* 26 U.S.C. § 7422.   The availability of an adequate tax refund remedy, by itself, disposes of Klemencic's request for an injunction because "general equitable principles disfavor[] the issuance of federal injunctions against taxes, absent clear proof that available remedies at law [are] inadequate." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 742 n.16 (1974).

Without apparent irony, Klemencic notes that his maximum possible liability under 26 U.S.C. § 5000A for 2014 is only $150 (or about $12.50 per month, as that assessment is determined on a monthly basis), and he contends that it would not be worth the effort for him to pursue a tax refund action for such a small sum.   *See* ECF 37 at 4.   But a preliminary injunction requires a showing of harm that is "great, certain, and imminent."   *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 168 (D.D.C. 2012).   It is not apparent how Klemencic can argue that his potential liability under Section 5000A is both too paltry for him to bother with a tax refund action and yet so great, certain, and imminent as to require this Court to issue emergency injunctive relief.[12]

---

[12]   Nor is it apparent how Klemencic can simultaneously claim that he would prefer to spend an additional $320 *per month* for catastrophic coverage, and at the same time that he would be irreparably harmed by the possibility of a later $150 assessment *for the year*.

In sum, Klemencic has not shown that he suffers an irreparable injury from the Treasury regulation; indeed, he is not harmed at all.   He cannot meet his burden, then, to show "that irreparable injury is *likely* in the absence of an injunction."   *Winter*, 555 U.S. at 22.

## V.   The Public Interest and the Balancing of the Equities Weigh Heavily against Issuing a Preliminary Injunction

Finally, the public interest and the equities weigh strongly against Klemencic's claim for injunctive relief.   Congress has charged the Treasury Department with implementing the taxation-related provisions of the Affordable Care Act, and the public interest and the equities weigh strongly against interference with Treasury's performance of its duties to apply its understanding of Section 36B and the rest of the ACA to Klemencic's circumstances.   "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce."   *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008).

Klemencic asserts that he seeks broader relief that would preclude Treasury from applying its interpretation of Section 36B in *any* circumstance, not only his own.   He is wrong on this score; if any injunction could issue in this case, it should be no broader than what would be needed to address Klemencic's own claimed injury, as he is the only movant before the Court. *See Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) ("[w]e have long held that an injunction must be narrowly tailored to remedy the specific harm shown") (internal quotation omitted); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (equitable relief must be tailored to the particular final agency action and parties before the court and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").   Moreover, for the reasons that the defendants

30

have explained in prior briefing, it would not be possible to enjoin the broader application of Section 36B, given that numerous persons not before this Court would have a claim for premium tax credits that this Court could not extinguish.   *See* MTD Reply at 6-8.

But even if a broader injunction could be issued here, the public interest and the equities would weigh strongly against such relief.   Klemencic argues that it would be a "recipe for chaos" if a preliminary injunction does not issue here, given that a court might later adopt his theory.   Mot. for Prelim. Inj, at 13.[13]   To the contrary, it is Klemencic who would throw the process of tax administration into disarray.   This Court cannot adjudicate the tax liabilities of numerous parties not present here, as Klemencic requests, and any attempt to do so would "seriously disrupt the entire revenue collection process." *Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174, 1177 (5th Cir. 1993).   Injunctive relief – and particularly *preliminary* injunctive relief – in Klemencic's favor could not settle the issue, then.[14] Instead, the public interest and the equities weigh heavily in favor of the uniform operation of a central feature of the Affordable Care Act that will enable millions of Americans to receive the substantial tax relief to which they are entitled under the ACA.[15]

---

[13]   This premise is wrong, in any event.   In the highly unlikely event that the Treasury regulation is later invalidated, the Treasury Department would have the discretion to apply such a ruling prospectively.   *See* 26 U.S.C. § 7805(b)(8).

[14]   This is particularly the case, given the existence of other pending litigation raising the same issue.   Plaintiffs' counsel have also recently filed a complaint in the Eastern District of Virginia, on behalf of four individuals, asserting the same theory that they have argued here.   *David King, et al. v. Kathleen Sebelius, et al.*, No. 3:13-cv-00630-JRS (E.D.Va. filed Sept. 16, 2013).

[15]   Klemencic argues that "potentially millions of American employees" are immediately poised to lose access to employer-sponsored insurance coverage under Treasury's reading of Section 36B.   Mot. for Prelim. Inj. at 13.   This assertion is wildly overblown.   More responsible studies have estimated that the ACA as a whole (let alone the Treasury regulation at issue here)

## Conclusion

For the foregoing reasons, the defendants respectfully request that the motion for a preliminary injunction be denied.

Dated: September 27, 2013                    Respectfully submitted,

                                             STUART F. DELERY
                                             Assistant Attorney General

                                             RONALD C. MACHEN, JR.
                                             United States Attorney

                                             SHEILA LIEBER
                                             Deputy Branch Director


                                             _____/s/ Joel McElvain_____
                                             JOEL McELVAIN
                                             Senior Trial Counsel
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Avenue, NW
                                             Washington, D.C. 20530
                                             (202) 514-2988
                                             Joel.McElvain@usdoj.gov

---

will have relatively "modest effects" on employer-sponsored coverage, ranging from an estimated 1.8% decrease in the percentage of persons covered at the workplace to an estimated 2.9% *increase*.   *See* Thomas Buchmueller, Colleen Carey, and Helen G. Levy, *Will Employers Drop Health Insurance Coverage Because of the Affordable Care Act?*, 32 Health Affairs 1522, 1526 (Sept. 2013) (summarizing relevant studies and criticizing methodology of researchers who have predicted more pronounced effects).