IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JACQUELINE HALBIG, ET AL.,

        Plaintiffs,

     vs.

KATHLEEN SEBELIUS, ET AL.,

       Defendants.
_____

CA No. 13-623
Washington, DC
October 22, 2013
10:05 a.m.


TRANSCRIPT OF ORAL RULING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:

Michael A. Carvin, Esquire
Yaakov M. Roth, Esquire
Jonathan A. Berry, Esquire
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-7643
Fax: (202) 626-1700
macarvin@jonesday.com
yroth@jonesday.com


For the Defendant:

Joel L. McElvain, Esquire
Sheila Lieber, Esquire
U.S. DEPARTMENT OF JUSTICE
Civil Division
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514-2988
Fax: (202) 616-8460
joel.l.mcelvain@usdoj.gov

Court Reporter:                    Lisa M. Foradori, RPR, FCRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6706
                                   333 Constitution Avenue, NW
                                   Washington, DC  20001
                                   (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

THE COURT:  Good morning, everybody.

COURTROOM DEPUTY:  Civil Action 13-623, Jacqueline Halbig, et al. versus Kathleen Sebelius, et al.  I'm going to ask counsel to please come forward and identify yourselves for the record.

MR. CARVIN:  Michael Carvin for the plaintiffs. Yaakov Roth and Jon Berry.

MR. McELVAIN:  Good morning, Your Honor.  Joel McElvain for the defendants, with me today is Sheila Lieber.

THE COURT:  Good morning.  All right.  Yesterday I heard argument on the motion to dismiss filed by the Government and on the motion for preliminary injunction filed by the plaintiffs in this case.  There's been a lot of press inquiry, as you might imagine.

Just so everybody knows, there is a press room downstairs and this is all being piped in to them, so -- I don't know that that matters to anybody.  But I didn't want you to think that people were listening in on our conversations without us knowing about it, and I'm sure that's not happening.

So, I said that I would give you an oral opinion today, and the reason for that, obviously, is this is of some urgency to both sides and timing is important.  And to the extent that anything I do -- well, obviously, the grant or

1   denial of a preliminary injunction is immediately appealable,

2   and the grant of a motion to dismiss is appealable, but the

3   denial is not.

4          So, this will be an oral opinion -- or two

5   opinions, if you like.  You can get a transcript, if you want

6   one.  And there will be a very short order or two orders that

7   follow, which will say simply, For the reasons stated in open

8   court -- whatever.  And that will be done today.  So, if

9   anybody wants to appeal, you can appeal.

10          As I always say when I'm about to give an oral

11   opinion, I assume it would be much more coherent if I spent

12   the time to write it and edit it and rewrite it.  So, if I am

13   a little redundant or not as organized, that's the way it is.

14   I thought you'd rather have an opinion dealing with the issues

15   as quickly as possible.

16          All right.  By way of background, as everybody at

17   counsel table knows and lots of the people in the room know,

18   this case involves the Patient Protection and Affordable Care

19   Act.  And under that Act most individuals must either obtain

20   minimum health coverage or pay a penalty imposed by the

21   Internal Revenue Service.

22          The law provides for the establishment of Exchanges

23   through which individuals can purchase health insurance.  And

24   it also provides for the availability of a premium tax credit

25   or subsidy for many low- and middle-income individuals who

1   purchase insurance on at least some of the Exchanges.  And

2   larger employees are expected to share the costs of health

3   insurance coverage for their full time employees, and

4   employers who do not provide affordable health care may be

5   subject to an "assessable payment" or tax.

6           As I said, the Exchanges, I think they are called

7   American Health Benefit Exchanges under the statute, are for

8   the purpose of facilitating the purchase of insurance by

9   private individuals and small businesses.  In addition to

10  serving as the forum for health insurance shopping, an

11  Exchange is also used to determine the eligibility of

12  individuals to enroll through an Exchange in a health

13  insurance plan, their eligibility to obtain advance payment of

14  the premium tax credit and other cost reductions, and their

15  eligibility to be deemed exempt from the individual mandate.

16          We spent a lot of time talking about this

17  yesterday.  The language of the statute was up here on big

18  poster boards.  The Act provides that each state shall, not

19  later than January 1, 2014, establish an Exchange.  It also

20  provides that if a state decides not to establish its own

21  Exchange, or fails to establish an Exchange, then under the

22  statute the Secretary of Health and Human Services is directed

23  to establish an Exchange in that state.

24          Thirty-four states have declined to establish their

25  own Exchanges.  Seven have elected to assist the federal

1    government with its operation of federally-run Exchanges.

2    Twenty-six have opted out entirely.  And, thus, 34 states have

3    federal Exchanges, and 16, plus the District of Columbia, have

4    state-established Exchanges.

5            The Act authorizes premium tax credits for many

6    low- and medium-income individuals who purchase health

7    insurance through the Exchanges.  26 U.S.C. Section 36B or

8    Section 1401 of the Act calculates this credit based in part

9    on the premium expenses for the health plan.  I'm not going to

10   go into all the details about how that works.

11           Under the Act most individuals must obtain health

12   insurance or be subject to a penalty.  Individuals who cannot

13   afford coverage will not face a penalty if they do not obtain

14   health insurance.  The unaffordability exemption applies

15   generally to any individual whose annual health insurance

16   costs exceed eight percent of his or her annual household

17   income.  An individual's costs are determined with reference

18   to the cost of the relevant health insurance premium minus the

19   credit allowable under this section.

20           Then there's 26 U.S.C. 4980H, which talks about the

21   "assessable payment" or the tax.  And it may matter whether

22   you -- it does matter whether you view it as a tax or not for

23   certain purposes.  Imposition of this payment is triggered

24   and, thus, an employer is required to pay it when any of its

25   full-time employees purchases coverage on an Exchange.

1         And as Mr. Carvin pointed out yesterday, it means

2    that if a single employee chooses to purchase coverage on the

3    Exchange, that that triggers the obligation of the employer

4    under 4980H.  If an individual is eligible for a premium tax

5    credit or a subsidy, the Exchange notifies the employer that

6    it will be assessed a payment or required to pay a tax under

7    4980H.

8         What this case is about is the regulations that

9    were promulgated by the Internal Revenue Service,

10   26 C.F.R. 1.36B.  And the regulations make tax credit -- the

11   premium tax credit available to qualifying individuals who

12   purchase health insurance in either a state-established

13   Exchange or a federally-established or facilitated Exchange.

14        And that regulation defines Exchange by reference

15   to an earlier regulation, 45 C.F.R. 155.20, which says that

16   the Exchange referred to in these regulations is an Exchange

17   regardless of whether Exchange was established and operated by

18   a State, including a regional Exchange or subsidiary Exchange,

19   or by HHS.

20        So, the plaintiffs in this case are a group of

21   individuals and a group of employers that reside in states

22   that have declined to establish Exchanges.  And those

23   plaintiffs contend that this regulation, 26 C.F.R. 1.36B and

24   related regulations, are inconsistent with and violate the

25   plain language of the Affordable Care Act.  And, therefore,

1   that those regulations exceed the scope of the agency's

2   statutory authority and, thus, are arbitrary, capricious, an

3   abuse of discretion, or otherwise not in accordance with law.

4   They say they're inconsistent with the language of the law.

5   And they bring this action under the Administrative Procedure

6   Act.

7          So, the defendants have moved to dismiss.

8   Plaintiffs have moved for a preliminary injunction.  As I

9   said, there are two groups of plaintiffs.  There are four

10  individuals, all from states that have declined to establish

11  Exchanges.  Ms. Halbig from Virginia.  Mr. Klemencic -- and if

12  I'm not pronouncing his name, you can apologize to him,

13  because his name will come up frequently.  It's

14  K-L-E-M-E-N-C-I-C in West Virginia.  Ms. Lowery in Tennessee

15  and Ms. Rumpf, R-U-M-P-F, in Texas.

16          And then there are three employers, although one of

17  them is a group of restaurants, but they're commonly owned.

18  Innovare Health Advocates in Missouri, which I believe has

19  something like 55 full-time employees.  And GC Restaurants and

20  affiliated companies in Texas with about 350 full-time

21  employees.  And Community National Bank in Kansas, which I

22  think has 80 full-time employees.

23          Now, all of these businesses have said, I think in

24  the complaint, that they will comply, if they have to comply,

25  under protest, in order to avoid sanctions.  But the choices

1   faced by them as well as by the individuals have been

2   described as a Hobson's choice, either complying with a

3   statute that they -- complying with a regulation that they --

4   I guess complying with a statute because of a regulation which

5   they say is an arbitrary, capricious, an unlawful regulation

6   because it's inconsistent with the statute, and either

7   complying or facing a penalty.

8         I suppose it's easier for an individual to make

9   that choice of saying, well, I'll take the penalty, although

10  some of them have said they will comply, than it is for an

11  established business that doesn't want to be viewed as a law

12  violator.

13        In any event, there are several challenges that the

14  Government raises in its motion to dismiss, and I think they

15  do not all have to be decided today.  The first one is whether

16  the individual plaintiffs have -- basically there are several

17  standing arguments.  Do you have standing to bring a lawsuit?

18  So, there was a question of whether the individuals whose

19  names I mentioned have standing under Article III of the

20  Constitution.  Whether the businesses have standing under

21  Article III of the Constitution.  And whether those groups of

22  plaintiffs have what's known as prudential standing.

23        So, the first thing I'm going to talk about is the

24  standing requirements and how I view the arguments of counsel

25  on this.  As we all know, federal courts are courts of limited

1   jurisdiction, and if we don't have jurisdiction, we can't hear

2   a case.  The Court does not have subject matter jurisdiction

3   over a case where the plaintiff or plaintiffs does not have

4   standing or -- and I'll get to this as well -- the case or

5   controversy is not ripe.

6          The case is not justiciable if the matter is not

7   ripe for decision.  So, when there's a motion to dismiss by

8   the defendant, in this case the Government, for lack of

9   subject matter jurisdiction, the plaintiff bears the burden of

10  establishing that the Court does have jurisdiction.

11         But at the pleading stage, which is where we are

12  now, the burden of production to establish standing is more

13  relaxed than it would be later at summary judgment.  Still, a

14  plaintiff must allege general factual allegations of injury

15  resulting from the defendant's conduct.

16         There are three requirements for Article III

17  standing under the Constitution that must be established at --

18  what the courts have called an "irreducible constitutional

19  minimum."  First, that the plaintiff has suffered an injury in

20  fact -- the invasion of a legally protected interest.  Second,

21  that the injury is fairly traceable to the defendants'

22  conduct, that is, that there is an injury that was caused by

23  the conduct of the defendant.  And, thirdly, that a favorable

24  decision on the merits likely will redress the injury.

25         There are loads of cases, I'm not going to cite

1    them, but Lujan, L-U-J-A-N, in the Supreme Court; Sprint

2    Communications in the Supreme Court.  Lots of cases in the

3    D.C. Circuit.  The alleged injury must be concrete and

4    particularized and actual or imminent, not conjectural,

5    hypothetical or speculative.

6           In the Clapper decision the Supreme Court recently

7    said:  The threatened injury must be certainly impending to

8    constitute injury in fact, and that allegations of possible

9    future harm are not sufficient.  And they also said, in

10   Clapper, that a federal court's standing inquiry is

11   "especially rigorous" if reaching the merits of the dispute

12   would force the Court to decide whether an action taken by one

13   of the other two branches of Government was unconstitutional.

14          So, let me talk first about the four individuals.

15   I'm going to focus on Mr. Klemencic because we have

16   declarations from Mr. Klemencic and I think both sides have

17   focused mostly on him.  The plaintiffs maintain that these tax

18   credits financially injure and restrict the economic choices

19   of these individuals in the states that have declined to

20   established Exchanges.

21          The Subsidy Expansion Rule, in effect, makes

22   insurance less "unaffordable."  So, they have to purchase

23   costly comprehensive health insurance that they would

24   otherwise forgo.  In other words, if it weren't for the

25   subsidy, they would be under the level where an individual is

1    required to buy insurance.  Because Mr. Klemencic, for

2    example, there's declarations that show he is self-employed,

3    he earns about $20,000 a year, and to buy insurance would be

4    more than eight percent of his income.  He wouldn't have to do

5    it.  If he gets a subsidy, he no longer falls under that level

6    and so he would have to do it.  He doesn't want to buy

7    insurance.  That's what he's told us in his declarations.

8         So, because of this regulation, which the

9    plaintiffs say is inconsistent with and not authorized by the

10   language of the statute, he's going to be forced to buy

11   insurance.  True, it will be subsidized, but he'll be forced

12   to do something he otherwise would not do.

13        And absent the regulations, he would undoubtedly be

14   entitled to the certificates of exemption exempting him from

15   the individual mandate penalty and from the need to buy

16   insurance, and that would be the end of the matter.  The

17   defendants argued, at least at the initial briefing, that all

18   of this was much too speculative.  There were several levels

19   of speculation.

20        I'm going to get to that in a minute because we've

21   got several declarations from Mr. Klemencic and other people

22   as well as much more information about how much the insurance

23   that he would be required to buy, if he were required to buy

24   insurance, would actually cost.  Now, back to the law for just

25   a minute.

1          In order to defeat the Government's motion to

2    dismiss on standing grounds, the plaintiffs need only

3    establish the standing of any one plaintiff at the motion to

4    dismiss stage.  They might be able to establish the standing

5    of more than one, but all that's required is that they

6    establish the standing of one.

7          So, the Supreme Court said that in Watt versus

8    Energy Action Educational Foundation, 454 U.S. 151, a 1981

9    case.  And that was a case, actually, where there were three

10   separate groups of plaintiffs, the State of California, the

11   City of Long Beach, and consumers of oil and gas products.

12   And the Court found that California had standing, so they

13   didn't even discuss the standing of the other plaintiffs.

14         In the D.C. Circuit in Mountain States Legal

15   Foundation versus Dan Glickman, 92 F.3d Page 1228, in 1996,

16   said -- reiterated that principle citing Watt, and

17   specifically said, if there was any question, that for each

18   claim, if constitutional and prudential standing can be shown

19   for at least one plaintiff, we need not consider the standing

20   of the other plaintiffs to raise that claim.

21         So, A, this principle of Watt applies both to

22   constitutional and prudential standing; and, B, it's claim by

23   claim, but in this case there is only one claim in the

24   complaint.  So, if Mr. Klemencic shows standing, nobody else

25   has to -- or I don't have to reach the standing of the others.

1   So, let's talk about Mr. Klemencic first.

2   Plaintiffs have provided a lot of information about

3   Mr. Klemencic's financial situation and his insurance

4   prospects, along with several declarations, and they've been

5   updated as we've gone along. They said he earns about -- he

6   anticipates earning about $20,000 a year. He's self-employed.

7   As we discussed yesterday, he'd like to earn more, but $20,000

8   is what he anticipates. And there's some figures in the

9   record about what the implications would be if he earned

10  $21,000 or $25,000, I don't think it really matters.

11  There's a discussion about whether he would have to

12  buy the bronze plan or the second lowest silver plan. And the

13  data we talked about yesterday -- have I got it right?

14  Silver? The data we talked about yesterday was the data

15  relating -- the numbers relating to the cost of the second

16  lowest silver plan. But in some of the earlier briefs there

17  was talk about the bronze plan.

18  So, I'm focusing, I guess, on the second lowest

19  silver qualified plan, which I'm told is the minimum coverage

20  that he's permitted to purchase under the Affordable Care Act.

21  In the data that has been presented by the parties is that it

22  might cost $438 a month or $450 a month or $463 a month. But

23  in any event, that far exceeds whatever the number is -- his

24  eight percent -- eight percent of his monthly income.

25  So, I don't think the parties are in disagreement,

1    that if not for the existence of the premium tax credit or

2    subsidy, Mr. Klemencic would be exempted from purchasing

3    health insurance under the unaffordability provision,

4    regardless of which number we're dealing with.  That's what he

5    wants to do.  He told us he doesn't want to buy insurance.

6            The defendants -- the Government says -- first they

7    argued that his income, his age, his family status, all these

8    other estimates show that he would pay nothing for the

9    relevant insurance.  And, therefore, he's got no injury.  And

10   they said that the injury must be concrete and particularized,

11   actual or imminent at the time he files suit.  It wasn't.  And

12   there's a lot of speculation involved.

13           But if we look at the most recent declarations for

14   Mr. Klemencic, he's averring that he anticipates adjusted

15   gross income for 2014 for $20,000.  I've just mentioned that

16   from his affidavits and other affidavits and other documents

17   provided by the Government and by the plaintiffs, we know that

18   the range of cost of the insurance he'd have to buy would be

19   between $438 and $463 a month.  And he wants a certificate of

20   exemption.

21           But he says in his declaration:  If I'm eligible

22   for a subsidy that would reduce my required contribution, I

23   would be disqualified from the unaffordability exemption and

24   unable to obtain a certificate of exemption, and would be

25   forced to either buy insurance or pay a tax penalty.  He says:

1   I do not want to purchase comprehensive health coverage, even

2   if the Government subsidizes it.

3          The later declarations suggest that –– and other

4   information in the record –– suggests that if he's making

5   $20,000 a year –– the Government submitted a declaration on

6   the 18th of this month that shows it would cost him zero.  The

7   plaintiff says it would cost him $18.  If it goes –– if his

8   income goes up to $21,000, it would cost him $3.90, according

9   to the Government.  If his income goes up to $25,000, it would

10  cost him $51.64, according to the Government.

11         It seems to me, and I think that for purposes of

12  argument yesterday, the Government said that their argument

13  was still their argument and they think still persuasive, even

14  if we talk about $18 a month.  So, I think the information

15  that we have in the record is –– we'll assume $18 a month is

16  what it's going to cost him if he buys the insurance.  And we

17  assume $100 to $150 a month is what the penalty would be,

18  which is $12 a month, if he decided to pay the penalty.

19         So, is there enough in this record to demonstrate

20  standing by Mr. Klemencic?  And imminent injury, not –– and

21  concrete, particularized and actual imminent –– actual or

22  imminent injury sufficient to give him standing.  As I said a

23  few minutes ago, at the pleading stage, general factual

24  allegations of injury resulting from the defendants' conduct

25  are sufficient, according to National Association of Home

1   Builders in this circuit.

2           Or as the Fourth Circuit said, general factual
3   allegations of injury resulting from the defendants' conduct
4   may suffice because on a motion to dismiss we presume that
5   general allegations embrace the specific facts that are
6   necessary to support the claim.  And that's in the recent
7   Liberty University decision.  I'm told that I said that the
8   penalty would be $100 to $150 a month.  I meant to say the
9   penalty would be the $100 to 150 a year, which translates to
10  about $12 a month maximum.

11          So, based on the declarations of Mr. Klemencic and
12  an expert declaration, based on the numbers submitted even by
13  the Government as well as by the plaintiffs, I find it highly
14  plausible -- I think he has shown injury and I find it highly
15  plausible that because of this challenged regulations he will
16  cease to be eligible for the unaffordability exemption, and
17  instead, will be required to pay for health insurance of
18  somewhere around probably $18, but even if it's a little less
19  than $18, or an individual tax penalty of $12 or somewhat less
20  than $12.

21          So, I think that Mr. Klemencic has done enough to
22  show that he has been injured as a result of the defendant's
23  conduct.  And a favorable decision on the merits can redress
24  his injury.  And the merits, which I'm not going to discuss,
25  but this is a claim brought under the Administrative Procedure

1   Act, and we had a lot of discussion yesterday about whether it

2   can be brought under the Administrative Procedure Act, and

3   about whether, at least in the context when we're talking

4   about the employer plaintiffs, do they really get their

5   grievances redressed if the Government could still -- if one

6   of their employees still sought a subsidy, sought insurance.

7   But that doesn't apply to Mr. Klemencic.

8           His grievance would be redressed if this regulation

9   were vacated, it seems to me.  And the same is true of the

10  other individual plaintiffs, even though I do not have the

11  kind of detailed information about them that allows me to make

12  the same sort of analysis.  So, Mr. Klemencic has Article III

13  standing in my judgment.

14          So, what about the employer plaintiffs?  Those

15  three entities, one in Missouri, Innovare, GC Restaurants in

16  Texas and Community National Bank in Kansas.  They say that

17  prior to the promulgation of the IRS Rule, they were planning

18  not to offer health insurance plans that complied with the

19  Affordable Care Act to their full time employees.

20          Now they say they must either pay a penalty or

21  alter their behavior to avoid the penalty, i.e., to provide

22  insurance under the Affordable Care Act.  And Innovare Health

23  Advocates says that they have something called a

24  "consumer-driven" insurance plan, which they provide.  They

25  say it does not comply with the Affordable Care Act, but they

1   would continue to provide it and in fact expand it.  But

2   because of the IRS Rule, they would opt to offer insurance

3   that complies with the Affordable Care Act.

4          The restaurants do not offer and do not wish to

5   offer health insurance to many of their full-time employees.

6   But they say, if forced to, they would do so to avoid the

7   penalty.  And the same with employer plaintiff Community Bank.

8   They say they would rather not drop its full-time health

9   insurance and provide coverage compliant with the statute, but

10  it plans to provide such insurance rather than risk the

11  penalty.

12         The Government argues that these business

13  employers, these entities, have failed to show that they will

14  or allege facts sufficient to show that they will incur a

15  Section 4980H penalty.  So, the Government says -- we're

16  talking about 4980H -- they say that the plaintiffs' complaint

17  does not allege that the employees of these businesses will

18  necessarily obtain coverage on the Exchanges or that they will

19  obtain premium tax credits, and that any such allegations at

20  this stage are purely speculative.

21         They say that the ability of the plaintiffs, these

22  plaintiffs to show standing, depends on third parties who are

23  not before the Court, namely, their employees.  Plaintiffs

24  respond that, well, the injury is not the penalty, at least in

25  part, but the cost of complying with the employer mandates,

1    sponsoring coverage, related administrative costs and so

2    forth.

3            The plaintiffs rely on the recent Fourth Circuit

4    opinion in Liberty University versus Lew, that's L-E-W.  And

5    they also cite State Farm Insurance.  The Fourth Circuit said:

6    Even if the coverage Liberty -- and Liberty was an employer.

7    So, they were talking about the employer situation in 4980H.

8    Even if the coverage Liberty currently provides ultimately

9    proves sufficient, it may well incur additional costs because

10   of the administrative burden of assuring compliance or due to

11   an increase in the cost of care.  So, Liberty -- the Fourth

12   Circuit in Liberty said that the employers had standing.

13           The District Court in Oklahoma in Oklahoma ex rel

14   Pruitt versus Sebelius said that the plaintiffs -- employer

15   plaintiffs had standing.  As I understood the argument

16   yesterday, the Government isn't trying to distinguish that

17   portion of the Liberty University case, but rather says that

18   the Fourth Circuit is wrong in its view and that I shouldn't

19   follow it.

20           I think there's a lot to what the Government says.

21   And I think the employer plaintiffs have an uphill battle in

22   showing that they have Article III standing.  They may

23   possibly be correct, but the Government may also be possibly

24   correct that the injury depends on the actions of third

25   parties.

```
 1              The Government cites a number of cases.  National

 2   Wrestling Coaches Association versus Department of Education,

 3   366 F.3d 930, a D.C. Circuit case, which said:  When the

 4   plaintiff is not himself the object of the government action

 5   or inaction that he challenges, standing is not precluded but

 6   it is ordinarily more difficult to establish.

 7              And in a case called Grocery Manufacturers

 8   Association versus EPA.  On the other hand, the plaintiffs

 9   argue that the theory of injury that was posited in the

10   Grocery Manufacturer's case was far more attenuated than the

11   theory presented here.  It appears highly plausible, they say,

12   that an employer that employees 18 full-time employees at

13   wages between 100 and 400 percent of the federal poverty line,

14   as set out in one of their declarations, or if you're looking

15   at the numbers employed by the restaurants, 350 full-time

16   employees, certainly some substantial number of them would

17   qualify.  And that even if one of them goes and buys insurance

18   and seeks a subsidy or gets a subsidy, the employer will be

19   subject to a penalty under the employer mandate.

20              So, we can go back and forth on this.  The

21   Government also argues, and this is a strong argument, on the

22   third prong of Article III standing, redressability, that the

23   employer plaintiffs can't have standing even if they show

24   injury or imminent injury because of a failure to establish

25   redressability because no judgment in this action could bind
```

1    the parties who were not present here, namely, the employees

2    of the employer plaintiffs.

3              And Mr. McElvain yesterday spent a lot of time and

4    came back to this about what happens if I was to vacate or

5    strike down the regulation.  That's not going to stop an

6    employee from going forward and seeking -- from seeking

7    insurance and seeking a subsidy.  And if they don't get it,

8    bring a lawsuit, for example, regardless of what happens to

9    this regulation.

10             The Government argues that even if I ruled in favor

11   of the employers, these 18 employees of the Golden Chick

12   quick-service restaurant described in Dr. Tharp's declaration

13   would not be bound by the judgment.  There's no way that

14   vacating the regulation could prevent the restaurant employees

15   from seeking premium tax credits under 26 U.S.C. 36B.

16             So, I think these are hard questions.  They

17   implicate issues of redressability, that is, even if the

18   plaintiffs are injured and even if the injury is fairly

19   traceable to the defendants' conduct, is a favorable decision

20   on the merits likely to redress the injury?  I'm happy to

21   revisit that on a motion for summary judgment, and both sides

22   can talk more about redressability.

23             And this relates to another argument that the

24   Government makes that I'll get to in a little bit, is they say

25   that this is not a legitimate Administrative Procedure Act

1   argument -- a legitimate Administrative Procedure Act case.

2   That it should be a tax refund case.  That because of the

3   Anti-Injunction Act and because there is a remedy under the

4   tax laws, that's another issue that's implicated by this whole

5   question of the Government's argument that these plaintiffs

6   don't have standing.

7        And I have to say, in terms of the briefs that are

8   coming from both sides, I guess the plaintiffs have to do a

9   better job on redressability.  The Government has to do a

10  better job on the APA, because they have yet to persuade me

11  that this is not a legitimate APA case.  And why is it any

12  different from any other challenge to a regulation, that if

13  it's arbitrary, capricious, contrary to law, the courts vacate

14  them.

15       The D.C. Circuit has said that when a reviewing

16  court determines that agency regulations are unlawful, the

17  ordinary result is that the rules are vacated, not that their

18  application to individual petitioners is proscribed.  National

19  Mining Association versus U.S. Army Corps of Engineers,

20  145 F.3d 1399.

21       In National Mining Association, the Court quoted

22  Justice Blackmun's dissent in Lujan, which the circuit said,

23  quote, apparently expressed the view of all nine Justices on

24  this question.  And Justice Blackmun in Lujan said:  In some

25  cases the "agency action" will consist of a rule of broad

1    application. And if the plaintiff prevails, the result is

2    that the rule is invalidated, not simply that the Court

3    forbids its application to a particular individual. Under

4    these circumstances a single plaintiff, so long as he is

5    injured by the rule, may obtain "programmatic" relief that

6    affects the rights of parties not before the Court.

7          So, these are arguably two sides of the same coin,

8    or maybe they're separate questions. Redressability for the

9    plaintiffs and APA for the defendants. So, for these reasons

10   and because I've already found that one plaintiff has Article

11   III standing, I'm going to defer a decision on the employer

12   plaintiffs' Article III standing as well as their prudential

13   standing until the summary judgment stage.

14         So, now we get to prudential standing. There is

15   this debate about whether prudential standing is

16   jurisdictional or not. I don't think it matters for today's

17   purposes. Regardless, the courts have said that prudential

18   standing -- that for a plaintiff to show prudential standing

19   is usually not a particularly difficult thing to do.

20         There are arguably two elements to prudential

21   standing, zone of interest and injury. And I say "arguably"

22   for a reason, I'll come back to it. Clearly, one of the

23   requirements for prudential standing is that a plaintiff's

24   injury must be arguably, arguably within the zone of interest.

25   That's important. Not in fact. Not provably. But "arguably"

1  within the zone of interest to be protected or regulated by

2  the statutes that they allege were violated.

3        D.C. Circuit, International Brotherhood of

4  Teamsters, 724 F.3d 206.  This test, said the Court in

5  International Brotherhood of Teamsters in 2013, quote:  Is not

6  meant to be especially demanding and forecloses suit only when

7  a plaintiff's interests are so marginally related to or

8  inconsistent with the purposes implicit in the statute that it

9  cannot reasonably be assumed that Congress intended to permit

10  the suit.

11        Further, whether a plaintiff's interest is arguably

12  protected by the statute within the meaning of the zone of

13  interest test is to be determined by the particular provision

14  of the law upon which the plaintiff relies.  So, I think a

15  pretty interesting discussion is Justice Kagan's decision in

16  this case -- ready for this?  Match-E-Be-Nash-She-Wish Band

17  versus Patchak -- we'll give you the spelling later.  There's

18  a lot of hyphens here.

19        Match-E-Be-Nash-She-Wish Band -- is it the name of

20  a band?  Oh, it's the name of an Indian tribe I think --

21  versus David Patchak and Ken Salazar.  Yes, it's an Indian

22  tribe.  It's actually a statute that arose under the Indian

23  Reorganization Act.

24        Justice Kagan says, for the Court, first, that

25  under prudential standing, the interest must arguably be

1    within the zone of interest to be protected.  Secondly, the

2    test is not meant to be especially demanding.  Then in

3    something that may be relevant here, she said:  When enacting

4    the Administrative Procedure Act to make agency action -- it

5    was intended to make -- Congress intended to make agency

6    action presumptively reviewable.

7          Then she says:  We have always conspicuously

8    included the word arguably in the test to indicate that the

9    benefit of any doubt goes to the plaintiff.  The test

10   forecloses suit only when a plaintiff's interest are so

11   marginally related to or inconsistent with the purposes

12   implicit in the statute that it cannot reasonably be assumed

13   that Congress intended to permit the suit.

14         I think both sides rely on the D.C. Circuit in Safe

15   Extensions, Inc. versus the Federal Aviation Administration,

16   509 F.3d 593.  They talk about the zone of interest question.

17   They talk about the APA's strong presumption of reviewability.

18   They say that the Supreme Court has declared in Abbott Labs

19   that judicial review of final agency action by an agreed

20   person will not be cut off unless there is persuasive reason

21   to believe that suit was -- to believe that such was the

22   purpose of Congress, such being the idea of cutting off the

23   rights.

24         There is one other quote I was looking for that I

25   can't seem to find.  Defendants on the prudential standing

1   prong argue because Congress's clear intent on passing the

2   Affordable Care Act was to insure that health coverage is

3   affordable, and because plaintiffs here are seeking to insure

4   that health coverage is unaffordable by avoiding the subsidy,

5   they're not within the zone of interest, these plaintiffs.

6          The Government argues because the interest is

7   contrary to the purpose of the statute, the plaintiffs may not

8   bring suit.  Well, I'm much more persuaded by the plaintiffs'

9   argument.  And I agree with the plaintiffs that disagreement

10  with the Government about a statute's true interest does not

11  render plaintiff outside the zone of interest.

12         The Court cannot resolve the merits question of

13  the statute's true interests, let alone accept the

14  Government's view of the merits as a means of denying the

15  plaintiffs the chance to make their merits arguments.

16  Plaintiffs argue that enacting this and related provisions of

17  the Affordable Care Act, one of Congress's interests was in

18  limiting the expenditure of taxpayers' money and expanding the

19  number of low income people, satisfying the exemption from the

20  individual mandate penalty.  And that both groups of

21  plaintiffs in this case are either directly or indirectly

22  regulated by the IRS Rule and, thus, must be considered to be

23  within the zone of interest.

24         So, at least with respect to the individual

25  plaintiffs, I think that the plaintiffs have the much better

1    argument.  The circuit has said:  In reviewing the standing

2    question, the courts have to be very careful not to decide the

3    questions on the merits for or against the plaintiff, and must

4    assume that on the merits the plaintiffs would be successful

5    in their claims.

6              Furthermore, as the plaintiffs' correctly note,

7    again, citing this Supreme Court case,

8    Match-E-Be-Nash-She-Wish Band, parties challenging agency

9    actions will often assert that an agency has gone too far in

10   promoting certain goals underlying a statute.

11             Plaintiff falls within the zone of interest if

12   the plaintiff's interest is arguably one that is regulated or

13   protected.  And, clearly, and it says arguably regulated or

14   protected.  Clearly, the individual plaintiffs are directly

15   regulated by the IRS Rule, and this is enough to bring them

16   within the zone of interest, and they have prudential

17   standing.

18             As for the employer plaintiffs, they may be

19   regulated or at least indirectly regulated under the employer

20   mandate provision, and they do rely largely on the -- largely

21   on the Safe Extensions versus FAA decision, which I just

22   mentioned.

23             So, I think that clearly the individual

24   plaintiffs have prudential standing.  I'm going to reserve

25   ruling on the employer plaintiffs.

```
 1              In addition to presenting a zone of interest
 2    argument, defendants also argue that a third party like the
 3    plaintiff employers generally may not challenge the tax
 4    liability of another.  This argument comes up or some variant
 5    of it comes up as part of the prudential standing argument
 6    that the Government makes, part of a stand alone tax refund as
 7    the better route or the only route argument, and also under
 8    the Anti-Injunction Act.
 9              So, the Government says that, you know,
10    essentially these employers are challenging the tax liability
11    of another and that, therefore, they don't have prudential
12    standing.  And, in fact, if they're successful, they would be
13    increasing the tax liabilities of third parties who are not
14    before the Court.  And it is established, they say, that
15    ordinarily one may not litigate the tax liability of another.
16              Plaintiffs reject the Government's contention
17    that there is a categorical rule against challenges to laws
18    and rules granting tax credits to others.  And they list a lot
19    of cases in which federal courts have reached the merits of
20    third party challenges to tax laws.  And there's this dispute
21    about whether those cases all -- the Government says those
22    cases all relate to constitutional challenges to tax laws, and
23    the plaintiffs say, no, they're not, and they're perfectly
24    applicable here.
25              I guess I'm going to invite both parties to
```

1    further address the issues and, you know, highlight the cases

2    that you think are -- plaintiffs should highlight the cases

3    that they think are most apt in this situation, most

4    analogous.

5                So, bottom line on standing.  Since at least one

6    plaintiff has both Article III and prudential standing, the

7    Government's motion to dismiss must be denied on standing

8    grounds.

9                So then we get to ripeness.  I have an intern

10   here who is still in law school, so now he can skip his

11   federal jurisdiction course, he knows about standing and

12   ripeness and all of that after today.  The ripeness doctrine

13   limits the power of federal courts to decide only judicial

14   matters.  It finds its roots both in the 'case or controversy'

15   requirement of Article III of the Constitution, and the same

16   sort of prudential considerations I was previously talking

17   about which favor the orderly conduct of the administrative

18   and judicial processes.

19               Now, in the context of administrative action, the

20   ripeness doctrine prevents courts through premature

21   adjudication from entangling themselves in abstract

22   disagreements over administrative policies, and it protects

23   agencies from judicial interference until the administrative

24   decision has been formalized and its effects are felt in a

25   concrete way.

1          I'm going to get to this, but all you have to do

2   is -- and that's from Abbott Laboratories, 387 U.S. 136.  I

3   mean, this is a final agency rule.  It's out there.  It's

4   beginning to affect people now.  And I just don't -- I just

5   don't accept the Government's argument that this case is not

6   ripe for review.  But now I'll tell you why.

7          The cases say that in considering a ripeness

8   challenge, the Court has to consider the fitness of the issues

9   for judicial decision and the hardship to the parties of

10   withholding judicial review.  And a dispute is generally fit

11   for judicial review if it is legal in nature and no other

12   institutional concerns militate in favor -- concerns militate

13   in favor of withholding review.  And under the hardship prong,

14   the Court has to consider what the plaintiffs are in securing

15   review now rather than later.

16          The Government argues that the claims are not

17   ripe.  They make a number of arguments.  But because it's not

18   clear how this regulation will affect the plaintiffs, and they

19   can raise the issues at a later proceeding -- I can't remember

20   whether we're talking about 2015 or 2016 or 2017, but in a

21   later proceeding.  And I just don't buy that.  The lawfulness

22   of this regulation is a purely legal question.  No further

23   factual development will help me in deciding whether or not to

24   vacate this regulation.

25          The case law is pretty clear, what's going on --

1    what I should be looking at.  American Petroleum versus EPA,

2    683 F.3d 382, D.C. Circuit, 2012.  In the context of agency

3    decision making, letting the administrative process run its

4    course before binding parties to a judicial decision prevents

5    the Court's from entangling themselves in abstract

6    disagreements over administrative policies, and protects the

7    agencies from judicial interference.

8              In this case we've got a final regulation.  And

9    when considering the fitness of an issue for review, the Court

10   said, we ask whether it is purely legal.  Okay.  In this case

11   we have a final regulation, it's purely legal.  What does it

12   mean?  Is it consistent with the statute or isn't it?

13             On the hardship question, the circuit said in

14   American Petroleum Institute:  Considerations of hardship that

15   might result from delaying review will rarely overcome the

16   finality and fitness issues inherent in attempts to review

17   tentative positions.  So, what they're saying is if somebody

18   comes in and claims hardship to review an interim rule, you

19   shouldn't do it just because of hardship.

20             But it seems to me that the Congress also makes

21   sense, that if you've got a final rule, how much hardship does

22   the plaintiff need to show?  In this case, whether

23   Mr. Klemencic has shown irreparable injury -- justifying

24   preliminary injunction is something I'll talk about later.

25   But we know he's shown that he will be forced to do something

1    he doesn't want to do.  And if I can decide the validity of

2    that regulation, he will not have to do that.

3                Again, Electric Power Supply Association versus

4    F.E.R.C., another D.C. Circuit case, 391 F.3d 1255.  When

5    you've got a final regulation and no further factual

6    development is necessary to clarify the issues before the

7    Court, then the matter is as fit for judicial review, as it

8    can be -- in that case it says, it can be wholly resolved by

9    an analysis of the Sunshine Act, the Act's legislative

10   history, and its construction by relevant case law.

11               In this case, this can be decided looking at the

12   language of the Affordable Care Act, to the extent it's

13   relevant, the legislative history, and the regulation that

14   issued under it.  Quote:  The hardship prong under the

15   ripeness doctrine is largely irrelevant in cases, such as this

16   one, in which neither the agency nor the court has a

17   significant interest in postponing review.

18               Now, if one accepts this case as an APA --

19   plaintiffs have no interest in postponing review.  They're not

20   claiming -- they are claiming hardship if I do postpone

21   review.  From the Government's point of view, if you view it

22   as an APA case, I don't see there's any hardship involved.

23   Only if you view it as the plaintiffs are relegated to a tax

24   refund case later -- if there's some argument that I shouldn't

25   get to the matter now.

1          The Supreme Court's decision in National Park

2    Hospitality Association versus Department of the Interior,

3    123 Supreme Court 2026, and Cohen versus U.S., 650 F.3d 717,

4    the en banc decision of the D.C. Circuit.  Again, APA

5    challenges presumption of reviewability.  In the context of

6    APA challenges, we have previously said lack of hardship

7    cannot tip the balance against judicial review.  So, I think

8    the case is ripe.  The issue is ripe for review.

9          Moving right along -- and then, Lisa, we'll take

10   a break before I discuss the preliminary injunction question.

11   The Government next argues that this is not appropriate --

12   this is not an appropriate case under the Administrative

13   Procedure Act.  That APA review of this regulation is

14   precluded -- maybe that's too strong a word, maybe it's not --

15   by the existence of another review mechanism.

16         They say that the plaintiffs may not bring this

17   action as an APA action because Congress has specified that

18   the judicial remedy that the plaintiffs must pursue is an

19   action for tax refund.  In other words, pay the tax, apply for

20   a refund, if you're right, you'll get your money back and

21   you'll be vindicated on this issue of law.

22         I think I made myself clear yesterday, I am very

23   skeptical of this argument.  Maybe I'm too simplistic, but the

24   APA is there for a reason, and there's a challenge to an

25   APA -- there's a challenge under the APA to a regulation that

1   is arbitrary, capricious, contrary to law -- why shouldn't

2   that be resolved, even if it doesn't mean that other people

3   aren't going to -- employees of these employers, for example,

4   aren't going to feel free to seek subsidies and to proceed.

5   We may still have the question -- well, I won't get into that.

6            I'm skeptical that the tax refund action would

7   provide the individual plaintiffs with an adequate remedy, as

8   they are requesting certificates of exemption at the outset

9   and not tax refunds.  And the employer plaintiffs say they

10  will choose to comply with the regulations that they think are

11  unlawful rather than violate them.  And it just seems to me

12  that this argument undermines the purposes of the APA, which

13  seems imminently appropriate here.

14           There is some support for that view and for the

15  plaintiffs' view on this point in the Cohen versus United

16  States, en banc decision, 650 F.3d 717, where the IRS and the

17  dissenters, because it was an en banc decision, says you

18  should use the tax refund mechanism.

19           And, again, I haven't read the statute at issue

20  there, but the Judge Brown in her opinion said:  This suit is

21  an APA action.  It questions the administrative procedures by

22  which the IRS allows taxpayers to request refunds for

23  wrongfully collected taxes.  The dissent assumes a refund suit

24  provides an adequate remedy at law.  But she goes on to say:

25  Congress has not required exhaustion in APA suits challenging

1   the adequacy of IRS procedures, and we're not going to impose

2   it here.

3         I know that that case is not -- the portion of

4   the Internal Revenue Code there is different and nuanced, but

5   I think there is some support for the notion that the APA is

6   an appropriate remedy here.  This sort of melds into the

7   Anti-Injunction Act question, although they're presented as

8   and are separate questions.

9         The Anti-Injunction Act argument, as I understand

10  it, is raised by the Government only with respect to the

11  employer plaintiffs, not with respect to the individual

12  plaintiffs.  The Anti-Injunction Act provides that no suit for

13  the purpose of restraining the assessment or collection of any

14  tax shall be maintained in any court by any person, whether or

15  not such person is the person against whom such tax was

16  assessed.

17        The courts have said, it's intended to protect

18  the Government's ability to collect a consistent stream of

19  revenue by barring litigation to enjoin or otherwise obstruct

20  the collection of taxes.  Normally, because of the

21  Anti-Injunction Act, taxes can only be challenged after they

22  are paid by suing for a refund.  That's why I say it melds

23  into this other APA argument.

24        So, I guess from the Government's point of view,

25  the Supreme Court sort of threw a monkey wrench into this AIA

1   discussion by its decision in National Federation of

2   Independent Business versus Sebelius.  Nevertheless, I think

3   that HHS and the Government and the President are happy to

4   have to deal with that monkey wrench rather than to deal with

5   what the alternative was going to be -- because we can all

6   count to five.

7          So, the Supreme Court in National Federation of

8   Independent Businesses versus Sebelius held that the label

9   that Congress gives to a payment matters for purposes of the

10  Anti-Injunction Act.  They said -- the Anti-Injunction Act --

11  the Chief Justice said:  Both the Anti-Injunction Act and the

12  Affordable Care Act are creatures of Congress's own creation.

13  How they relate to each other is up to Congress, and the best

14  evidence of Congress's intent is the statutory text.

15         Congress cannot change whether an exaction is a

16  tax or a penalty for constitutional purposes, they say, but

17  for purposes of whether the Anti-Injunction Act applies.  It's

18  what they call things that matters.  The Supreme Court then

19  noted that the penalty imposed on individuals who failed to

20  obtain essential minimum coverage under the Affordable Care

21  Act, the individual mandate, cannot be considered a tax for

22  purposes of the Anti-Injunction Act since Congress

23  consistently used the term penalty when discussing the

24  individual mandate and not the term tax.

25         In other aspects of the Affordable Care Act they

1   use the term tax or taxes, said the Supreme Court.  In fact, I

2   believe the Chief Justice in his opinion said the word tax or

3   taxes are used several hundred times, maybe over 600 times, in

4   other parts of the statute.

5          The Court found that the distinction between the

6   terms tax and penalty is important for purposes of the

7   Anti-Injunction Act.  So, the Government asserts that in

8   contrast to the individual mandate at issue in the National

9   Federation of Independent Businesses case, the exaction under

10  Section 4980H, the so-called employer mandate, is a tax.  And

11  it's true that sometimes the word tax is used here, but the

12  term assessable payment is also used.

13         This question came before the Fourth Circuit in

14  Liberty University versus Lew.  Liberty University was an

15  employer plaintiff.  The Fourth Circuit concluded that the,

16  quote:  Assessable payment reference in 4980H did not in fact

17  constitute a tax under the Anti-Injunction Act.

18         In an opinion -- we don't know who wrote it, it's

19  signed by all three judges and I'm not sure why.  They didn't

20  say per curiam and they didn't say who, but Judge Motz, Judge

21  Davis and Judge Wynn issued an opinion jointly.  And they said

22  that in this part of the Act, the employer mandate part, the

23  use of the word tax is used infrequently, and assessable

24  payments is used more frequently.

25         And while they couldn't explain why it's mostly

 1   called one thing and occasionally called something else, they

 2   did say that they saw no distinction between what the Supreme

 3   Court did in National Federation of Independent Businesses and

 4   what was before them in Liberty University.   No distinction

 5   between the employer mandate and the individual mandate in

 6   terms of what is and is not a tax for purposes of the

 7   Anti-Injunction Act.

 8            And they specifically said, under the Secretary's

 9   theory:  An employer subject to the employer mandate can bring

10   only a post-enforcement suit challenging the employer mandate.

11   The Fourth Circuit said:  It seems highly unlikely that

12   Congress meant to signal with two isolated references to the

13   term tax -- that the mandate should be treated differently.

14   And, therefore, they ruled against the Secretary on this.

15            The Government's argument on this question is

16   that the Fourth Circuit is wrong and that I should reject the

17   Fourth Circuit reading.  They say that the employer plaintiff

18   suit is barred by the Injunction Act -- barred by the

19   Anti-Injunction Act because, they say, 4980H imposes a tax.

20   And what the employer plaintiffs are seeking is to be relieved

21   from a tax under that section applied to them.

22            The Fourth Circuit has analyzed this.  The Tenth

23   Circuit in the Hobby Lobby case has analyzed this and has

24   followed the Fourth Circuit.  And the question is:  Are the

25   employer mandate, the language of the relevant provision of

1    the statute and the structure and affects sufficiently similar

2    to the individual mandate penalty to call it a tax -- I mean,

3    to call it a penalty, or is this different and is it a tax?

4              So, you know, the Government's got an uphill

5    battle on this.  But since I found that one individual

6    plaintiff has both Article III and prudential standing, and I

7    found that the case is ripe for decision, I don't have to

8    decide this now since this AIA argument applies only to the

9    employer plaintiffs.

10             The Government can brief it further.  The

11   Government can see if they can try to persuade me, in the

12   summary judgment papers, not to follow the Fourth Circuit, not

13   to follow the Tenth Circuit, to see if there's a distinction

14   between this and what the Supreme Court previously did.  And

15   it seems to me, finally, that until I decide the standing of

16   the employer plaintiffs in this issue, I really don't need to

17   decide the Rule 19 question of indispensable parties.

18             And, again, the Government can give me more on

19   Rule 19 if they think it's worth a candle, but I'm not going

20   to decide that one today either.  So, bottom line, it took a

21   long time to get there.  Anything I missed?  Bottom line is

22   that the motion to dismiss is denied and the case goes forward

23   with summary judgment briefing.

24             And we will talk about a schedule for summary

25   judgment briefing at the end of this hearing.  So, should we

1   take a 10-minute break and then I'll come back and tell you

2   what I think about the preliminary injunction motion?

3   BRIEF RECESS

4                          AFTER RECESS

5           THE COURT:   The second motion that I heard argument

6   on yesterday is the plaintiffs' motion for a preliminary

7   injunction.   And, again, we focus on Mr. Klemencic, and

8   because -- one of the things that one has to show for

9   preliminary injunction is irreparable harm, and so the effort

10  was made with respect to him to show irreparable harm.

11          Essentially what the plaintiffs are asking is that

12  the regulation be enjoined, or its effectiveness or its

13  application be enjoined, pending a final determination on the

14  merits of this case.   And now that I've denied the motion to

15  dismiss we know that there will be a final determination on

16  the merits in this case.   If I had granted the motion to

17  dismiss, then the motion for preliminary junction would have

18  been moot, as the case would have been gone.

19          So, as all the lawyers in the room know, a

20  preliminary injunction is considered an extraordinary remedy

21  that may only be awarded on a clear showing that the plaintiff

22  is entitled to such relief.   A plaintiff seeking a preliminary

23  injunction has the burden by a preponderance of establishing

24  that, one, he's likely to succeed on the merits; two, he's

25  likely to suffer irreparable harm in the absence of the

1    preliminary relief that he's requested; and that the

2    balance -- third, that the balance of equities tips in his

3    favor; and fourth, that an injunction is in the public

4    interest.

5             Traditionally, in this circuit, these factors were

6    viewed as a continuum, and if there were more than one factor

7    that could compensate for less than another.  So, for example,

8    if you had a really, really strong likelihood of succeeding on

9    the merits then you had to show less injury.  And if you had

10   really significant injury, then maybe not so much on the

11   merits.

12            Under this sliding scale test, if the argument for

13   one factor was particularly strong, an injunction may issue

14   even if the arguments in other areas are weak.  The Supreme

15   Court decided a case called Winter versus Natural Resources

16   Defense Council, 129 Supreme Court 365.

17            And in Sherley versus Sebelius, 644 F.3d 388, the

18   D.C. Circuit suggested, but did not decide, that the

19   likelihood of success and irreparable harm factors each are

20   independent requirements, and that you couldn't get a

21   preliminary injunction unless you showed both -- likelihood of

22   success and likelihood of irreparable harm.

23            So, regardless of whether I adopt a more or less

24   flexible approach to this, the D.C. Circuit has said in

25   Chaplaincy of Full Gospel Churches versus England, among other

1     cases, and a case which I lost called Sea Containers versus

2     Stena, 890 F.2d -- that's when I was practicing law -- F.2d

3     1205.  I shouldn't cite that, I guess.  I won part of the

4     case, but I lost the preliminary injunction part of the case.

5            The circuit has said, regardless, it has said that

6     a movant has to demonstrate at least some injury for a

7     preliminary injunction to issue.  And if the moving party

8     fails to show any irreparable harm, that's grounds for denying

9     the motion.

10           So, I'm going to start by talking about

11    plaintiffs' injuries in the irreparable harm prong.  So, the

12    minimum coverage provision, under which individuals who do not

13    obtain minimum coverage are assessed a tax penalty, will be

14    effective starting in 2014.  Plaintiffs have asserted that

15    unless the challenged regulations are enjoined before the end

16    of this calendar year, David Klemencic will be irreparably

17    deprived of his right to obtain a certified exemption from the

18    Affordable Care Act's individual mandate for calendar

19    year 2014.

20           He's got to obtain that certified exemption, it

21    was said in the briefs, before December 31st.  And if he

22    doesn't get relief before December 31st, he would be forced

23    either to buy comprehensive health coverage that he doesn't

24    want or risk incurring a penalty; and he would be foreclosed

25    from getting the catastrophic coverage for 2014.

1                  In the briefs it was said that once 2014 begins,

2       he would no longer be able to obtain a certificate of

3       exemption and that his remedy -- his injury could not be

4       remedied after the fact.  In short, the rule that's at issue

5       in this lawsuit, the IRS rule that's at issue in this lawsuit,

6       is preventing him from obtaining a certificate of exemption,

7       and the window for him to do so is going to close.

8                  Now, I think what I understand from the recently

9       filed declarations by Mr. Klemencic, by the representations

10      made by counsel for both sides yesterday, that the actual

11      deadline for enrolling in an Exchange is March 31, 2014.  And

12      under the applicable regulation, an individual who seeks a

13      certificate of exemption under the unaffordability provision

14      may apply for such a certificate any time before the final

15      date on which he or she is eligible to enroll in a qualified

16      plan offered under the Exchange.  And that's 45 C.F.R. Section

17      155.605(g(2).

18                 In looking at the penalty provision of the

19      statute, this deadline appears consistent with the exemption

20      for short coverage gaps of less than three months.  Thus, it

21      seems, that an individual who waits until March 30, 2014, to

22      obtain health insurance would not be subject to a penalty and

23      that you can get a certificate of exemption anytime before

24      that date.

25                 It was said in court yesterday by plaintiffs'

 1   counsel, with the necessary lead time, they think the date

 2   that it becomes crucial -- they may still be sticking to their

 3   December 31st date -- but I understood them to say that with

 4   the necessary lead time leading up to March 30, 2014, and

 5   getting the exemption and other things, that would be

 6   February 15th, 2014.

 7          And, so, the question is, if there is no risk of

 8   injury until February 15th, 2014, or possibly later, is there

 9   irreparable injury in this case for Mr. Klemencic?  And I

10   guess I would add, is there irreparable injury if I can decide

11   the merits of the case before February 15th, 2014?  And I see

12   no reason why I can't with expedited briefing.  And some of

13   the issues -- some of the issues that were briefed on the

14   motion to dismiss have either been resolved or one side or the

15   other is going to abandon them or tell me they are not that

16   important to them.

17          Other issues that have previously been briefed

18   have to be briefed further, if you want to persuade me, and

19   I've said some of that earlier this morning.  The main issue

20   that still needs to be briefed, in my judgment, is the Chevron

21   Phase I and the Chevron Phase II, but there are others.

22          So, without a preliminary injunction,

23   Mr. Klemencic and possibly other plaintiffs will have to

24   choose between paying a penalty estimated for Mr. Klemencic

25   at about $12 a month, or obtaining health insurance that he

1    doesn't want, after being awarded a subsidy that he says would

2    be illegally granted, around $18 a month.  If he chooses the

3    penalty -- if he chooses the penalty or tax, if you want to

4    call it a tax, and ultimately prevails in this lawsuit, he'll

5    be able to recover the money expended through a tax refund.

6    If he chooses to buy the insurance, that money is, I think,

7    not retrievable.

8         So, I would make a couple of points.  One, this

9    case can be resolved on the merits before February 15th, 2014,

10   and I think that really undercuts Mr. Klemencic's irreparable

11   injury argument.  Two, if he pays the penalty and wins

12   ultimately, if I didn't get to it by that date, which I will,

13   he would get a tax refund.  So, I don't see any irreparable

14   injury.  And if there's no irreparable injury, then there's no

15   preliminary injunction.

16        But he says he may choose to take the insurance

17   under protest.  In fact, I think he says he will choose to

18   take the insurance under protest rather than pay the penalty.

19   And if he does that and later wins the lawsuit, he doesn't get

20   a tax refund.  So, I raise the question, without deciding it,

21   although -- and that's this.

22        Preliminary injunction is an equitable remedy.

23   Is it fair to let someone create his own irreparable injury

24   and then get a preliminary injunction because he's created his

25   own irreparable injury?  This gets to the Hobson's choice

1  discussion we've had before.  But if he pays the penalty, no

2  irreparable injury.

3            If he takes the other option, for whatever

4  reason, can he thereby create irreparable injury?  Even if he

5  did -- if he could -- is the amount, $18 a month, so

6  de minimis that it's not really irreparable injury, because

7  surely, even if I didn't require expedited briefing, which I

8  will, this case can be decided by me quickly.  And, so, maybe

9  he pays one month of insurance, maybe he pays two months of

10  insurance, that's not going to happen.  What you all do with

11  respect to the Court of Appeals and what kind of stays and

12  injunctions you ask for, depending upon how I rule, is another

13  question.

14            There's a second and independent reason that the

15  Government raises, and that's that traditionally economic harm

16  is not a basis for a preliminary injunction, and certainly

17  de minimis economic harm cannot constitute irreparable harm

18  for preliminary injunction purposes.  And, again, we're

19  talking about a penalty of $150 a year, is the estimate, or

20  $12 a month, or $18 a month in insurance.

21            The cases -- there are a lot of cases on this

22  point.  Hi-Tech -- but, again, you know, other than a tax

23  refund, you can't sue the Government presumably because of

24  sovereign immunity.  But even in cases where the Government is

25  a defendant, the courts have invoked that principle where the

1   economic harm is de minimis.

2           In an opinion by Judge Bates, Hi-Tech Pharmacal

3   Company versus the Food and Drug Administration, 587 F.Supp.2d

4   Page 1.  He says:  To demonstrate irreparable injury, a

5   plaintiff must show that it will suffer harm that is more than

6   simply irretrievable; it also must be serious in terms of its

7   effect on the plaintiff.  To warrant emergency injunctive

8   relief, the injury must be certain, great, actual, and

9   imminent.

10           Harm that is merely economic in character is not

11   sufficiently grave under this standard, citing Wisconsin Gas.

12   To shoehorn potential economic loss into a showing of

13   irreparable injury, plaintiff must establish the economic harm

14   is so severe as to cause extreme hardship to his business or

15   threaten his very existence.  That's one example, there may be

16   others.

17           Chaplaincy, which I mentioned, of Full Gospel

18   Churches versus England, 454 F.3d at 290, the D.C. Circuit

19   also discusses that, and says:  The key word in this

20   consideration is irreparable.  Mere injuries, however

21   substantial, in terms of money, time and energy necessarily

22   expended in the absence of a stay are not enough.

23           The possibility that -- in Gulf Oil Corporation

24   versus Department of Energy, 514 F.Supp. 1019, a 1981 decision

25   by Judge Flannery says:  Some concept of magnitude of injury

1    is implicit.  The injury must be more than simply

2    irretrievable, it must be serious in terms of its effect on

3    plaintiff.

4            Another case is American Association for Homecare

5    versus Leavitt by Judge Urbina, at 2008 Westlaw 2580217.

6    And -- let's see if I think this is relevant.  In a case of

7    mine, Sterling Commercial Credit-Michigan versus Phoenix

8    Industries, 762 F.Supp.2d Page 8.  I said that, under some

9    circumstances, courts have held economic harm may qualify

10   where a plaintiff's alleged damages are unrecoverable.  But

11   even unrecoverable losses must have a serious effect on a

12   plaintiff in order to be considered irreparable.  And I cited

13   a case called Sandoz versus FDA 439 F.Supp.2d 26.  A loss of

14   less than 1 percent of total sales is not irreparable harm.

15   So, it's a second reason for why I find that the injury to Mr.

16   Klemencic is not irreparable.

17           So, what about success on the merits?  Even if I

18   assume that there -- even if there were some threat of

19   irreparable harm to Mr. Klemencic, what about the merits?

20   If the sliding scale analysis still applies, the plaintiffs

21   would have to show, since I've said I didn't find any

22   irreparable harm, a particularly strong likelihood of success

23   on the merits.  And I don't think the plaintiffs have made

24   that showing.  And let me be very clear what I'm saying here

25   because this is important to you and to the world at large.

1          The plaintiffs make a very good argument.  We

2     spent a lot of time on this yesterday.  That the words in the

3     statute, an Exchange, quote, established by a state, should be

4     construed literally and that federal Exchanges are not

5     established by a state.  The defendants have a good argument,

6     too, at least a credible argument, that when you view this in

7     the context of the entire statute and the overall scheme of

8     things, and when you apply Chevron to the regulation, that

9     they're likely to win on the merits.

10          We haven't had a lot of discussion about Chevron.

11     I think both sides suggested that we don't get beyond Chevron

12     Step 1 that the statute is unambiguous.  But I think the

13     briefs that I'm going to get from you on summary judgment are

14     going to have to discuss both Chevron Step 1 and Chevron

15     Step 2.

16          So, all I'm saying is that if, on preliminary

17     injunction, in a case where I find no irreparable harm, the

18     plaintiffs have the burden of showing a particularly strong

19     likelihood of success on the merits, I don't think they've

20     done that.  They have made an argument that may ultimately be

21     successful.  The defendants have made an argument that may

22     ultimately be successful.

23          And as I delve further into the statute, with the

24     assistance of additional briefing by the parties, the strength

25     of each party's position will become clearer.  So, that's what

1    I have to say about irreparable harm -- about merits.  I guess

2    implicit in my irreparable harm discussion is that because of

3    the February 15th/March 31st as opposed to December 31st

4    discussion, the employer plaintiffs probably couldn't show

5    irreparable harm either, although, as I understand the

6    preliminary injunction motion, it's brought only on behalf of

7    Mr. Klemencic.

8                 What about the balance of the equities, the

9    public interest.  You know, I've spent a lot of time on this,

10   but it's not worth spending a lot of time on this in light of

11   what I've said so far.  The plaintiff said there's a public

12   interest in ensuring that a government agency acts within the

13   limits of authority.  No doubt that's true.  But until I

14   decide the merits, it's hard to know whether they have not

15   done that.

16                They also argue that lots of people are going to

17   be affected by this if I don't adjudicate this matter

18   promptly, and plaintiffs, the employers, the employees, are

19   making health insurance decisions based on the current

20   regulations, and that's undoubtedly true.  So, that's why I

21   want expedited briefing so that I can deal with this.

22                The defendants argue that there is inherent harm

23   to an agency in preventing it to enforce its regulations that

24   Congress found it in the public interest to direct the agency

25   to develop and enforce.  Well, yeah, but only if the

1    regulations are lawful.  And they also argue that the ability

2    to award relief in this case is limited -- it would not

3    affect -- any relief I granted would not affect many people

4    not before the Court.  Well, that goes to arguments on the

5    merits -- on the -- partly on the APA argument and partly on

6    the other prudential issues.  And I don't need to talk about

7    that further today.

8              So, I think what we need is further briefing.

9    And I'm assuming that the plaintiffs have filed a motion for

10   summary judgment.  So, what we'll get next is an opposition to

11   the motion for summary judgment and a reply.  Or are we going

12   to get an opposition to the motion for summary judgment plus a

13   defendant motion for summary judgment?  In which case, we

14   get -- the Government files a summary judgment

15   motion/opposition, or in two separate documents on the same

16   day.

17             The plaintiffs then file their reply to the

18   opposition and an opposition to the Government's motion, and

19   then the Government files a reply.  But I want to do it

20   quickly.  The parties can address the remaining arguments on

21   jurisdiction and on the merits.  They could revisit, if they

22   wanted to, any of the things I've already decided.  But,

23   certainly, the question of the standing of the employer

24   plaintiffs, the redressability question, the APA versus tax

25   refund question, the APA question more broadly, I said

1    redressability, and Chevron Step 1 and Step 2.  I'm sure that

2    when all of the lawyers get back to their office they will

3    think of other things they want to brief, too.

4                So, that's where I am.  Who wants to say

5    anything?

6                MR. CARVIN:  Just a brief inquiry of the Court,

7    Your Honor.  If I remember correctly, the extant order was for

8    them to file an opposition within two weeks of you ruling on

9    the motion to dismiss.  Do I remember that correctly?  Or are

10   you planning on -- do you want us to suggest a briefing

11   schedule?

12               THE COURT:  I think we should revisit the briefing

13   schedule because it seems to me that you want an answer

14   quickly.

15               MR. CARVIN:  As fast as possible.

16               THE COURT:  And I think you should have an answer

17   quickly.  Mr. McElvain can tell me whether they've already

18   decided whether they're going to file their own summary

19   judgment motion, but that --

20               MR. CARVIN:  Did you want to --

21               THE COURT:  Do you want to do it now or do you all

22   want to get together and talk and try to submit something in

23   the next couple of days?

24               MR. CARVIN:  Because time is of the essence, I'd

25   rather do it now, but...

1          MR. McELVAIN:  Your Honor, I'll need to return to

2     my office and consult with people in -- Your Honor, I'll need

3     to engage in consultations as to dates.  I think there should

4     be no problem arranging a schedule that would build towards

5     reaching a decision by the February 15th date.

6          THE COURT:  Or earlier.

7          MR. McELVAIN:  Or earlier.  We would intend to file

8     a cross motion for summary judgment, so we would work out a

9     schedule for cross briefing.  One potential X-factor, which I

10    won't ask the plaintiffs to make a representation one way or

11    the other right now, but there is one potential issue, which

12    is, I don't know if the plaintiffs intend to take an appeal

13    from the denial of the preliminary injunction motion, and that

14    may affect scheduling.

15         THE COURT:  Well, I don't know whether it does.

16    I mean, if you take an appeal from -- does it affect my

17    jurisdiction to consider summary judgment?

18         MR. CARVIN:  It's a nonfactor, Your Honor, right.

19    And with all respect to Mr. McElvain, if he wants us to get

20    back to the Court, that's fine, but the Justice Department is

21    a big place.  I think a deadline for getting back to you with

22    proposed schedules by COB tomorrow will maybe make those

23    wheels spin a little quicker.

24         THE COURT:  Today is Tuesday.

25         MR. McELVAIN:  Your Honor, I'm going to be out of

1   the office for the afternoon for a previously scheduled

2   medical appointment.  So, if I could have until Thursday close

3   of business, that would be --

4           THE COURT:  Let's do this.  If you can reach an

5   agreement and file something by close of business Thursday --

6   if you can't, I'll make myself available for a conference call

7   on Friday.  I'm going to be away the first couple of days of

8   next week, so I would like to get it resolved this week.

9           MR. CARVIN:  That's fine with me, Your Honor.  We

10  could also submit something in writing Thursday before the

11  conference call --

12          THE COURT:  Here's what I'm suggesting.  Why don't

13  we do this.  Submit something in writing by close of business

14  Thursday.  If you're in agreement there's no need for a

15  conference call.

16          MR. CARVIN:  Right.

17          THE COURT:  But if you're not in agreement -- I

18  don't think I've got anything in court on -- I've got my

19  calendar right here.  I don't have anything in court on

20  Friday, I do on Thursday.  So, do you want to set a time now

21  for a tentative conference call?

22          MR. CARVIN:  10:00 cloak.

23          MR. McELVAIN:  10:00 o'clock would be fine.  I

24  doubt that we'll need it, but that would be fine.

25          THE COURT:  So, let's say 10:00 o'clock Friday

1  morning for a tentative conference call.  I don't know how you

2  want to do it, with a call-in number or whatever.  My law

3  clerk, Julie Dona, will send you both an e-mail so we can get

4  the logistics set up.  And then if you don't need it, you can

5  respond to her by e-mail at the same time you file something

6  on Thursday by close of business.  I mean, no need to do it if

7  you're in agreement on a schedule.

8            MR. CARVIN:  Thank you, Your Honor.

9            THE COURT:  And I'll issue an order today saying,

10  motion to dismiss denied for reasons, and preliminary

11  injunction denied for reasons, blah, blah, blah.  So, if you

12  do want to appeal the preliminary injunction, you'll have a

13  piece of paper or an electronic thing or both.

14            MR. CARVIN:  Thank you, Your Honor.

15            THE COURT:  Okay.

16            MR. McELVAIN:  Thank you, Your Honor.

17            THE COURT:  Okay.

18  END OF PROCEEDINGS

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, Lisa M. Foradori, RPR, FCRR, certify that

3    the foregoing is a correct transcript from the record of

4    proceedings in the above-titled matter.

5

6

7

8    Date:_____          _____

9                                   Lisa M. Foradori, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25