```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - x

JACQUELINE HALBIG, et al.   :  Docket Number CA 13-623

          vs.               :    Washington, D.C.

KATHLEEN SEBELIUS, et al.,  :  Tuesday, December 3, 2013

            Defendant.    :      2:00 P.M.

- - - - - - - - - - - - - - x

                  TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE PAUL L. FRIEDMAN
                 UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Plaintiffs:  MICHAEL A. CARVIN, ESQUIRE
                     JOHN BERRY, ESQUIRE
                     Jones Day
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 626-1700


For the Defendants:  JOEL McELVAIN, ESQUIRE
                     SHEILA LIEBER, ESQUIRE
                     U.S. Department of Justice
                     Civil Division
                     20 Massachusetts Avenue, N.W.
                     Room 7332
                     Washington, D.C.  20001
                     (202) 514-2988


Court Reporter:               Lisa Walker Griffith, RPR
                              U.S. District Courthouse
                              Room 6507
                              Washington, D.C.  20001
                              (202) 354-3247

1           P-R-O-C-E-E-D-I-N-G-S

2           THE DEPUTY CLERK:  Matter before the Court, Civil

3     Action Number 13-623, Jacqueline Halbig, et al. versus

4     Kathleen Sebelius, et. al.

5           Counsel, please come forward and identify yourselves

6     for the record.

7           MR. CARVIN:  Good afternoon, Your Honor.  Michael

8     Carvin for the plaintiffs.  And with me today is John Berry.

9           THE COURT:  Good afternoon.

10          MR. McELVAIN:  Good afternoon, Your Honor.  Joel

11    McElvain for the defendants.  With me today is Sheila Lieber.

12          THE COURT:  Ms. Lieber.

13          Good afternoon, everybody.

14          Okay, we're here on the parties' cross-motions for

15    summary judgment.  I've read all the papers.  And, of course,

16    I'm familiar with the matter from the last time we were here.

17    So, and I sent out an order that said 45 minutes a side.

18    I'll try to keep you to that.  You'll try to keep yourselves

19    to that.  It depends on how active I am in asking questions,

20    I suppose.  And I guess both sides get a rebuttal since

21    they're cross-motions.

22          So is it the plan that you are going start,

23    Mr. Carvin?

24          MR. CARVIN:  Yes, Your Honor.

25          Good afternoon, Your Honor.  I know you're familiar

1    with this, and I'll try not to endlessly repeat it.

2         But the language of the statute is still as plain as

3    it was, and the policy it pursues is just as compelling as

4    when we first met.  Obviously, the relevance statutory

5    language is found in 36(b), the subsidy provision, which says

6    subsidies are available if you bought the insurance through

7    a, quote, exchange established by the state under Section

8    1311.

9         The Government wants you to rewrite that to say,

10   under an exchange established by the state under 1311 or by

11   the Federal Government.

12        We think that plainly violates every principle of

13   interpretation and constitutes a judicial revision of the

14   statute.

15        I don't think there's actually much disagreement

16   about 36(b) itself.  The Government's argument directs you to

17   another provision of the Act administered by HHS, Section

18   1321.  And that's the provision, as you undoubtedly know,

19   that authorizes the Secretary to establish such exchange

20   within the state in the event that the state has not

21   established an exchange under Section 1311.

22        Our first basic point is the fact that this is an

23   exchange established by the Secretary under 1321 precludes

24   interpreting it as an exchange established by the state under

25   1311.  They make the point that such exchange means such,

1  means this exchange, an exchange under the definitional

2  exception, it means exchange under 1311.

3          That's quite true.  It means when the Secretary

4  establishes the substitute exchange, it needs to be the same

5  exchange as the state would have established.  But it doesn't

6  change the fact that it's established by the Secretary as a

7  substitute for the state's failure to create the exchange.

8  And a substitute exchange by the Secretary can't be an

9  exchange established by the state under 1311.

10          More particularly, there's three reasons why their

11  interpretation of 1321 cannot survive even minimal scrutiny.

12  First of all, the premise of 1321, as I said, is that the

13  state has failed to establish an exchange under 1311.  It

14  doesn't exist.  It's not triggered unless the state has

15  failed to establish an exchange.  So it can't be that what

16  the Secretary is establishing, because the state has failed

17  to establish an exchange under 1311, is itself a state

18  established exchange under 1311.  Again, it can only be a

19  substitute.

20          The ambiguity that they focus on that's created by

21  the fact that exchange means exchange established under 1311

22  is of no import here.  It doesn't do what they need to do,

23  which is to say this is an exchange established by the state

24  under 1311.

25          So regardless of how you answer the metaphysical

question of whether the thing established by the Secretary is a 1311 exchange or a 1321 exchange is beside the point, because in either event, it's not an exchange established by the state.  The most that their argument would prove is there's two kinds of 1311 exchanges.  Those established by the state in the first place and those established by the Secretary when the state doesn't do it.

But again, the operative language is established by the state under 1311 for the subsidy provision to apply and therefore whatever ambiguity is created by this definitional exchange doesn't get them close to where they need to be.

Even if there weren't those two fatal flaws in their argument, the language itself that they're focusing on, they claim that this creates some legal fiction where an exchange established by the Secretary is deemed to be an exchange established by the state.

But there's no language that even remotely conveys that, even if you just view that sentence in isolation.  It doesn't say this is an exchange established on behalf of the state or as if it were by a state.  It simply says an exchange within the state.  So it doesn't have the language that is necessary to create the legal fiction that they argue for.  They cannot point to a single statute in the U.S. Code where one entity is deemed to be another entity without language expressly doing that.

1          And that absence is particularly notable here

2    because we have language in the act itself, the territorial

3    provision.  It says territories aren't states, but we want

4    them to be treated like state exchanges.  And then they

5    therefore add very explicit language saying this will be

6    deemed under 1804(3).  This will be deemed a state exchange.

7    There is no parallel language here.

8          The House bill had language like that.  The House

9    bill was sort of the opposite.  It made the federal exchange

10   the regular order, but states could step up and step to the

11   plate and say we'll take it over.  And the House bill, which

12   you can find at the U.S. Government's Summary Judgment

13   Exhibits 15 at page 182 through 183 says, if that happens,

14   then the state exchange shall be deemed to be the relevant

15   exchange.  So even in the House bill, they had this relevant.

16         Every other federal code provision has similar

17   language, the Amicus Families U.S.A. helpfully points out

18   that there's a lot of these kind of provisions and each and

19   every one of them has the words "deemed to be or be treated

20   as."  No such language here, and again, they can't point to

21   any statute anywhere which has ever been interpreted to deem

22   one entity to be another absent such deeming language.

23         Two other points that I think are relevant here.

24   One is, even the Government admits that the things created by

25   the Secretary are not exchanges created by the state under

1311.  The HHS reg defining what a federally facilitated

exchange is, defines it as one established by the Secretary

under 1321 so even their own regs were at war with the

argument they're making here.  And, of course, there's a

provision in the subsidy provision which says here's some

money we're going to appropriate for states when they run the

exchange.

Well, if they believe their deeming argument, then

HHS should have been able to draw on that fund.  But they

haven't been able to because they have not had the audacity

to argue to Congress that the money that Congress gave to the

states through this imaginative legal fiction should be

soaked up by HHS so they won't follow their logic to where it

leads.

And finally, an overarching point is that it is

undisputed that tax credits or tax exemptions or tax

deductions are, in their words, they quote *Mayo* in their

reply brief, must be narrowly construed.  That's a recent

Supreme Court decision.  There's a presumption, an obvious

presumption.  Congress is the custodian of the federal purse.

Congress guards those prerogatives, and we're not going to

allow money to flow out of the Federal Treasury unless in the

words of the Supreme Court and Wells Fargo, it is

unambiguously proved that this tax credit was to be made

available.

 1          And whatever you can say about the Government's

 2     argument, the notion that it unambiguously proves that

 3     subsidies are available, tax credits are available on federal

 4     exchanges is plainly not true.

 5          So, what kind of policy was Congress trying to

 6     implement when it limited subsidies to state exchanges?

 7     Again, we've briefed this up and it seems self-evident.

 8     Congress had a real problem.  It wanted states to run the

 9     exchanges because, among other things, Senator Nelson

10     insisted on it.  It knew that it was asking the states to

11     undertake a thankless, very controversial task, as recent

12     events have certainly proved true, so they needed to provide

13     them with a big incentive to do it.  They couldn't offer them

14     nothing to take on this arduous task.

15          THE COURT:  Is there anything in the statute or in

16     the legislative history that says that or are you just saying

17     that makes logical sense as a matter of policy.  That the

18     reason we're doing subsidies for the states and only for the

19     states is to give them an incentive to establish exchanges?

20          MR. CARVIN:  I think that's an important point, Your

21     Honor, and I'd like to focus on that.  The only way that a

22     federal court can depart from the plain language of the

23     statute is to conclude that it leads to an absurd result or a

24     policy that doesn't make any sense.  It's certainly

25     inarguable and I don't even think arguable that the policy

1   here makes perfect sense.  The Government switches then to

2   say, okay, well, the policy may make perfect sense, but

3   there's no legislative history reiterating this condition.

4   And therefore, you shouldn't infer it.

5          Two points, two fundamental points.  One, if they

6   can't find a lick of legislative history which in any way

7   supports their interpretation of the statute which in any way

8   hints that subsidies are available on the Federal Exchange.

9   If they could, it still wouldn't matter because the statute

10  is unambiguous, but they can't even find that.

11         So their entire argument is, well, this Court is to

12  assume that if they were going to make this deal what we

13  would have had is a bunch of senators writing letters to

14  governors and senators going on the floor and talking about

15  this deal.  And the absence of that creates this inextricable

16  inference, which is going to now authorize you to rewrite the

17  actual language of the statute.

18         Well, the short answer to that is Medicaid.  Surely

19  it was revolutionary to think that Congress was going to

20  actually cut off Medicaid funds to the states.  That was a

21  far greater revolution in America than anything about these

22  exchanges which nobody knew about.

23         But they haven't cited you one snippet of

24  legislative history where a senator went out on the floor and

25  said, governors, be aware, if you don't cut our deal, this is

1   going to happen.  They didn't have one senator go on the

2   floor and say, gee, what if the state rejects the deal, what

3   happens then?  And so there was the same negative -- the same

4   deafening silence that they talk about with respect to

5   Medicaid.  And the deal was in the statute was done exactly

6   the same way as it was done for the exchanges as it was done

7   for Medicaid.  There wasn't some blinking yellow light saying

8   states, hereby be warned, you're going to lose your Medicaid

9   funds if you don't accept this deal.

10          All the Act did was raise the eligibility provisions

11   of Medicaid to what Congress now wanted it.  It upped the

12   number of people that were now eligible to be covered by

13   this.  That was it.  It just changed 1396(a) to up the

14   eligibility provision, it didn't have any warning on top of

15   that.

16          The Government points to 1396(c), but that wasn't

17   part of the Affordable Care Act, that preexisted the Act.

18   They didn't say here's an additional warning for the new

19   deal.  And all 1396 says is what -- confirms what is obvious.

20   Look, if you're not eligible under the criteria we just set

21   forth, then we're not giving you the money.  That's what

22   ineligibility criteria is.  So all of these negative

23   inference arguments that they trumpet about the exchanges

24   were equally true about Medicaid.

25          But if somebody came into this court and argued if a

state had rejected the Medicaid deal that Congress had

proposed and said, no, we're not going to up our eligibility

standards, could somebody seriously argue the Treasury is

nonetheless authorized to give them the old Medicaid money

even though they've rejected the deal, even though the

statute makes the medicaid money conditional on them

accepting these new things.  No, and the same analysis should

apply here.

So if you think about it this way, why was there so

little discussion of this deal.  First of all, there was some

discussion.  Jost, who was one of the leading implementors of

this, expressly suggested it as a way of inducing states to

do it.  The Health Act, we keep talking about the Finance

Committee's version of the bill under Senator Baucus's

control, but the Health Committee had also done a bill, and

that had the same provision, the same condition in it.  So it

was accepted wisdom.

But why wasn't there more talk about this?  Well,

first is the point I think I just made, which is we like to

talk about deals between states and the Federal Government,

but nobody really thinks that legislators are getting on

phones and talking to states and saying -- negotiating some

kind of contract.  The way you communicate the deal, whether

it's the Medicaid deal or any other condition like the

insurance provision that they also had is to put it in the

1   statute, the regs will make it clear, and the states will

2   either accept it or not.  The regs in the statute make it

3   clear what the deal is.  Not in a particular sense.

4        Here you had three years between writing the statute

5   and when the states were going to have to make a decision.

6   So you had ample time to communicate this.  It was never

7   communicated this time because the IRS decided to communicate

8   a completely different message than you can find in the plain

9   language of the statute.

10       The other reason there wasn't a lot of discussion of

11  it was the same reason there was very little discussion of

12  Medicaid.  Everyone assumed that the states would take the

13  deal.  Who wouldn't take this deal?  As the Government points

14  out, this deal is free federal money.  It doesn't cost the

15  states a dime.  Who turns down a gift horse like that in the

16  mouth?  Particularly since, as the Government also helpfully

17  points out, you're not just hurting the low income people

18  getting the subsidies, you're hurting everybody in the state.

19  Because by denying the subsidies, the wealthier people have

20  to make up the difference in the premiums and the insurance

21  companies get hurt.  So you'll have the business community,

22  wealthy people, low income people objecting to this change.

23  Congress had every reason to believe and certainly assume,

24  just like they did with Medicaid, that the states were going

25  to take this deal.

1          The CBO didn't score the money that it would take to

2     run the federal exchanges because they didn't think there was

3     going to be any money for federal exchanges.  There was no

4     appropriation in the Act to run the federal exchanges because

5     Congress didn't really think there were going to be these

6     things.

7          The White House admitted afterwards, they never

8     thought that they would be running any exchanges much less 36

9     of them.  And the reason they're running 36 of them is

10    because the IRS adopted this irrational policy of saying

11    here, take on this task, what will we get in return?  Zero,

12    nothing, bupkis.  And, of course, 36 states said, no, thank

13    you.

14         THE COURT:  Say that again?  Your explanation as to

15    why 36 states, you just said this is a deal that no one could

16    refuse.  And then you gave me a one sentence explanation as

17    to why 36 states refused it.  And I didn't understand the

18    sentence.

19         MR. CARVIN:  I apologize.  If you say to the states,

20    here's the deal.  We are going to cut off your subsidies if

21    you don't run the exchange.  The IRS comes in and says, no,

22    no, here's the deal, we'll give you the money even if you

23    don't run the exchanges, you get the sweet without the

24    bitter.  You get the quid without the quo.

25         Well, if they don't have to do anything to get the

1    exchanges, if they are treated exactly the same way, whether

2    they undertake the very difficult task of running the

3    exchanges or they sit and watch the Federal Government run

4    the exchanges, then what incentive do they have to run the

5    exchanges?  If somebody says --

6         THE COURT:  What's the evidence, what's the evidence

7    that 50 states were going all opt in until the IRS issued

8    this regulation?

9         MR. CARVIN:  What I'm saying is, what we -- we were

10   talking about Congressional expectations, and Congressional

11   expectations are vividly revealed by the fact that the CBO

12   didn't even account for how much money the feds would be

13   using to run the exchanges because they assumed the states

14   would do it.  Congress didn't appropriate any money for the

15   feds to run the exchanges because they assumed the states

16   were going to do it.  And do I know or do you know what would

17   have happened?  No, but we're talking about reasonable

18   expectations.  And I'm saying the proof is in the pudding.

19        If you undo the deal, let me put it this way.  They

20   were greatly worried the states wouldn't do it but for the

21   subsidies.  Right?  And if you undo the deal, if you say

22   we're going to give you the subsidies regardless of whether

23   you run the exchange, we've seen what happened in the real

24   world, 36 states said no.

25        Now, can you or I psychoanalyze what would have

1   happened if they were put to the Hobson's choice of denying

2   all these billions of dollars flowing into their states?  No.

3   But common sense tells us that the deal would have been a

4   heck of a lot more attractive, and they would have had to

5   engage an entirely different decisional calculus if they are

6   confronted with this choice.

7            I assume if we strike, as we request, the IRS will

8   be struck down, I think there's going to be a lot of

9   discussion in the states.  Are we really going to deny

10  thousands, hundreds of thousands of our citizens these

11  subsidies simply because we don't want to run the exchanges?

12           But all I'm talking about now is we're in the fourth

13  level of trying to psychoanalyze Congress.  And they're

14  trying to --

15           THE COURT:  That's always a difficult job.

16           MR. CARVIN:  Always a difficult job, which is why we

17  like to stick to what Congress enacted, not what individual

18  legislators were thinking.  But even in that scenario, wasn't

19  it very reasonable for them to assume, just like they did

20  with Medicaid, that nobody would turn down this deal because

21  it would have paid at least a severe political cost.  And we

22  don't know what would have happened because the IRS never put

23  them to that painful choice since it gave them all the

24  goodies without asking for any of the sacrifice.

25           Finally, we didn't have any real discussion of this

1    because the real discussion of this was going to happen in

2    conference if they had followed the normal provision.  The

3    House is going one way with the federal exchanges, the

4    Senate's going the other way with the state exchanges.  This

5    was all going to get worked out of conference because with

6    Scott Brown's election, they had to go under budget

7    reconciliation.  All you could do was budget items that

8    didn't increase the deficit.

9         Then you've got the declaration from

10   Mr. Holtz-Eakin, which is attached to the Adler/Cannon

11   amicus, he's the ex-director of CBO, who makes it clear that

12   if CBO had been asked the question, what if we're going to

13   have to provide subsidies on the federal exchanges, obviously

14   in addition to the state exchanges, obviously that would

15   increase the deficit.  Or at least there would have been a

16   very strong argument that that would have increased the

17   deficit.  And if you increase the deficit, you can't operate

18   under the reconciliation provisions because of the brouhaha.

19   So it really wasn't a viable candidate to be put into the

20   reconciliation process.  Therefore, the entire colloquy

21   between the House and the Senate were shortchanged when

22   people were really trying to figure it out.

23        So I think, even if we're dealing with these levels

24   of abstraction, the policy was clear.  The results were

25   clear.  And none of the psychoanalysis that the United States

1    wants you to engage in in any way refutes that.  So finally

2    they come up with just the purely naked policy argument would

3    be, it would be really bad not to have subsidies in every

4    state because we want every state to be treated the same.

5         But Congress didn't want every state to be treated

6    the same.  They wanted to treat the states that establishes

7    the exchanges better than the exchange that didn't.  They

8    needed to provide that incentive.  And the one thing that the

9    Government can't come up here and tell you is why anybody in

10   Congress would have thought that all 50 states would have

11   signed on the dotted line if they hadn't given them any money

12   or money to their citizens to induce them to do it.  That

13   would have been the irrational policy to think that these

14   people who sit on the sidelines, these states who sit and

15   watch the Federal Government run their exchanges would have

16   adopted the more difficult thing when they're not getting

17   anything in return.

18        In other words, sure, Congress obviously wanted

19   subsidies in every state, but it wanted something else.  It

20   wanted the states to run it.  And they thought they were

21   getting both because they thought it was a deal that nobody

22   could refuse.  And they didn't want the perfect to be the

23   enemy of the good.  They thought they could get the best of

24   both worlds.  They could get the states to run it and have

25   the subsidies.  When the IRS undid that deal, then all the

1    logic of the Congressional Act was undone.

2         But in all events, appeals to policy can't just

3    focus on that Congress wanted subsidies to the states, which

4    is stipulated.  It also has to account for the fact that

5    Congress wanted states to run the exchange.  And the

6    Government can't give you any reason to think that that

7    second objective would have been accomplished when the IRS

8    gave subsidies regardless of whether you ran the exchange.

9         So as I say, I think that that's the end of this

10   case.  Then the Government takes you on this cook's tour of

11   the other provisions of the Act.

12        THE COURT:  Well, is the reason for the cook's tour

13   because of *Chevron*?  In other words, your argument is, your

14   argument is the statute is clear and it's unambiguous.  But

15   if there's an argument that it's ambiguous, then there's the

16   question as to what I'm supposed to look at and what I'm not

17   supposed to look at to determine whether it's ambiguous.

18        MR. CARVIN:  So, I think we may be conflating two

19   points.

20        THE COURT:  All right.

21        MR. CARVIN:  There needs to be ambiguity in the

22   language to get to *Chevron* step two.

23        THE COURT:  Correct.

24        MR. CARVIN:  In all circumstances.

25        THE COURT:  But I mean, but the question, and maybe

1    you don't want to get there yet, but the question is, in

2    deciding, I mean, you say it's unambiguous, that's your

3    Motion for Summary Judgment.  They say it's unambiguous, but

4    if it's ambiguous, here is why you should defer to the IRS.

5         So, question one under *Chevron* step one is what am I

6    permitted to look at to determine if it's ambiguous beyond

7    the, if anything, beyond the specific words of the text?

8         MR. CARVIN:  Your Honor, that's fine.  I'm going to

9    have to break my answer into two parts.  One is we don't

10   think *Chevron* step two applies here for reasons that I'll

11   return to in a moment.  But to answer your question more

12   directly:  If a provision says the sun comes up in the East.

13   And another provision says we assume that the sun will be

14   coming up in the West, I'm not in any way suggesting you

15   can't look at that separate provision if you've got some kind

16   of conflict between the two.

17        If, for example, 1321 said states will be deemed,

18   federal exchanges will be deemed to be state established

19   exchanges under 1311, you could look at that provision and

20   read it into the subsidy provision.  That's fine.  But what

21   I'd like to walk you through is, have they come up with

22   anything like that, some absurdity, some conflict between our

23   interpretation of the subsidy provision and these other

24   provisions of the Act?  And the answer is no, which is why I

25   somewhat derisively referred to it as a cook's tour.  What

1  they try and do is walk you through the rest of the Act and

2  say, see, the plaintiff's interpretation must be wrong

3  because, like in your hypothetical, it bumps up against

4  another provision.

5       Well, let's look at these other provisions, see if

6  our interpretation creates some unworkability, some absurdity

7  that leads you to question the plain language.  The one they

8  lead with is 1803(2), which says individuals are qualified

9  under the federal exchange and the second box they need to

10  check is they reside in the state that created the exchange.

11  And therefore, they say, see, the state didn't create the

12  exchange.  They can't check that second box, and they can't

13  become eligible for the federal exchange.

14       Okay.  But first of all, that's blatantly untrue

15  under 1803(2) itself because it says you need to check that

16  box for eligibility only with respect to an exchange.  And an

17  exchange, as they emphasize quite vigorously when they're

18  making their legal fiction argument, exchange is defined as

19  an exchange under 1311.  So in other words, the check the box

20  provision only applies to exchanges established under 1311,

21  i.e., state exchanges.  It wouldn't have applied if the state

22  doesn't create it.

23       THE COURT:  Well, is there such a thing as a

24  qualified individual under an exchange established by the

25  Secretary?

1          MR. CARVIN:  Yes.  But he doesn't have to -- he

2     doesn't have to check that box.  In other words, anybody who

3     lives in the state has to do it.  You only have to check the

4     box that says I'm a resident of the state that created the

5     exchange with respect to an exchange under 1311, i.e., with

6     respect to a state exchange.

7          THE COURT:  In other words, you don't have to tell

8     the Secretary of HHS or the IRS where you live if it's a

9     federal exchange?

10          MR. CARVIN:  You can tell them where you live, but

11     it doesn't have to be in a state that was created by the

12     exchange.  Nobody argues that there's ambiguity about the

13     word "state."

14          THE COURT:  No, but the question is qualified

15     individual.  I mean, how do you -- what provision of the law

16     defines a qualified individual for a federally created

17     exchange?

18          MR. CARVIN:  Well, all of the reporting provisions,

19     all the premium provisions only go to state residents, if

20     that's what I'm understanding you to mean.  So, in other

21     words --

22          THE COURT:  I know, but don't you have to be a

23     qualified individual to get health insurance through a

24     federal exchange as well as through a state exchange?

25          MR. CARVIN:  Well, it says with respect to an

exchange.  And again, an exchange is an exchange under 1311,
it doesn't say an exchange under 1321, it says an exchange
under 1311.  Do you have to be a qualified individual?  Yes.
But your qualifications are not that you would live in a
state that's -- where -- you reside in the state which
created the exchange.  You just reside in a state that has
the exchange.

In other words, there's no obligation for the
Federal Government to provide people from West Virginia in
exchange for Virginia.  The entire logic of the Act, all of
the Act is built around each state will have an individual
exchange.

THE COURT:  But we now know that 36 states don't
have state established exchanges.

MR. CARVIN:  Right.

THE COURT:  And so I live in one of those states.

MR. CARVIN:  Uh-huh.

THE COURT:  Do I have -- is there a provision, is
there a section of the Affordable Care Act that requires me
to prove to somebody that I'm a qualified individual or is
anybody and everybody qualified in the federal exchange
situation, or is nobody a qualified individual in a federal
exchange situation?

MR. CARVIN:  Right.  And I take your point, but you
wouldn't look at 1803(2) to determine qualifications.  You

1    would you look at the reporting provisions and the exchange

2    functions which are built for people in that provision.

3            In other words, the Government has to read this

4    language right now; right?  It has to say, do you reside

5    within a state that created the exchange.  And they have not

6    had any problems saying only people from Virginia can get on

7    the Virginia exchange.

8            THE COURT:  Right.

9            MR. CARVIN:  So it may not come from 1803(2).  They

10   are using this definitional section which flows throughout

11   the Act, the first check box.  They keep coming back to

12   qualified individual and say, aha, it says the state created

13   the exchange.  But what happens if the state didn't create

14   the exchange?  Okay.  And I'm saying one answer is, the

15   provision only applies if the states create the exchange

16   because the definition of exchange is state created exchanges

17   under 1311.

18           But even if I'm wrong on that, the Government

19   still's got to answer the question.  Remember, the only

20   reason we're looking at this provision is whether our

21   interpretation of the subsidy provision creates some

22   craziness that is avoided by not reading it -- by not

23   interpreting it to mean what it says.

24           And nobody says, the Government doesn't say that

25   Virginia is a state that created an exchange.  Their argument

is through the legal fiction, the alchemy of 1321, the state
didn't create the exchange, but you can treat the Federal
Government exchange like it was the state exchange for those
purposes.  But they still have to deal with the question,
well, you don't reside in a state that created an exchange,
you reside in a state that didn't create the exchange, but
HHS created them for it.  Either way, you've got to read that
language with some common sense background.

And so, it's not our discussion, the subsidy
provision that creates the problem.  The problem is created
if the state doesn't create the exchange under anybody's
circumstance.  The problem is not created by whether or not
subsidies are available if the states doesn't create the
exchange, the problem is created if the state doesn't create
the exchange at all.

And your question would be equally valid there.
Well, how do we figure out what a qualified individual is?
The common sense answer, and the one we advanced in our brief
and they didn't respond to, is these can't be viewed as
qualifications, these can just be viewed as information that
the Federal Exchange wants.  And the fact that they assumed a
condition that doesn't exist, i.e., that the state created
the exchange, shouldn't be used to penalize people from that
state from getting on, because otherwise the Federal
Government would have created a condition that is impossible

1   for anybody to meet.  And we don't interpret statutes to

2   create catch-22s.  So that's another way, without worrying

3   about it.

4          But again, my basic point is none of those

5   difficulties are created by our interpretation of the subsidy

6   provisions.  All of those difficulties are created when the

7   state doesn't create the exchange under anybody's

8   interpretation.  We've given two very common sense ways out

9   of that dilemma, which doesn't seem to have puzzled anybody

10  thus far in actual implementation, and the Government

11  resisted.

12         Now, the reason the Government resists our exchange

13  under 1311 argument is they say, no, exchange means 1311 and

14  1321.  Well, two points:  I think that contradicts the

15  argument they were originally making, but regardless, that's

16  their interpretation, not ours.  So they can't ascribe any

17  difficulty to us because they disagree with us.

18         Again, the purpose of this exercise is to see if you

19  interpret the subsidy provision, does it create this

20  roadblock that you indicated earlier, this ambiguity.

21         The next effort at this is to say that look, there's

22  reporting requirements and functions that are listed for both

23  state and federal exchanges, and they reference subsidies.

24  So they say, therefore, you must infer that Congress thought

25  federal exchanges would have subsidies.

1              Well, that doesn't follow at all.  If Congress

2     thought some states were going to have subsidies and some

3     states were not going to have subsidies, it would have

4     written what the exchanges are required to report and their

5     functions in precisely the same way.  They would have put one

6     list together for both states and say some states say it

7     doesn't apply to don't need to fill out the list.

8              What would have been the alternative?  They would

9     have had two lists.  They would have had to have the list for

10    the state exchanges with the subsidy provisions included,

11    then they would have had to have the exact same list minus

12    two or three items that referenced subsidies for the feds.

13    That's just redundancies, it's just duplication.  Again, it

14    doesn't prove any kind of inconsistency.

15             The others, some I can't even understand in all

16    candor.  The next argument is look, there's this provision in

17    the act that says in 2017, the Secretary can give innovation

18    waivers to the states.  It can say, look, this is the

19    structure we've established in the Affordable Care Act, but

20    if you come up with a better way of skinning the cat, I'm

21    going to waive you out of it.  Okay.  And they say that is

22    somehow made redundant by our view of subsidies.  Because

23    they say, look, if the states can opt out of running

24    exchanges, then that makes the innovation waiver process

25    superfluous.

1          Well, what they're arguing renders the innovation

2     waiver provision superfluous is the fact that the states can

3     opt out.  They agree the states can opt out.  So no, it has

4     nothing to with our interpretation of the subsidy provision,

5     it has to do with whether or not states can opt out at all,

6     which everyone agrees they can do.

7          I will point out that there's absolutely no

8     inconsistency.  The innovation waiver goes to a lot more than

9     just running the exchanges.  It goes to the individual

10    mandate, the employer mandate, all of these other things.

11    And in all events, it makes perfect sense.  What the Act said

12    was, look, if you're running an exchange, and you want to get

13    out, we'll let you get out if you've got a better way of

14    doing it.  But we're not going to let you get out if you've

15    never run an exchange.

16         In other words, there's two paths here.  You get

17    into the exchange business, and in 2017 we'll look and see if

18    you've got a better way of doing it.  You stay out of the

19    exchange business, and, of course, then you don't need the

20    waiver because you've never been in it in the first place.

21    So that one makes no sense.

22         The abortion provision.  The abortion provision

23    states, says states can prohibit abortions offered through an

24    exchange.  The only word there is "exchange."  I didn't think

25    we disagreed about the word "exchange."  It certainly has

1    nothing to do with our debate about the subsidy provisions,

2    the word "exchange."  So again, this is just a complete

3    nonissue.

4         But in all events, I will point out, if exchange

5    means state established exchanges, then the provision makes

6    perfect sense; right?  Because then it means states can stop

7    abortions if states run the exchange, but not if the feds run

8    the exchange.  Well, that's a very sensible policy.  Why

9    should the states be able to dictate to the Federal

10   Government what policies they offer on their exchanges.

11   States usually don't have some power to tell the Secretary of

12   HHS how to run her exchanges, number one.

13        Number two, if you adopt, which I guess is their

14   interpretation for this provision, which exchange means state

15   and federal, then that simply means that the states can do it

16   for both.  But however you resolve that dispute has nothing

17   to do again with the subsidy provision.  It's just a problem

18   they've created out of the word "exchange," which is not

19   something we're debating about.

20        Finally, I think finally, they say, look, there's a

21   lot of provisions in there that tell the Act, the Act says

22   the states have to do this on their exchange, they have to do

23   this on their exchange, and there's no parallel provision

24   telling the Secretary that she's got to do X, Y and Z; right?

25        Well, okay, that's because the Secretary is not

given specific direction, she's given general directions in

1321.  It says take any actions necessary to establish such

exchange.  You've got to replicate these state exchanges so

go ahead and do it.  You've got general authority to do it.

That's not a problem.

In their reply brief they make a new argument for

the first time which says, okay, that may generally be true,

the Secretary may generally be able to use her own general

discretion to do all this stuff, but not with respect to this

one provision, it's a very complicated argument.

Apparently there's a provision in the Act that

there's a chip program out there that gives money to

relatively poor kids.  And so there's a provision in the Act

that says, look, if the chip fund runs out of money for some

reason, what you should do is in exchanges establish by the

states, you should put those kids on the exchanges and see if

you can take care of them that way.  And they say, see,

exchange established by the state.  So the Secretary couldn't

do it.  Well, I think they're right.  And I think that helps

us.

In other words, the only reason you're switching

these kids from chip to the exchange is because they can get

subsidies on the exchange.  And if we're right that subsidies

are only available on the state exchanges, you'd only want to

switch them to the exchanges so they could get the subsidies.

1    If you switch them to the federal exchanges where there's no

2    subsidies available, then you can't make up the chip

3    shortfall.  So that's another example out of many where the

4    supposed inconsistencies with our interpretation actually

5    reinforce our interpretation of the Act.

6           I'd like to switch, I told you a minute ago I was

7    going to get to why *Chevron* doesn't apply.  If this is -- I

8    can now answer the second part of your question.

9           THE COURT:  All right.  Then maybe you should wrap

10   up soon because we're getting close to --

11          MR. CARVIN:  Yeah.  But I do think it's important on

12   Chevron to understand that we're not talking about Chevron

13   step two here; right?  Yes, we think that it's unambiguous so

14   you don't get there.

15          But in addition to that, it is binding D.C. Circuit

16   case law that you need to -- you can only defer to an agency

17   if they've been given the authority to administer the Act.

18          THE COURT:  Well, doesn't Section 36 specifically

19   give the Secretary of the Treasury the authority to issue

20   regulation under 36?

21          MR. CARVIN:  Absolutely, and they've got plenty of

22   authority to resolve, therefore, any ambiguities in 36(b).

23   They don't claim there's any ambiguities in 36(b), we've all

24   agreed on that.  They claim the ambiguity comes from 1321.

25   And that's administered by HHS, so HHS can resolve the

ambiguities in 1321.  But it can't resolve the ambiguities in

36(b) because it doesn't administer it.  You can't defer to

the IRS because there's no ambiguity in the provision they do

administer, and you can't defer to HHS because they have no

ability to administer 36(b).

     This is just like the *Shinseki* case that the D.C.

Circuit decided this year.  There, you had a specific

provision in the Veterans Administration under collective

bargaining; right?  So what Judge Silberman said was, look, I

can't defer to them under *Chevron* with respect to this

provision, even though the head of the Veterans

Administration we normally defer to because the word

"collective bargaining" is administered by, generally by the

FLRA.

     THE COURT:  Well, Judge Silberman doesn't have to

defer to anybody to figure out what collective bargaining

means.  I mean, he knows that better than anybody in the D.C.

Circuit.

     MR. CARVIN:  That's true.  But even a more modest

judge, a less --

     THE COURT:  Yes.  And I might say that we know many

more modest judges.  And I say that, I say that, you know,

just so the record is clear, Judge Silberman and I are

neighbors and friends, so I'm kidding.

     MR. CARVIN:  And if I could add the same

1    clarification --

2         THE COURT:  Go ahead.

3         MR. CARVIN:  -- although we're not neighbors.  But

4    look, this is the dilemma; right?  The provision you're

5    fighting about, in this case 1321, is not administered by the

6    agency that's claiming *Chevron* deference.  The FLRA was

7    administering collective bargaining so you don't defer to the

8    VA, and so if what you're fighting about is a different

9    provision than the one they've been granted a delegation for,

10   what are you going to defer to?

11        Look, the IRS recognizes this; right?  They didn't

12   come up with their definition of exchange.  They incorporated

13   HHS's definition of the exchange.  HHS wakes up tomorrow,

14   changes their minds, the IRS has nothing to say about where

15   these subsidy provisions go.  That's about as clear an

16   illustration as I can make is the IRS is not in control of

17   these subsidy provisions, HHS is.

18        So then the Government comes back and says, well,

19   look, when agencies jointly administer a statute, if they

20   agree on it, then you do give them *Chevron* deference.  A,

21   that's irrelevant, and B, it's clearly wrong under the law.

22        It's irrelevant because, as we just discussed, HHS

23   and IRS don't share 36(b).  This is a rule that was developed

24   like for OCC, the Fed, OTS, they're all administering the

25   same statutes that govern the various depository institutions

1    banks.  And so they say, look, we're not going to give

2    deference to any of the agencies because they're all

3    administering the same statute.

4         But that doesn't even apply here because they're not

5    administering the same statute.  If it did apply here, they

6    would still be wrong under *DeNaples*, which again is D.C.

7    Circuit decision of this year.  There, the OCC and the Fed

8    administering the same statute absolutely agreed on the cease

9    and desist order at issue there.  And *DeNaples* was clear as

10   it could be, we don't give *Chevron* deference because it's

11   shared.

12        They drop a footnote and says, look, there's been

13   some inconsistencies in footnote four in our prior decisions

14   on this, but this is the rule.  And so they can tell you

15   whatever they want about whatever prior D.C. Circuit opinions

16   said or didn't; they're all wrong.  But the relevant point is

17   the D.C. Circuit's done your work for you and they've told

18   you what the rule is here.

19        And then finally, I've already emphasized that

20   there's a provision that says there's a presumption against

21   interpreting tax credits unless it's unambiguous.  And

22   therefore, *Chevron* doesn't apply for that reason as well,

23   because under *St. Cyr* and these other cases, they say, look,

24   the normal rule is there's ambiguity, you follow the agency.

25   But if there's a presumption that ambiguity is resolved

against, in this case the person seeking the tax credit, then that -- that's how you resolve ambiguities, pursuant to the presumptions, not pursuant to the agency.

I would like to briefly comment on the relief that they're seeking because, A, I'm puzzled, and B, they seem to be asking you not to invalidate the regulation, to the extent I can understand it, with any American -- with respect to any American citizen except Mr. Klemencic and maybe some of the other plaintiffs.  That has never happened in American history, and that's lawless for three reasons.

It's lawless because it's contrary to the clear holding of the D.C. Circuit in *National Mining Association* which says, no, you set aside direct.  It's contrary to the plain language of the EPA, which does not say you may set it aside if it's contrary to law, as the Government claims, it says you shall set it aside if it's contrary to law.

So, courts every day in this circuit and everywhere else see a reg, it's lawless, then obviously they invalidate the reg.

The reason I'm worried about this is the Government seems to be saying that even if you strike down this reg as lawless and completely contrary to the statute, they plan on continuing to administer it even though the reg is vacated. The reason I'm saying that is they complain about this nationwide injunction, which seems -- the only difference

between a nationwide injunction and validating the reg is

that they are going to defy this Court's order and continue

to administer the reg even if you order otherwise.  That's

just the kind of chaos that the D.C. Circuit in *National*

*Mining Association* was designed to prevent, and I think what

the Government's up to is if they lose in this case, they

won't even take an appeal to the D.C. Circuit, they'll just

allow this to pucker along for Mr. Klemencic only, and then

continue the lawless regime.

        If that's not their plan, they need to explain to

this Court why they're resisting the nationwide injunction,

what they think the consequences of vacating the regulation

are in terms of how they administer this reg, and if they

tell you that they're going to defy it and not -- and

continue to apply the reg, I think that's reason alone to

make sure that the reg is vacated and they are enjoined from

applying --

        THE COURT:  I think the APA says that if you find

that there's a regulation that's capricious or contrary to

law, that the Court is supposed to vacate it.  And there are

some cases, and there's a debate actually, I think between

Judge Silberman and Judge Randolph for a number of years

about circumstances where you might remands to the agency to

fix it up without -- without vacating it.  But I don't quite

see how that works in this situation.

1          MR. CARVIN:  Right.  We were saying this regulation

2     is invalid under any rationale and in all circumstances.  I

3     think the debates between Judge Randolph and Judge Silberman,

4     both fine judges, is that in the *McHenry* example where maybe

5     they used the wrong, they used the wrong reasoning, but the

6     result might not be wrong, then we'll let them fix it.  But

7     here, this is a straight statute versus regulation.  It has

8     nothing to do with the reasoning underlying the IRS rule.

9          THE COURT:  All right.

10          MR. CARVIN:  Thank you.

11          THE COURT:  Okay.

12          MR. CARVIN:  Did you have further questions?

13          THE COURT:  Not at the moment.

14          MR. CARVIN:  Thank you.

15          THE COURT:  Mr. McElvain.

16          MR. McELVAIN:  Good afternoon, Your Honor, and may

17     it please the Court.

18          When Congress enacted the Affordable Care Act, it

19     set out to create a system with nationwide application to

20     provide for affordable health coverage for all Americans.

21     The plaintiffs propose a reading of the Act that would

22     provide for that coverage in some states, but not others.

23     Their reading is directly contrary to the text of the Act,

24     Congress's obvious purpose in enacting the Act, and it defies

25     common sense as well.

1          Their reading of the Act should be rejected, and

2    Treasury's contrary reading should be adopted because it

3    comports with the language of the Act, and at the absolute

4    minimum is a reasonable reading of the Act under *Chevron*.

5          Now, beginning with the text of the statute, the

6    plaintiffs refer you to Section 36(b), which includes the

7    phrase in it an exchange established by the state under

8    Section 1311 of the Act, 42 USC 18431.  And they ask you

9    essentially just to look at that phrase alone, but it's quite

10   clear under *Chevron* and every principle and statutory

11   interpretation that you cannot look at that phrase alone, you

12   need to look to the larger structure of the Act.  The Supreme

13   Court has said that over and over and over again, most

14   recently in *National Association of Home Builders*, and in the

15   *Zuni* case, *FDA versus Brown and Williamson* gave us --

16          THE COURT:  Slow down a little bit.

17          MR. McELVAIN:  Oh, I apologize.

18          *FDA versus Brown and Williamson*, *Davis versus*

19   *Michigan Department of Treasury*, and many other cases.  You

20   have to look to the overall structure of the Act to be sure

21   that you're adopting a reading that comports with Congress's

22   overall intent and in adopting the statute.

23          If there were any doubt in that score, the phrase

24   that plaintiffs rely on itself would resolve that because it

25   doesn't just say exchange established by the state, it says

exchange established by the state under 42 USC 18031.  So

even by its own terms that phrase is telling you, you need to

go to other provisions of the Act to figure out what Congress

had in mind.  And 1803(1) is quite instructive on this score

because it tells you in 1803(1) Sub B, each --

THE COURT:  Sub E or B?

MR. McELVAIN:  Sub B, B as in boy.  Each state shall

establish an American health benefit exchange referred to in

this title as an exchange for the state.  It repeats that

directive again in 1803(1)(d), "An exchange shall be a

governmental agency or a nonprofit entity that is established

by a state."  So that is what Congress had in mind when it

was using the term "exchange."

Now, we're all agreed, both plaintiffs and defense

agree does not mean literally every state is going to set up

their mechanisms and operations of running the exchange.  If

a state declines to do so or tries to do so, but fails to do

so adequately under federal standards, the Act directs the

Secretary to step in and to create the required exchange

which is to find as such exchange, that is, the same

exchange.

So, when you combine these provisions together, it's

quite clear that Congress intended both the state run

exchange and the federally run exchange to be equivalents,

not -- they're not two different classes of exchanges.  The

1    federally run exchange steps in and performs all the same

2    functions as the state run exchange.

3         And again, if there are any doubt on this score,

4    there are further definitional provisions in the Act that

5    says an exchange is an exchange established by a state.  Each

6    time the word "exchange" appears in the Act, that's what that

7    means.  And so when you plug that into 42 USC 1804(a)(c),

8    which is the language referring to the Secretary running the

9    exchange, the Secretary is running the exchange that is

10   established under 1803(1).  It is the same exchange.  That is

11   the one type of exchange that Congress had in mind each time

12   it refers to that concept throughout the Act.

13        So, it's quite clear that Congress did not intend

14   there to be two types of exchanges, a greater kind of

15   exchange and a lesser kind of exchange that could perform

16   some functions, but not others.

17        This is further confirmed, as we've referenced

18   before and in our briefs, by Section 36(b) itself because as

19   we've discussed, 36(B)(f)(3) has the reporting provisions in

20   it which explicitly refer both to exchanges run by the state

21   and run by the Federal Government.  And there's absolutely no

22   reason that Congress would have enacted this reporting

23   provision and specifically directed that it apply to the

24   federally run exchanges unless it understood as a background

25   that the federally run exchange would be -- that federally

```
1    offered premium tax credits would be available on the

2    federally run exchange.

3         There are six provisions, there are six items in

4    (f)(3) that are listed as required to be reported by the

5    Federal Exchange to the Department of the Treasury.  There's

6    absolutely no reason at all that Congress would have thought

7    that the Treasury Department would have wanted to receive

8    this information other than to administer the premium tax

9    credits.  I can go through each of them.

10        First, (f)(3) Sub A asks you to, for each plan

11   purchased on the federally run exchange, asks the federally

12   run exchange to report the level of coverage described.

13   There is no reason in the world that the Treasury Department

14   would care what level of coverage, bronze, silver or gold or

15   platinum, a particular person buys other than the fact that

16   it is only on silver plans that cost sharing subsidies are

17   available which are administered along with tax credits.

18        THE COURT:  And just so we're clear, in this

19   provision, 36(b)(f)(3), Secretary means the Secretary of the

20   Treasury.

21        MR. McELVAIN:  Absolutely, because it is a provision

22   of the Internal Revenue Code, and the Internal Revenue Code

23   defines "Secretary" as Secretary of the Treasury, yes, that's

24   correct.

25        B is the total premium for the coverage provided,
```

and that, of course, is needed by Treasury to calculate -- to calculate the subsidies.  C is the aggregate amount of any advance payment.  And that's obvious, you don't get the advance payment of the credit unless you're eligible for the credit, which, under our reading of the Act, of course, under the federally run exchange, somebody is eligible, but under the plaintiff's reading, nobody is.

D is the name, address and tax identification number of the primary insured and the other individuals obtaining coverage.

Now, the only reason that Treasury would care about getting that information in the aggregate for everybody under the policy is so that they can reconcile that with the tax credit claimed, both by the person buying coverage and anybody else in his family who he's claiming the tax credit for.

And then the last two are self-evident.  Any information provided to the exchange to determine eligibility for the credit, information necessary to determine whether the taxpayer has received excess advance payments, those are obviously linked to the tax credit.

So there's just absolutely no reason that Congress would have gone to the effort of specifically instructing the Federal Exchange to report this information to the Treasury Department that would have been useless for the Treasury

1    Department apart from the fact that Treasury was

2    administering federal premium tax credits for participants on

3    the federally run exchange.

4          And if there's any doubt on that, the common sense

5    point is that this provision is in Section 36(b) itself.

6    What Congress obviously had in mind was that b's elements of

7    information were necessary for administering 36(b), not some

8    free-floating other issue that Treasury might deal with.

9          So, for three reasons, one is the structure of

10   1803(1) and 1804(1) combined with 36(b)'s reference to

11   1803(1).

12         Second, the definitional provisions of the Act.

13         Third, the reporting provisions of 36(b) itself,

14   it's quite clear what Congress had in mind, that federal

15   premium tax credits would be available on a nationwide basis

16   regardless of the identity of the operator of exchange.

17         This conclusion is further reinforced by the

18   presumption that has not been rebutted by the plaintiffs that

19   Congress, when it enacts federal legislation, it enacts

20   federal legislation on a nationwide basis.  The Supreme Court

21   said that in *Mississippi Band of Choctaw Indians*, and this

22   presumption applies a special force in federal tax statutes

23   as the Supreme Court said in *United States versus Irvine*, you

24   would need the plain language, a plain indication of

25   Congress's intent that Congress meant the federal tax statute

to apply in some states, but not others.  And there is no
such indication here.  So, just from those provisions
themselves, I think it's clear what Congress had in mind.

But if you go to the larger structure of the Act, it
becomes even more clearer and what is -- what is -- what I
think is particularly telling is the language in 1803(2), the
language referring to qualified individuals, persons who are
eligible to buy insurance on the exchange.  This is the very
next section in the Act after 1803(1), so it's clear that
Congress had the same concepts in mind in the first section
and then in the section immediately following.

Under 1803(2), it defines a qualified individual as
somebody who may enroll in a qualified health plan, and it
defines a qualified individual as an individual who resides
in the state that established the exchange.

Now, under the plaintiff's reading of the Act,
although it's the logic of plaintiff's reading leads to the
conclusion that there are no such individuals.  Nobody could
buy in the federally run exchange, which means the exchange
would just collapse in on itself.  That cannot be the law.
That cannot be what Congress had in mind.

So -- and even the plaintiffs acknowledge that that
would be an absurd result.  Congress could not have meant to
have an exchange that would just be a shell entity.  And
they've offered a few ways around the absurdity that their

1    reading leads to.

2           One says, well, you know, the language is slightly

3    different, so it's not necessarily the language we're

4    referring to that leads to this conclusion.  So there's no

5    reason for you to get involved in whatever the language is in

6    1803(2).

7           But I'm not sure what distinction they're trying to

8    draw.  Under 36(b), the reference is to an exchange

9    established by the state.  1803(2) refers to the state that

10   established the exchange.  If there is some difference

11   between those two phrases, it's not one that is apparent to

12   me.  And I've thought hard about it because I've read the

13   plaintiff's briefs, and I was trying to figure out what they

14   were referring to.  And they have not explained what

15   distinction they think exists between those two phrases, and

16   there is none.  So they have to come up with some other way

17   around the absurdity that their reading creates.

18          Then they say, well, it's not an issue because that

19   definitional provision only refers to with respect to an

20   exchange, and you can read with respect to an exchange to

21   mean only the state reference exchange, so there would be no

22   definitions at all that apply in the federally run exchange,

23   and we just don't need to worry about the problem.

24          But that's obviously not what Congress had in mind.

25   Congress obviously was intending to establish a definition of

who a qualified individual was that would apply on a

nationwide basis.  And you couldn't just throw that out the

window and say it's free form, and anybody could apply for

coverage in a state without really running afoul of what

Congress had in mind when it set up the system of the

Affordable Care Act.

Moreover, the plaintiffs elsewhere in the argument

have fully conceded and fully agree with us that the term

"exchange" when it appears to the Act refers both to the

state run exchange and the federally run exchange for the

reasons we've already discussed.  They're the definitional

provisions of exchange, 1804(1)(c) says the Federal

Government run such exchange so it gets plugged into that

definitional provision, and the term refers to both.

Other aspects of their argument, plaintiffs fully

agree with that reading of that term "exchange," they only

resisted right here in 1803(2).  In fact, just earlier,

plaintiff's counsel, when referring to the abortion

provisions in the Act, said he doesn't -- he sees no problem

whatsoever with -- there's no inconsistency in whether or not

states could adopt their own abortion policies and states

with federally run exchanges because, and I think this is his

quote from just a few minutes ago, we don't disagree about

the meaning of the word "exchange."  That's right, I don't

think we disagree except for right here where he's offering

1    you a brand-new and different definition of the term

2    "exchange" that would apply for 1803(2) and 1803(2 alone.

3    That violates fundamental principles of statutory

4    construction as the Supreme Court has said in empower acts

5    and other case, when Congress uses one term, you presume it

6    means to use the same meaning for that term throughout the

7    Act.  And they've offered no reason to think that there

8    should be some one time departure from the meaning of that

9    word from 1803(2) alone.

10            So the plaintiff's next argument to get around the

11   absurdity that their theory creates is, well, maybe this

12   definition just doesn't apply at all because there are two

13   provisions, qualified individuals defined as one person

14   seeking to enroll in a plan, and B, resides in the state that

15   established the exchange.  They said, well, maybe you can

16   just read and as or.  And that one, too, would just be --

17   clause two would just be read out of the statute, and as long

18   as you satisfy clause one, you're seeking to enroll, you're a

19   qualified individual.

20            Well, that's obviously not right.  Congress used

21   that clause for a reason.  And it used the word "and" for a

22   reason.  They were adopting a definition of qualified

23   individual that included that aspect of the definition.  You

24   can't just read that out of the statute.

25            For that reason, by parenthetically I would note

1    because they're proposing to read that clause out of the

2    statute, and they're proposing to ignore 1803(1)(d), which

3    again defines an exchange as an exchange established by the

4    state, because they're proposing to read those clauses out of

5    the statute.

6         Their reference to the canon against superfluidity,

7    which is a hard term to say, which is really is the only

8    thing they have going for them when they seek to interpret

9    36(b).  Their reference to that canon has no force

10   whatsoever.  The Supreme Court has said over and over that if

11   a party is relying on that canon, but their reading creates

12   other superfluidities, then the canon has no force

13   whatsoever.  You have to provide a reading that makes sense

14   of every provision of the Act.  Our reading does make sense

15   of the whole Act read together, their reading does not.

16        So I think that alone, the reference to the

17   qualified individuals provision, is a very strong textual

18   clue of what have Congress had in mind, that every exchange

19   would be treated as the same, that there were not two classes

20   of exchanges that the Affordable Care Act created.

21        But there are other absurdities as well, other

22   anomalies.  There's the issue of the state innovation

23   waivers.  And Mr. Carvin addressed those in his argument.

24        Under 42 USC 10852, there's a system set out

25   starting in 2017 where a state can --

1      THE COURT:  Let me just ask you a question as you go

2   through this.

3      MR. McELVAIN:  Yes, uh-huh.

4      THE COURT:  Are we still in *Chevron* step one?

5      MR. McELVAIN:  Both.

6      THE COURT:  Well, that's what -- I mean, I think

7   both of you are pretty slippery on this question.  I mean, my

8   question is, as I understand *Chevron*, if a statute is

9   unambiguous and is clear, that's the end of the matter.

10      Now, what am I allowed to look at to decide whether

11   a statute is unambiguous and clear?  Your first argument is,

12   well, you have to look beyond the words of 36(b) because

13   36 -- the portion of 36(b) that's at issue itself references

14   1803(1) and through that 1804(1).  And you say you have to

15   look at 18, you have to look at 26 USC 36(b) in all of its

16   parts to put it in context.  And you're still in *Chevron* step

17   one.

18      And then you say, well, okay, let's also go to

19   1803(1) because it's the very next section.  Well, now you're

20   many sections later.  So, in deciding what a particular

21   phrase in a provision in 36(b) means, how much of the

22   Affordable Care Act do we have to look at on the question of

23   whether this portion of the statute is clear and unambiguous

24   and, therefore, that's the end of the analysis?  Because

25   eventually the context and the statutory purpose, you can

1    expand those notions.  I mean, if you want to look at the

2    statutory purpose and goal, which is to provide affordable

3    health care to all, you say, then we'll -- they'll never get

4    to *Chevron* step two in the statute.  Or in the Clear Air Act

5    you can say the goal is to provide clean air, or in the

6    Endangered Species Act.  So nothing can ever be ambiguous if

7    you take this too far beyond the text.

8              MR. McELVAIN:  Well, and I'm not proposing that we

9    go far beyond the text.  What I am proposing is that we take

10   a look at what Congress meant by the words that are used, and

11   it meant that the Federal Exchange is plugged into the

12   definition of the state exchange.

13             So on the question of what you can look at

14   *Chevron* step one, again, the Supreme Court has said over and

15   over and over, the meaning or ambiguity of certain words or

16   phrases may only become evident when placed in context.  So

17   you do need to look to the larger context.  You do need to

18   look, not just to the reference sections, but to the larger

19   operation of the Act.

20             Now, I think when you put that all together, and

21   when you also look at the purpose of legislative history, as

22   the Supreme Court said in *Zuni*, you should do it, step one.

23             THE COURT:  Do you look at legislative history in

24   step one?

25             MR. McELVAIN:  Under Zuni, you do, yes.  But in any

1    event, if you look at all these things together, I think, I

2    think we do --

3              THE COURT:  I think Judge Scalia says you never look

4    at legislative history.

5              MR. McELVAIN:  Well, it may be an eight to one vote

6    on this one.  But there are holdings from the Supreme Court

7    that say you do look to the --

8              THE COURT:  I do think I -- I think there are lots

9    of judges who don't think you should look at legislative

10   history that will concede that the Supreme Court says you

11   look at legislative history if you get to *Chevron* step two.

12   But do you look at it in *Chevron* step one?

13             MR. McELVAIN:  Under Zuni and other cases, you do.

14   But the overall point I want to make is I think when you look

15   at all these things together, I think we do win under *Chevron*

16   step one.  I think we're the only ones of the two parties

17   here who have offered a reading that reconciles the whole

18   Act, the text of the Act, reinforced by the purpose and

19   history of the Act.  I think -- so I think we win under step

20   one.

21             But at minimum we win under step two, and I'm, you

22   know, I'm not going to stand on principle and insist on step

23   one, step one, step one.  I'm perfectly happy to accept a

24   victory under step two.

25             THE COURT:  Sometimes we can really hurt ourselves

1    by standing on principle.

2              MR. McELVAIN:  You know, and I think at a minimum

3    we've offered a reasonable reading given, given what Congress

4    had in mind, given the text of the statute, given Congress's

5    purpose.

6              THE COURT:  If you're going to get to -- are you

7    ready to talk about step two?

8              MR. McELVAIN:  Sure.

9              THE COURT:  What about Mr. Carvin's argument about

10   the fact that the IRS has issued a regulation.  And it's that

11   regulation that's at issue.  But he says that since it is

12   really an interpretation of 1803(1), I guess, they've

13   overstepped their bounds because it's not the Secretary of

14   the Treasury at all, it's the Secretary of HHS that has

15   authority under that statute.

16             MR. McELVAIN:  Two points in response to that, and

17   there are really three points.  The first point is they

18   waived it because they said over and over, and theirs are

19   fully briefed, and then up comes this new argument on the

20   reply filed about a week ago.  But that aside, there are two

21   responses on the substance of the argument.

22             The first is, there is no conflict here between

23   Treasury and HHS.  They've worked in close coordination as

24   they specifically recited in the "Federal Register" to enact

25   the -- I'm sorry, to promulgate the exchange related

1    regulations, and they've worked in lockstep.  And their

2    interpretations are the same.  Treasury in its interpretation

3    of 36(b) provides for federal tax cuts nationwide.

4         HHS for its part provides for advance payments of

5    the tax credits, provides for cost sharing subsidies which

6    are related to the tax credits.  Again, on a nationwide basis

7    for every exchange.  So, there's no conflict at all.  The

8    agencies are fully in agreement.  In fact, both agencies are

9    defendants here.  I'm counsel for both agencies.  And I'm

10   telling you both agencies share the same interpretation in

11   this courtroom today.

12        So, the occasion to apply this exception just simply

13   does not arise.  There is no conflict, and the Supreme Court

14   and the D.C. Circuit and courts in the D.C. District Court

15   have said over and over where there is no conflict where the

16   agencies stand together to offer the same interpretation,

17   there is no issue.  *National Association of Home Builders*,

18   the Supreme Court said it was deferring to, quote, the

19   agencies, in the plural, agencies charged with implementing

20   the Endangered Species Act.

21        *Coeur Alaska*, again the Supreme Court said it was

22   deferring to the agency's regulations again, in the plural,

23   where there were both statutes worked together to implement

24   the statute in that case, the Clean Water Act.  So there's

25   just simply no occasion to apply the exception that

1    plaintiffs are referring to.

2           Second, moreover, this is not a case where we need

3    to hunt for what Congress implicitly intended as to whether

4    *Chevron* should apply or not.  Congress specifically said in

5    36(b), I'm sorry, 36(b), Sub G, that the Treasury had

6    rule-making authority under that provision.  And generally

7    under the Internal Revenue Code, as well, under 7805.  And

8    that's exactly the language that Congress has -- I'm sorry

9    the Supreme Court has referred to, to say that *Chevron*

10   applies where there's been such an express grant of

11   rule-making authority.

12          In fact, the City of Arlington just this past June

13   from the Supreme Court, the majority chided the descent for

14   ignoring the fact that there was an express grant of

15   rule-making authority, and it said where there is such an

16   express grant --

17          THE COURT:  He chided the Senate on lots of things.

18          MR. McELVAIN:  Indeed.  But as relevant here, the

19   point is there was an express grant, and so there was no need

20   to hunt provision by provision as to what was within the

21   express grant or not.  So, *Chevron* clearly applies for both

22   of those two independent reasons.

23          They've also offered the argument that *Chevron*

24   wouldn't apply because there's a clear statement principle

25   for tax benefits.  In fact, as we've already discussed, in

the realm of tax law the clear statement of principle runs in

the opposite direction that the presumption is that tax

statutes apply with nationwide effect.  And that you need a

clear statement that Congress intended the tax provision to

apply in some states, but not others.

But in any event, whatever the principle is, it's

not -- is not a rule that trumps *Chevron* deference as the

Supreme Court just made clear in *Mayo Foundation* because *Mayo*

*Foundation* itself involved a tax exemption, an exemption from

calculations of income.  And the Supreme Court recited the

fact that ordinarily you do construe tax benefits provisions

narrowly.  But didn't say that to trump the question of

*Chevron* deference, it recited that principle as a reason that

Treasury had adopted a reasonable regulation applying *Chevron*

deference, applying *Chevron* step two.

So there's absolutely no reason at all to avoid

applying *Chevron* deference here.  And when you do apply

*Chevron* deference, at the absolute minimum, we have provided

you with a reasonable interpretation of the statute that

should prevail.

Now, I'd be happy to address the purpose and history

arguments as well.

THE COURT:  So my first question about purpose and

history is to what extent are they relevant at step one or

are they only relevant at step two or are they somewhat

1   relevant at step one and more relevant in step two?  What's

2   the Government's real position on that?

3          MR. McELVAIN:  They are relevant in both.  I mean,

4   you referred to, I think the Clean Air Act earlier where if

5   all that was going on as it was referring to the principle

6   that Congress wanted there to be clean air, that that

7   wouldn't be enough.  And I agree with that, that's not the

8   hypothetical we have here.  We're not using the purpose that

9   Congress had in mind to trump the language, we're using it to

10  reinforce the statutory language as a principle, a background

11  principle that the Congress -- I'm sorry, that the Court

12  should look at the language that Congress used to figure out

13  what Congress had in mind.

14         And I actually think there's not that much dispute

15  at all as to what the purposes of Congress were, we're all

16  agreed that Congress wanted to provide for affordable health

17  care.  We're all agreed that everybody understood at the time

18  that the tax credits were absolutely central, absolutely key

19  to this goal for providing for affordable health care because

20  the exchanges simply couldn't operate as Congress wished them

21  to work if you could not provide for the tax credits on that,

22  on a particular exchange.

23         So --

24         THE COURT:  What about this argument that -- that

25  the Congressional Budget Office only calculated the amount

1   that would be necessary or something to that effect, then

2   it's the Holtz-Eakin affidavit and other places that -- that

3   there was no money appropriated for federal exchanges, only

4   for state exchanges?

5        MR. McELVAIN:  Well, in fact, and sorry, let me

6   check my notes.  42 USC 18121 establishes a health insurance

7   reform implementation fund that HHS could use to implement

8   the Act.  So Congress provided an appropriation to the states

9   because he needed something specific to justify money going

10  out the door to particular states.  But also more generally

11  established a fund for HHS to use for various activities

12  including operating the exchange.

13       Now, as to the question of whether anybody

14  anticipated that there would be federally run exchanges or

15  not, I think the words of CBO Director Elmendorf themselves

16  answer the question as to whether this was relevant or not.

17  He said in his letter to Representative Issa as cited in our

18  brief, "The possibility that those subsidies would only be

19  available in states that created their own exchanges did not

20  arise during the discussion CBO staff had with a wide range

21  of Congressional staff when the legislation was being

22  considered."

23       Now, plaintiff's whole theory is that there was this

24  intended enormous incentive that Congress intended to convey

25  to the states, and that this was a central feature of the Act

that -- that Congress intended the fundamental operation

exchanges to be different whether state run or federally run

as an incentive to the states.  That would have been quite a

central feature of Congress's deliberations at the time,

certainly somebody would have been discussed it and, in fact,

Director Elmendorf is telling you that the issue simply never

arose.  Congress just did not have the purpose that the

plaintiffs are ascribing to it.

        And the plaintiffs argue further, well, maybe the

issue didn't arise because everybody just assumed it was

absolutely impossible.  It was unthinkable that even a single

state would decline to run a state run exchange.  But it was

well known at the time that some states would decline to do

so.  That not every state considered the Affordable Care Act

to be a particularly popular piece of legislation coming

their way.

        They're saying about that -- that's in the "New York

Times" article that we cited to you where -- which quote

state senators as saying we would be essentially telegraphing

our intentions if there was an opt in, we're essentially

stating now we are not going to opt in.

        So this is -- it was clear at time that this was

controversial, not everybody loved the Affordable Care Act at

the time, it broke down on fairly stark partisan divide.  The

notion that it was just absolutely inconceivable that a

single state would decline to run the exchange is just not a

tenable -- tenable proposition given what we know about the

political climate in 2009, 2010.

So given the purpose I've discussed, given the utter

implausibility of what plaintiffs contend was the contrary

purpose that Congress had, given the relevant legislative

history and most importantly the text of the statute, which

makes clear that Congress intended to be -- there to be one

class of exchange, whether state or federally run, I think

it's quite clear that the federal premium tax credits are

available in every state even where the Federal Government is

running the exchange.

I would like to touch on the disability issues as

well.  I know we discussed them in detail at the last

hearing.  But most importantly, there are several threshold

barriers that still remain for the plaintiffs.  But in

particular, there's the question of what form of proceeding

that Congress specified.  And here all of the plaintiff's

claims are tax related claims.  Congress specified that such

actions should be brought in a tax refund action.  And when

you have this alternative remedy, alternative statute that

Congress has set up under 5 USC 703 and 5 USC 704, there's no

pre-enforcement APA action available unless that alternative

action is inadequate.  It's quite clear that a tax refund

remedy would be adequate here.

1          Mr. Klemencic, based on his own allegations --

2          THE COURT:  But why is it adequate when we know that

3     what's going to happen in the tax refund action, which will

4     take a very long time, so these individual plaintiffs say pay

5     the tax under protest.  And -- or I mean take the insurance

6     under protest or pay the tax or penalty, and then they seek a

7     refund, and that takes a long time.  And they finally get

8     through the administrative maze, and the Commissioner of IRS

9     or the Secretary of the Treasury says, well, haven't you read

10    this regulation?  Under 36(b), you lose; right?  And then

11    they come to court.

12         MR. McELVAIN:  Right.  And then they go to court.

13    And the same argument was raised by the plaintiff in *Bob*

14    *Jones University* under much more compelling facts of the

15    plaintiff there.  There was a university who was threatened

16    with shutting down business if they couldn't get immediate

17    relief as opposed to waiting for a tax refund action.

18         Here, Mr. Klemencic would pay $100 given the

19    allegations in his complaint if he's subject to the 5,000 day

20    tax penalty and then sued to recover that $100.  And even in

21    *Bob Jones University* the Court said, no, Congress set up this

22    remedy, the tax refund remedy is adequate, and we've always

23    held that a tax refund action is an adequate remedy at law.

24    And the same -- same principle holds here.

25         THE COURT:  Well, what do you make of the D.C.

1    Circuit's en banc decision in *Cohen*?

2           MR. McELVAIN:  *Cohen* supports us.  Because *Cohen*, it

3    does.  Because in *Cohen*, the issue there was a procedural

4    challenge to the refund procedures themselves.  It was not a

5    challenge to the substantive liability for the tax.  And the

6    D.C. Circuit took pains to note that they were not saying

7    everything is free form and any tax related challenge can be

8    brought in an APA action.  It's specifically where the action

9    itself relates specifically to procedures and not the

10   substantive liability for the tax.  And they distinguished

11   other circumstances where somebody is challenging the actual

12   tax liability.  Then you still need to go through the tax

13   refund action.

14          THE COURT:  Well, there seems to be a pretty sharp

15   conflict on this issue between Judge Brown and Judge

16   Kavanaugh.

17          MR. McELVAIN:  I think on this principle, they were

18   united.  I mean, Judge Kavanaugh thought that the -- even the

19   case that was before the Court should have gone away.  But

20   even under the majority opinion, they took pains to

21   distinguish actual challenges to substantive tax liability,

22   which is what we have here.

23          THE COURT:  Now, you mentioned *Bob Jones*, is that --

24   was that a tax refund case or was it an Anti-Injunction Act?

25          MR. McELVAIN:  It was an Anti-Injunction Act case,

1    but the question was what remedy was adequate.  And so the

2    same principle applies here for 5 USC 703 and 704, what

3    remedy is adequate.  So the tax refund actions remedy --

4    excuse me, the tax refund remedy is an adequate remedy for

5    purposes of the Anti-Injunction Act, the same principle

6    applies here.  Adequate is adequate.

7            THE COURT:  So, I mean, you've said why you think

8    *Cohen* supports you.  What about *Bowen verse Massachusetts*?

9            MR. McELVAIN:  Again, the question comes down to

10   what is the adequate remedy.  If Congress supports, if

11   Congress provides for the alternative remedy, the question is

12   what is adequate.  And under case after case after case, and

13   the specific application of tax law, tax refund actions have

14   been held to be adequate.

15           Now, the plaintiff's argument is, well, it wouldn't

16   be adequate because we would have to comply with the

17   individual mandate, and we shouldn't be put to the Hobson's

18   choice of violating the law so we can bring our claim.  But

19   that's simply not a plausible reading of Section 5,000(a)

20   anymore after what the Supreme Court said in *NFIB*.  *NFIB* said

21   Section 5,000(a) is a tax penalty.  There's no independent

22   legal requirement.  You're not a law breaker if you go

23   without insurance, you're subject to a tax.  And so under

24   that principle, you can challenge the tax that you may be

25   subject under the procedures that the Internal Revenue Code

1    provides.

2           One, if I may, one further note on the remedy,

3    which, of course, is an academic point because I believe we

4    are going to prevail here, but in the event, in the event

5    that we do not, any remedy should be limited to the

6    plaintiffs available here.  And that is a principle of equity

7    that the Supreme Court has emphasized over and over that

8    equitable relief should be tailored to the individual

9    plaintiffs before the Court, and equitable relief should not

10   be crafted so as to harm innocent parties who are not before

11   the Court.  And here there are millions of persons who have

12   an interest in receiving the tax credit.

13          THE COURT:  The general principle, but, you know,

14   the only way I get to the question of remedy is if you lose

15   on the merits.

16          MR. McELVAIN:  Right.

17          THE COURT:  And the way you lose on the merits,

18   presumably, is by my saying they don't have to pursue a tax

19   refund remedy.  This can be an APA action.  And then I move

20   on to disagree with your reading of the statute.  So, if it

21   hypothetically is an APA action, and I say that the rule is

22   contrary to law or arbitrary and capricious because it's

23   inconsistent with the statute, hypothetically, where in the

24   APA does it say that I do anything other than vacate the

25   rule?

1           MR. McELVAIN:  What the APA says is you set aside

2      the agency action.

3           THE COURT:  Right.

4           MR. McELVAIN:  And here the agency action at issue,

5      to be completely technical, the agency action issue is not

6      the regulation because this is not a direct review of the

7      regulation type proceeding as Congress sometimes establishes

8      for some statutes.

9           The potential agency action at issue here is the

10     potential application of the tax penalty to the individual

11     through the application of the tax to the employers.  So for

12     the purposes of considering the issue of the plaintiffs

13     before the Court, the Court sets aside the regulation to

14     consider their circumstances.  But the Court does not purport

15     to adjudicate the claims -- the claims because there's a

16     conflict here with absent parties.

17          The Court does not purport to subject absent third

18     parties to a detriment, those third parties can bring their

19     own claims in various district courts around the --

20          THE COURT:  We'd have a lot of litigation, then it's

21     not going to be in the tax court.

22          Anyway, go ahead.

23          MR. McELVAIN:  I fully agree.  There would be a lot

24     of litigation.  That's a reason that the Fifth Circuit

25     identified in Apache Bend Apartments that courts should not

1    go about presuming to deprive tax benefits on a nationwide

2    basis because under prudential principles that would lead to

3    a flood of litigation in every other court.

4         But fundamentally the issue does not arise because,

5    as you said, the remedy issue only arises if you rule against

6    us.  And for the reasons I've already defined, the text of

7    the statute, the larger structure of the statute, Congress's

8    obvious purpose in providing for affordable health care for

9    all Americans on a nationwide basis, the better reading of

10   the statute, and at a least a reasonable reading of the

11   statute, is that tax credits are available in every state.

12        Thank you.

13        THE COURT:  Why don't we take a little break, maybe

14   about ten minutes, and then I'll hear from both of you in

15   rebuttal.

16        THE DEPUTY CLERK:  All rise.  This Honorable Court

17   stands in recess for a period of ten minutes.

18        (Brief recess at 3:33 p.m, resuming at

19      3:45 p.m.)

20        THE COURT:  Mr. Carvin.

21        MR. CARVIN:  Thank you, Your Honor.

22        I know we're getting pretty granular here, but I

23   think it might help that we're focusing on, I think two

24   provisions now in terms of the extraneous provisions that are

25   somehow supposedly affected by our subsidy provision.

1          Mr. McElvain started with the reporting provision

2    that he says clearly contemplates that there would be

3    subsidies everywhere.  Two points on that.  First of all,

4    that provision isn't 36(b).  And at the top of that provision

5    it makes it clear that it's referring to exchanges under

6    Section 1311(F)(3) or 1321(c).  So, it expressly contemplates

7    that it's complying with both.

8          As to Mr. McElvain's point that why would the

9    Treasury Secretary of the IRS care about who's bought

10   insurance on the exchanges.  The only possible reason is for

11   subsidies.  That's obviously untrue.  Most obviously, they

12   enforce the individual mandate.  As he points out, that's a

13   tax penalty.  So, if you're going to find out who's complying

14   and who's not complying with the individual mandate, you need

15   a data source for people who have gotten insurance.  So

16   that's the most obvious thing, reason the Secretary of

17   Treasury would want to know it.  And indeed, that's why the

18   IRS was given the enforcement over the individual mandate in

19   the first place.  It's the only agency around that gets all

20   this information about what people are buying and not buying.

21         More generally, of course, it's borderline absurd

22   for a representative of the Federal Government to say the

23   Federal Government doesn't care how many people, you know,

24   who's getting what kind of coverage, what sort of premiums

25   are they paying and who they are on that exchange.

1    Obviously, they want to know if these exchanges are, quote,

2    working, and if they're providing affordable care.  The very

3    next provision of the ACA has a study on the affordability of

4    coverage.  So you need all this data to figure out who's

5    showing up and whether or not it's working for a multitude of

6    reasons, including, presumably, convincing the states that

7    they should get on board.

8            So, it's just completely untrue that the Secretary

9    of the Treasury is somehow unconcerned about whether or not

10   people are buying insurance.

11           Again, on the qualified individual provision that I

12   know we've discussed at length, again, the Government claims

13   not to understand our point about how their provision doesn't

14   solve the problem.  Their interpretation doesn't solve the

15   problem.  The provision says you have to reside in the state

16   that established the exchange.  Under their convoluted

17   reasoning, they're not saying West Virginia established the

18   exchange.  They're saying West Virginia is deemed to have

19   established the exchange because the Secretary did it.  So

20   you're going to have to confront this issue regardless of

21   which interpretation you undertake.

22           As to their only response again to our, with respect

23   to the exchange being exchange under 1381 is the claim that

24   we somehow agree with them that exchange means state and

25   federal exchange.  We've never said that, I don't know what

1   they're talking about.

2        I thought what they thought the -- when they're

3   dealing with 1321, they say, see, the definitional section

4   says exchange under 1311, so it's a state.  So I thought they

5   had locked themselves into the notion that exchange meant

6   exchange under 1311.  Now they're saying no, they mean both.

7        At the end of the day, I don't care what they say.

8   But the point is that it's not our interpretation that's

9   creating these difficulties, it's theirs.

10       To eliminate any potential ambiguity, when I said I

11  don't disagree with their view of exchange, what I was trying

12  to convey, perhaps ineptly, was that's not the disagreement

13  that brought us here.  We're not coming here and saying the

14  word "exchange" means this or the exchange means this.  Where

15  the phrase is an exchange established by the state under

16  Section 1311.

17       So, again, they keep saying, interpreting that

18  phrase to mean what it says somehow creates problems

19  throughout the Act.  When you get to these other provisions

20  in the Act, they don't focus on the words "exchange"

21  established by the state under Section 1311, they pull out

22  the word "exchange" and say it creates a problem, which I

23  reiterate again is a faux problem.

24       In terms of your *Chevron* questions, and again, well,

25  I don't want to use the word "ambiguity."  I want to make my

1    answers as clear as possible.

2          If there is no ambiguity in the statute, you never

3    get to *Chevron* step two, that is black letter law.  I was

4    trying to give you the caveat that if the first sentence said

5    west and the second sentence said east, you can look at that

6    provision.  I don't want you to pull a sentence, they keep

7    accusing us of saying just look at this one sentence.  You

8    can look at the context, the provision, and see if there's

9    something that says march north when the other one says march

10   south, but that's not where we are.  We're into all this

11   purpose and underlying stuff.

12          I think the best way to think about it is the exact

13   formulation that Justice Stevens used in *Chevron*.  He said

14   did Congress speak to the precise question at issue.  And

15   here the precise question at issue is when subsidies were

16   available, if we're clear that they're only available on

17   exchanges, then the rest of this, all the legislation,

18   everything else that they have looked at is irrelevant.  You

19   have to find ambiguity there.

20          My second point is, again, even if you get to step

21   two in normal circumstances, you don't get to it here,

22   because of the IRS, the point I was making before about the

23   two agencies being involved.

24          The Government had three responses.  They said we

25   waived this argument because we waived it in reply.  We put

1    in a opposition to their summary judgment.  It wasn't a

2    reply, it was an opposition to their summary judgment.  We

3    get to make our arguments in response to theirs.

4            Second, he says there's no conflict because the HHS

5    agrees with the IRS.  Well, again, what difference does it

6    make if the HHS agrees with the IRS about the tax code.  The

7    HHS's views about the tax code are irrelevant.  I don't care

8    if they can bring the Labor Department of the Defense

9    Department to agree as well.  Congress has not delegated to

10   HHS or the Labor Department the ability to interpret the

11   statute, the tax code.  So that's why this agreement issue is

12   irrelevant.

13           But as I also pointed out, and it --

14           THE COURT:  I think you made a mistake.  You said

15   Congress is not delegating to HHS.  Did you mean HHS or IRS?

16           MR. CARVIN:  Okay.  Let's be precise.  He says HHS

17   agrees with IRS, so everything's hunky-dory.

18           THE COURT:  Right.

19           MR. CARVIN:  I am saying I think he's

20   misunderstanding.  I think he's arguing that if they agree on

21   a jointly administered statute, that somehow leads to *Chevron*

22   deference.  My point is it's not a jointly administered

23   statute.  HHS doesn't administer 36(b), just the IRS does.

24   So, who cares what HHS says about 36(b) or the Labor

25   Department?

1          THE COURT:  Right.

2          MR. CARVIN:  Congress has not delegated to the HHS

3     the ability to interpret 36(b).  They have certainly

4     delegated to HHS 1321 and the abortion provisions, all of the

5     things that's begin with 42 USC, that's been delegated to

6     HHS.  But just as we wouldn't care about what the IRS's

7     interpretation of the abortion provision is, we don't care

8     what the HHS's interpretation is of the provision within the

9     IRS's bailiwick.

10          But in all events, it doesn't --

11          THE COURT:  Well, let me ask you this, and I'll ask

12     Mr. McElvain this, too.  It seems like a straightforward

13     point.  But unlike a lot of other situations where we either

14     have joint administration or not, this is one statute called

15     the Affordable Care Act and because, for a variety of

16     reasons, some portions of it wind up in Title 42 and some

17     portions of it wind up in Title 26.

18          So it would be very different, for example, if you

19     took Title 21, which governs controlled substances and said,

20     well, maybe it isn't so different because you've got Justice,

21     you've got DEA, which I guess is a part of Justice, you've

22     got certain things that were split off as part of Homeland

23     Security, and you've got HHS, and they're all involved in

24     some way in dealing with the drug enforcement in this

25     country, civil and criminal.

1      So, you know, if you have a statute that was passed

2  by Congress on a particular day, and then when it's codified,

3  some pieces of it go to Title 26 and some pieces of it go to

4  Title 42, is that different from the normal principle that

5  you just articulated so clearly?

6      MR. CARVIN:  No, for two reasons, Your Honor.  One

7  is there are a number of statutes.  This is a very long

8  statute.  But there's a number of statutes, I think some of

9  these examples you gave are good examples, where the same

10  crime bill is going to solve this problem and HHS would do

11  midnight basketball and Justice will do drug rehab.  So it's

12  not at all unusual to have separate delegations into separate

13  agencies' areas of expertise combined in the same thing.  I'm

14  sure the Immigration Bill that's pending has all kinds of

15  directions to all kinds of agencies.

16      But I don't think you can make *Chevron* deference

17  turn on whether these bills were passed individually or

18  separately or in combination because the relevant question is

19  did Congress make a judgment that if there's ambiguities in

20  here, we're going to defer to the people with the relevant

21  expertise.  The relevant expertise in this case is over the

22  tax code.  They have not deferred to HHS's interpretation of

23  the tax code anymore than they interpreted IRS's

24  interpretation of the Medicaid statute.

25      But even if all of that is wrong, what are you left

1   with?  You are left with a conscious decision by Congress to

2   say, look, we're going to have a number of agencies in your

3   example and in the cases where the relevant banking agencies

4   are all administering the same statute.  And there, D.C.

5   Circuit again couldn't have been clearer in *DeNaples*.

6        They say look, we don't defer there because Congress

7   has not told us that agency X is the one that we're supposed

8   to defer to.  It's given us this smorgasbord.  And it's not

9   just if they disagree, the test articulated in *DeNaples* and

10  *Rapaport* is we don't defer for two reasons:

11       A, they may think about it differently, which is the

12  Government's argument.  Or, one of them may come into court

13  beforehand and they'll be the ones that do it.  In other

14  words, we don't want to have *Chevron* deference turn on events

15  outside of Congress's control, i.e., when the relevant

16  regulation winds up in court.  So that was the separate

17  rationale, which again, the Government can argue all it wants

18  about *National Home Builders* and *Coeur Alaska* and all that.

19  Those were decided 2007, 2009.  We have a 2013 decision by

20  the D.C. Circuit that says we don't care that OCC and the Fed

21  agree because they have delegated it to separate statutes.

22       I will briefly comment on *National Home Builders*.

23  They never even discussed the issue of whether *Chevron*

24  deference was appropriate because it was delegated to two

25  agencies.  So it's a driveby at most.  But there, they're

1  just mischaracterizing the thing.  EPA was the one who was

2  given the authority to transfer these responsibilities to the

3  state.

4       One of the criteria on whether EPA made that

5  decision was this issue involving the Endangered Species Act.

6  And in that part of the opinion, the Court said, look,

7  there's other agencies that interpret the Endangered Species

8  Act, but there was only one agency involved, *Coeur Alaska,* if

9  you just read the opinion, the first thing they decide is

10 that it's the Corps of Engineers, not the EPA that has

11 responsibility for landfill permits.  So no, these were not

12 shared responsibility cases.

13      And in any event, drive-by decisions by the Supreme

14 Court don't trump subsequent explicit decisions by the D.C.

15 Circuit.

16      The other point that I guess we're getting to is the

17 plain statement rule, or the fact that was clearly a

18 presumption against interpreting the tax code provisions to

19 give the taxpayer money unless Congress has, as I said,

20 unambiguously conveyed that message to the IRS.

21      The Government comes up and says, well, look at

22 *Mayo.*  Well, *Mayo* is my case.  *Mayo* says you narrowly

23 construe tax exemptions.  That reinforces the presumption.

24 Government says, well, they agreed with the Government in

25 that case.  Well, that's because the Government was seeking

to narrowly construe.  So, of course, they -- if you have the

presumption and the agency, they'll say, you know, this is

yet another reason.

The question here is whether the agency can overcome

the presumption.  This is admittedly unusual.  The Government

wants to give money out of the Treasury that the plaintiffs

are saying don't give.  So therefore, the question is which

wins?  The presumption against letting the money go absent

plain or ambiguous language or *Chevron*?  And we know the

presumptions trust *Chevron* under *St. Cyr* and all the other

cases we cited in our brief.

I'm terms of this psychoanalyzing Congress, I'll

just make one last point about how the Government argues,

CBO, you know, they had these meetings with these guys, and

somebody said nobody even brought this up, as if that's some

kind of legislative history anybody can defer to.

Well, the relevant point is that CBO didn't score

what the federal -- the money needed to do federal exchanges.

That was an official decision.  They didn't think that they

would need the money.  He says there's some fund out there

that HHS could dip into.  Okay.  Maybe they could dip into

it, but CBO, when they're calculating new legislation, say,

well, how much are they going to dip into it?  Again, the

amount here was zero because nobody contemplated federal

exchanges.

1          Then they cite this "New York Times" article which

2     has nothing at all to do with states saying we're going to

3     turn down the deal offered to us in the ACA, it's about

4     proposals in Congress.  And yes, some states were saying,

5     we're going to resist any proposals, including opt out or opt

6     in provision.

7          There's a debate, of course, the states were

8     debating.  It's hardly any secret that a lot of people didn't

9     like the Affordable Care Act during its passing.  But think

10    about it, if that's true, that gave Congress all the more

11    reason to give the states an incentive.

12         Mr. McElvain comes up here and says, look, everybody

13    knew a lot of these red states were going to resist, hammer

14    and tongs, doing anything to make the Affordable Care Act

15    work.  Well, if I was somebody who supported the Affordable

16    Care Act, I said, well, I'd better make him an offer they

17    can't refuse.  I'm not going to trust on their good will like

18    the IRS rule does.  So to the extent he's making that

19    argument again, it supports us.

20         Finally, just -- I think finally.  In terms of

21    the -- this notion of the agency action we're complaining

22    about has something to do with Mr. Klemencic being subject to

23    the individual mandate and the employer sanctions.  No, no.

24    The agency action we're complaining about as the face of our

25    complaint makes clear is the IRS rule.  We say enter a

1    declaratory judgment, the IRS rule violates the APA.

2           Preliminary and permanent injunction –– I apologize.

3           Enter a preliminary and permanent prohibiting the

4    application or enforcement of the IRS rule.

5           He's confusing why we're affected, our Article 3

6    injury with what our cause of action is.  And as to your

7    point about a flood of litigation resulting from not

8    enjoining it, that's exactly the point the *National Mining*

9    *Association* used when it said that it's necessary to enter

10   injunctions that apply to litigants that are not before the

11   Court.

12          Unless there are further questions, thank you.

13          THE COURT:  Thank you.

14          Mr. McElvain.

15          MR. McELVAIN:  Just a few points on reply, Your

16   Honor.  First on the question of what the Court can look to

17   at *Chevron* step one.  I cited several cases in my initial

18   argument.  One additional case that was cited in our briefs,

19   I do want to call to your attention as well, is *Household*

20   *Credit Services versus Pfennig*, P-F-E-N-N-I-G, it's a 2004

21   Supreme Court case.  It said, "In ascertaining the plain

22   meaning of the statute, the Court must look to the particular

23   statutory language at issue as well as the language and

24   design of the statute as a whole."

25          And what's interesting about that case was the Court

1    of Appeals actually struck down a regulation under *Chevron*

2    step one looking only to particular provision, and the

3    Supreme Court very carefully recited that's not a proper

4    application of step one, you need to look more broadly to the

5    statute as a whole and the design of the statute.

6         So, all of the arguments we presented before, not

7    just the interplay of 36(b) and 1803(1), but the other

8    provisions of the Act, specifically the very next section,

9    1803(2), the qualified individual's absurdity that

10   plaintiff's argument creates.  These are all proper subjects

11   for the Court to take into account at step one.

12        And certainly they're proper again at step two to

13   reach the result that Treasury has provided at minimum a

14   reasonable reading of the statute, which again is all we need

15   to show you.

16        On Mr. Carvin's points regarding 36(b)(f)(3), the

17   reporting provisions relating to premium tax credits.  Now,

18   the first thing he said is while Treasury would care because

19   it also administers the minimum coverage provision Section

20   5,000(a).  But Treasury already gets reporting for that from

21   insurers relevant to Section 5,000(a) under 26 USC 6055.

22        What Section 36(b) directs is more information

23   beyond what Treasury is already getting for the minimum

24   coverage provision relating to the specific, for example, the

25   specific metal level of the plan that somebody is buying on

1    the exchange, bronze, silver, gold or platinum.  There is no

2    reason at all that Treasury would need to know what

3    particular kind of coverage somebody is buying on the

4    exchange, they just need to know somebody has bought a plan

5    on the exchange to establish that they've complied with the

6    minimum coverage provision.

7         It's a particular metal level that Treasury would

8    need to know to know whether or not the cost sharing

9    subsidies are available because those are only available for

10   silver plans for people below a certain income level.

11        And again, those are only available if you are

12   initially eligible for a 36(b) tax credit.  So it would make

13   no sense at all for the Federal Exchange to report that

14   information unless Congress was working from the initial

15   presumption that tax credits are, in fact, available on the

16   Federal Exchange, as I think it's clear from the face of

17   36(b)(f) that Congress had in mind.

18        And in particular, again, this is a provision within

19   36(b) itself.  So Congress was not contemplating just

20   reporting to the Federal Government for some free floating

21   purpose to see if the Affordable Care Act was working well or

22   not.  It was specifically -- they specifically directed

23   reporting to Treasury for the purpose of administering 36(b).

24   So I think the intent of Congress is plain right there.

25        Now, as to the qualified individual provision.

1   Mr. Carvin said, well, yeah, we have the -- I don't mean to

2   put words in his mouth, but I think what he said was, yeah,

3   there's this issue that we need to get around under our

4   reading of the statute, but the same issue arises under the

5   Government's reading.

6        But that's not the case at all.  If you follow our

7   reading, Treasury's reasonable construction of the statute,

8   the Federal Government stands in the shoes of the state,

9   that's what Congress had in mind when it used the phrase

10  "state exchange established by the state, or state that

11  established the exchange."  Then there's no interpretative

12  problem in 1803(2) at all.  If you live in a state with a

13  federally established exchange, you live in the state that

14  established the exchange because the background presumption

15  that Congress was working off of was the Federal Government

16  stands in the shoes of the state to perform that particular

17  function.

18        So for the same reasons that we've reconciled 36(b)

19  and 1803(1), and the issues with 1832 simply go away.  The

20  absurdity does not arise in the first place.  But under

21  plaintiff's reading it does, and they have to scramble around

22  to find some argument to get out of the absurdity, including

23  the argument that you should just read the qualified

24  individual provision out of the statute altogether, which is

25  not a proper mode of statutory construction.

1          So that is a very powerful textual clue as to what

2    Congress had in mind when it was -- when it was establishing

3    the premium tax credits and defining the state exchange and

4    the Federal Exchange to be equivalent in their functions.

5          On the *Chevron* issue, the question, as I think you

6    put it, is, is there a textual clue that Congress made a

7    judgment that some particular agency was to have interpretive

8    authority.  There's no question here.  There's no -- there's

9    no need to guess as to what Congress's intent was.  Congress

10   specifically said in 36(b) Sub G that the Secretary of the

11   Treasury shall have rule-making authority.  That is *Chevron*

12   authority, that's the language that Congress used to confer

13   *Chevron* authority as the Supreme Court has said over and

14   over.

15         So the issue simply doesn't arise because we know

16   what Congress's intent was.  Treasury shall have rule-making

17   authority for the statute the same way it does for the

18   Internal Revenue Code generally.

19         Mr. Carvin raised the question of, well, what if

20   there were a conflict between -- between Treasury's reading

21   and HHS's reading, which, in fact, there is not for the

22   reasons we already discussed.  But what if there were that

23   conflict, and then there would be some issue as to the

24   meaning of the statute being established for all time simply

25   by which agency got to the Court first.  That is no longer

good law under the Supreme Court case of *Brand X*, which said

that when you defer to an agency's interpretation under

*Chevron* step two, you're not setting the meaning of the

statute for all time.  You're simply deferring to a

reasonable construction.  And other reasonable constructions

could be adopted by the agency at a later point.

But this is a largely academic dispute because again

there is simply no conflict.  Treasury and HHS stand in

lockstep, they worked in close coordination, Treasury and its

regulations, HHS and its regulations.  And they are fully in

agreement that tax credits, cost-sharing subsidies, advance

payments for the tax credits, all of those things are

available, both on the state exchange and federal exchanges.

There's simply no conflict at all between the two agencies.

Under the DeNaples case, if I'm saying it correctly,

the recent D.C. Circuit case, what was noteworthy of that

case was that FDIC also had regulatory authority under the

relevant statute, and the FDIC was absent, so there was a

possibility, at least it was not certain as of the time of

the Court's consideration of the case, if FDIC could come

forward with an alternative interpretation.

Here, the only two relevant agencies are Treasury

and HHS, they both stand here together.  And as I've said,

there's no conflict, both agencies stand together to advance

the same interpretation to the Court.  So there is no *Chevron*

1    issue.

2         And with that, I think I've addressed the points I

3    wanted to touch on in reply, but I'd be happy to answer any

4    questions.

5         THE COURT:  No.

6         MR. McELVAIN:  That's an acceptable answer for me,

7    Your Honor.  Thank you.

8         THE COURT:  I'm not going to raise the

9    Anti-Injunction Act at this late hour.  I know your positions

10   from your briefs.

11        Okay.  Well, I've got all your arguments.  I've got

12   all your briefs.  And I will give you a decision as soon as I

13   can.

14        THE DEPUTY CLERK:  All rise.  This Honorable Court

15   adjourns.

16        (Whereupon, Court adjourned at 4:20 p.m.)

17                          - o -

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

        I, Lisa Walker Griffith, certify that the foregoing

is a correct transcript from the record of proceedings in the

above-entitled matter.


_____          _____
Lisa Walker Griffith                              Date