UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                        )
JACQUELINE HALBIG, *et al*.,            )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )        Civil Action No. 13-0623 (PLF)
                                        )
KATHLEEN SEBELIUS,                      )
   U.S. Secretary of Health and Human   )
   Services, *et al*.,                   )
                                        )
            Defendants.                 )
_____ )

OPINION

        On May 23, 2012, the Internal Revenue Service issued a final rule implementing

the premium tax credit provision of the Patient Protection and Affordable Care Act (the "ACA"

or "Act").  In its final rule, the IRS interpreted the ACA as authorizing the agency to grant tax

credits to certain individuals who purchase insurance on either a state-run health insurance

"Exchange" or a federally-facilitated "Exchange."  Plaintiffs contend that this interpretation is

contrary to the statute, which, they assert, authorizes tax credits only for individuals who

purchase insurance on state-run Exchanges.  Plaintiffs therefore assert that the rule promulgated

by the IRS exceeds the agency's statutory authority and is arbitrary, capricious, and contrary to

law, in violation of the Administrative Procedure Act.

        This matter is now before the Court on the parties' cross-motions for summary

judgment.  The Court heard oral argument on the motions on December 3, 2013.  After careful

consideration of the parties' papers and attached exhibits, the Act and other relevant legal

authorities, the regulations promulgated by the IRS, and the oral arguments presented by counsel

in open court, the Court will grant the defendants' motion, deny the plaintiffs' motion, and enter judgment for the defendants.[1]

## I. BACKGROUND

### A. The Affordable Care Act

On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), with the aim of increasing the number of Americans covered by health insurance and decreasing the cost of health care. Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2580 (2012).[2] Under the ACA, most Americans must either obtain "minimum essential" health insurance coverage or pay a tax penalty imposed by the Internal Revenue Service. 26 U.S.C. § 5000A; see Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. at 2580. Uninsured individuals who might otherwise have difficulty obtaining health

---

[1]     The papers reviewed in connection with the pending motions include the following: the complaint ("Compl.") [Dkt. No. 1]; plaintiffs' motion for summary judgment ("Pls.' SJ Mot.") [Dkt. No. 17]; declaration of David Klemencic ("Klemencic Decl."), attached to plaintiffs' opposition to defendants' motion to dismiss [Dkt. No. 24-1]; declaration of Daniel Kessler, J.D., Ph.D. ("Kessler Decl."), attached to plaintiffs' opposition to defendants' motion to dismiss [Dkt. No. 24-2]; defendants' motion for summary judgment and opposition to plaintiffs' summary judgment motion ("Defs.' SJ Mot.") [Dkt. No. 49]; third declaration of Donald B. Moulds, Acting Assistant Secretary for Planning and Evaluation at the Department of Health and Human Services ("Third Moulds Decl."), attached to defendants' motion for summary judgment [Dkt. No. 49-2]; plaintiffs' reply and opposition to defendants' motion for summary judgment ("Pls.' SJ Opp.") [Dkt. No. 57]; defendants' reply ("Defs.' SJ Reply") [Dkt. No. 62]; Brief of *Amicus Curiae* American Hospital Association [Dkt. No. 52]; Brief of *Amicus Curiae* Families USA [Dkt. No. 54]; Brief of *Amicus Curiae* Commonwealth of Virginia [Dkt. No. 60]; Brief of *Amicus Curiae* Jonathan H. Adler and Michael F. Cannon [Dkt. No. 61]; October 21, 2013 Transcript of Oral Argument on Motion for Preliminary Injunction and Motion to Dismiss ("Oct. 21, 2013 Tr.") [Dkt. No. 64]; October 22, 2013 Transcript of Oral Ruling ("Oct. 22, 2013 Tr."); and December 3, 2013 Transcript of Oral Argument on Summary Judgment ("Dec. 3, 2013 Tr.") [Dkt. No. 65].

[2]     A week after the Patient Protection and Affordable Care Act was passed, Congress amended the Act through the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029 (2010).

insurance are provided certain tools to facilitate the purchase of such insurance. Specifically, the law provides for the establishment of "Exchanges," through which individuals can purchase competitively-priced health insurance. See 42 U.S.C. §§ 18031, 18041. The Act also authorizes a federal tax credit for many low- and middle-income individuals to offset the cost of insurance purchased on these Exchanges. 26 U.S.C. § 36B. Large employers are expected to share the costs of health insurance coverage for their full-time employees, and employers who do not provide affordable health care may be subject to an "assessable payment" or tax. 26 U.S.C. § 4980H.

At issue in this case is whether the ACA allows the IRS to provide tax credits to residents of states that declined to establish their own health insurance Exchanges, that is, in states where the federal government has stepped in and is running the Exchange. Because this dispute necessitates a careful examination of certain features of the ACA – in particular, the Exchanges, the Section 36B tax credits, the minimum insurance requirement for individuals, and the Section 4980H assessment imposed on some employers – these features are described in more detail below.

## 1. The Exchanges

The ACA provides for the establishment of American Health Benefit Exchanges, or "Exchanges," to facilitate the purchase of health insurance by private individuals and small businesses. See 42 U.S.C. § 18031(b)(1); 42 U.S.C. § 300gg-91(d)(21). The Department of Health and Human Services ("HHS") has described an Exchange as "a mechanism for organizing the health insurance marketplace to help consumers and small businesses shop for coverage in a way that permits easy comparison of available plan options based on price, benefits and services, and quality." Centers for Medicare & Medicaid Services, *Initial Guidance to*

*States on Exchanges*, http://www.hhs.gov/cciio/resources/files/guidance_to_states_on_ exchanges.html (visited Jan. 5, 2014); see also H.R. REP. NO. 111-443, pt. II, at 976 (March 17, 2010) (describing an Exchange as "an organized and transparent 'marketplace for the purchase of health insurance' where individuals and employees (phased-in over time) can shop and compare health insurance options") (internal quotation omitted).

Each health insurance plan offered through an Exchange must provide certain minimum benefits, as set forth in regulations promulgated by HHS.  42 U.S.C. §§ 18021(a)(1), 18022.  In addition to serving as a marketplace for health insurance, an Exchange can determine an individual's eligibility to obtain an advance payment of a federal premium tax credit and his or her eligibility to be deemed exempt from the individual minimum coverage requirement.  See 42 U.S.C. § 18031(d)(4).

Section 1311 of the ACA provides that "[e]ach State shall, not later than January 1, 2014, establish an American Health Benefit Exchange (referred to in this title as an 'Exchange')[.]"  ACA § 1311(b)(1), *codified at* 42 U.S.C. § 18031(b)(1).  If, however, a state decides not to establish its own Exchange, or fails to establish an Exchange consistent with federal standards, Section 1321 of the Act directs HHS to step in and establish "such Exchange" in that state.  ACA § 1321(c)(1), *codified at* 42 U.S.C. § 18041(c)(1); see 45 C.F.R. § 155.105(f). While sixteen states and the District of Columbia have elected to set up their own Exchanges, thirty-four states rely on federally-facilitated Exchanges.  Seven of these thirty-four states have chosen to assist the federal government with its operation of federally-run Exchanges, while twenty-seven states have declined to undertake any aspect of Exchange implementation.  See State Decisions for Creating Health Insurance Marketplaces, Kaiser State Health Facts, http://kff.org/health-reform/state-indicator/health-insurance-Exchanges/ (visited Jan. 5, 2014).

2. Premium Tax Credits

The Act authorizes tax credits for many low- and middle-income individuals who purchase health insurance through the Exchanges.  The Exchanges administer a program to provide advance payments of tax credits for eligible individuals; where an advance payment is approved, the Exchange arranges for the payment to be made directly to the individual's insurer, lowering the net cost of insurance to the individual.  42 U.S.C. §§ 18081-18082.  The section of the Act setting forth how this tax credit is determined – ACA § 1401, codified at 26 U.S.C. § 36B – calculates this credit based in part on the premium expenses for the health plan "enrolled in [by the individual] through an Exchange established by the State under [42 U.S.C. § 18031]." 26 U.S.C. § 36B(b)(2)(A); <u>see</u> <u>also</u> 26 U.S.C. § 36B(c)(2)(A)(i).

As an example, amicus Families USA calculates that a single parent with two children in Florida, earning $41,000, would likely be charged about $5700 per year for a "silver-level" insurance plan on the federally-facilitated Exchange operating in that state.  If the tax credit is available, the family would pay approximately $2700 for this insurance, after receiving a tax credit of about $3000.  If the tax credit is unavailable, the family would bear the full cost of health insurance.  Brief of *Amicus Curiae* Families USA 7 (citing Kaiser Family Foundation, Subsidy Calculator, *available at* http://kff.org/interactive/subsidy-calculator).

3.  Minimum Insurance Requirement and Unaffordability Exemption

Under the Act, most individuals must obtain health insurance or face a tax penalty imposed by the IRS.  This penalty in 2014 is one percent of an individual's yearly income or $95 for the year, whichever is higher, 26 U.S.C. § 5000A(c)(2)-(3), but it "cannot exceed the cost of 'the national average premium for qualified health plans' meeting a certain level of coverage." <u>Liberty Univ., Inc. v. Lew</u>, 733 F.3d 72, 84 (4th Cir. 2013) (quoting 26 U.S.C.

§ 5000A(c)(1)(B)).  Individuals unable to afford coverage, however, are exempt from the

minimum insurance requirement, and therefore can avoid the tax penalty.  26 U.S.C. § 5000A(e).

The unaffordability exemption generally is available to an individual whose health insurance

costs exceed eight percent of his or her annual household income.  26 U.S.C. § 5000A(e)(1)(A).

An individual's costs are determined with reference to the price of the relevant insurance

premium minus the tax credit described above.  26 U.S.C. § 5000A(e)(1)(B)(ii).

### 4.   Section 4980H Assessable Payments on Large Employers

Under the ACA, many or most employers are expected to offer health insurance

plans to their employees, and large employers who do not offer affordable health insurance

coverage to their full-time employees are subject to an "assessable payment" or tax under 26

U.S.C. § 4980H.  Imposition of the Section 4980H assessment is triggered when a full-time

employee purchases subsidized coverage on an Exchange.  26 U.S.C. § 4980H(a)-(b).  After an

employee purchases insurance, the Exchange determines whether the employer failed to offer

affordable health insurance to that employee.  If so, and if the employee meets the income

requirements and other criteria, the employee will be deemed eligible for a premium tax credit.

The Exchange then notifies the employer that the employer will be assessed a Section 4980H

payment.  26 U.S.C. § 4980H(d).  The employer has the opportunity to administratively appeal

that notice.  26 U.S.C. § 18081(f)(2).

### B.  The IRS Rule

The Internal Revenue Service has promulgated regulations making the premium

tax credit available to qualifying individuals who purchase health insurance on state-run or

federally-facilitated Exchanges.  See 26 C.F.R. § 1.36B-1(k); Health Insurance Premium Tax

Credit, 77 Fed. Reg. 30,377, 30,378 (May 23, 2012) (the "IRS Rule").  Specifically, 26 C.F.R.

§ 1.36B-2(a)(1) provides that an applicable taxpayer who meets certain other criteria is allowed a

tax credit if he or she, or a member of his or her family, "[i]s enrolled in one or more qualified

health plans through an Exchange."  26 C.F.R. § 1.36B-1(k) provides that the term Exchange

"has the same meaning as in 45 C.F.R. § 155.20," which in turn defines Exchange in the

following manner:

> Exchange means a governmental agency or non-profit entity that
> meets the applicable standards of this part and makes [Qualified
> Health Plans] available to qualified individuals and/or qualified
> employers. Unless otherwise identified, this term includes an
> Exchange serving the individual market for qualified individuals
> and a [Small Business Health Options Program] serving the small
> group market for qualified employers, *regardless of whether the
> Exchange is established and operated by a State (including a
> regional Exchange or subsidiary Exchange) or by HHS.*

45 C.F.R. § 155.20 (emphasis added).  Participants in federally-facilitated Exchanges thus are

eligible for the premium tax credit under the IRS Rule.

In describing the Rule, the IRS noted that "[c]ommentators disagreed on whether

the language in [26 U.S.C. §] 36B(b)(2)(A) limits the availability of the premium tax credit only

to taxpayers who enroll in qualified health plans on State Exchanges."  77 Fed. Reg. at 30,378.

The IRS rejected such a limitation, explaining:

> The statutory language of section 36B and other provisions of the
> Affordable Care Act support the interpretation that credits are
> available to taxpayers who obtain coverage through a State
> Exchange, regional Exchange, subsidiary Exchange, and the
> Federally-facilitated Exchange. Moreover, the relevant legislative
> history does not demonstrate that Congress intended to limit the
> premium tax credit to State Exchanges. Accordingly, the final
> regulations maintain the rule in the proposed regulations because it
> is consistent with the language, purpose, and structure of section
> 36B and the Affordable Care Act as a whole.

Id.

*C.  This Litigation*

Plaintiffs are a group of individuals and employers residing in states that have declined to establish Exchanges.[3]  Pursuant to its statutory authority under 42 U.S.C. § 18041(c)(1), HHS has established Exchanges in those states.  Under the IRS Rule, tax credits are available to eligible individuals purchasing qualified health plans in those states.

Plaintiffs contend that 26 C.F.R. § 1.36B-1(k) and related regulations violate the plain language of the ACA, which provides that an individual's tax credit is calculated based on the cost of insurance purchased on "an Exchange *established by the State* under [42 U.S.C. § 18031]."  26 U.S.C. § 36B(b)(2)(A).  Plaintiffs argue that the regulations exceed the scope of the agency's statutory authority and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act, and they therefore must be set aside.  5 U.S.C. § 706(2)(A), (C); see Compl. ¶¶ 37, 40.  Plaintiffs also contend that the agency's explanation for its interpretation of the statute is "arbitrary, capricious, unsupported by a reasoned basis, and contrary to law."  Compl. ¶ 41.

Plaintiffs filed this action on May 2, 2013, naming as defendants HHS, the Department of the Treasury ("Treasury"), and the IRS, as well as the heads of those agencies. After serving defendants, plaintiffs promptly moved for summary judgment, and defendants filed a motion to dismiss.  Briefing on plaintiffs' summary judgment motion was stayed pending a decision on defendants' motion to dismiss.  In their motion to dismiss, the defendants argued that plaintiffs lacked standing; that their claims were not ripe; that this suit was precluded by the Anti-Injunction Act and other statutes; and that the case must be dismissed for failure to join

---

[3]      The individual plaintiffs are Jacqueline Halbig, David Klemencic, Carrie Lowery, and Sarah Rumpf.  Compl. ¶¶ 12-15.  The employer plaintiffs are Innovare Health Advocates, Community National Bank, and a group of restaurants under the common control of J. Allen Tharp.  Id. ¶¶ 16-18.

indispensable parties.  Plaintiffs in turn filed a motion for a preliminary injunction.  For the

reasons stated in open court on October 22, 2013, the Court denied plaintiffs' motion for

preliminary injunction on the ground that plaintiffs had failed to establish risk of irreparable

harm.  The Court also denied the defendants' motion to dismiss, with leave to renew their

justiciability challenges at the summary judgment stage.

Briefing on plaintiffs' summary judgment motion resumed, and defendants filed a

cross-motion for summary judgment.  These motions are now ripe for decision.

## II.  JUSTICIABILITY OF PLAINTIFFS' CLAIMS

Defendants urge this Court to dismiss plaintiffs' claims on various jurisdictional

and prudential grounds.  Defendants argue that the individual plaintiffs lack Article III standing

and that their suit is barred by a provision of the Administrative Procedure Act, 5 U.S.C. § 704.

Defendants raise similar challenges against the employer plaintiffs.  In addition, defendants

assert that the employer plaintiffs' claims are precluded by the Anti-Injunction Act, 26 U.S.C.

§ 7421(a), and by prudential standing principles.  The Court rejects defendants' arguments as to

the individual plaintiffs, but agrees that the Anti-Injunction Act bars the claims of the employer

plaintiffs.

### A.  *Individual Plaintiffs*

### 1.  Article III Standing

The defendants previously argued in their motion to dismiss that the individual

plaintiffs lacked Article III standing, and the Court rejected this argument in its oral ruling on

October 22, 2013.  See Oct. 22, 2013 Tr. 13-18.  The Court concluded that at least one individual

plaintiff, David Klemencic, had adequately shown economic injury likely to result from the IRS

Rule.  Id.  The defendants have renewed their challenge here, and the Court rejects this challenge for identical reasons.

In order to establish standing under Article III of the United States Constitution, a plaintiff must show, at an "irreducible constitutional minimum," that (1) he or she has suffered an injury-in-fact – i.e., the invasion of a legally protected interest; (2) the injury is fairly traceable to the defendants' conduct (a causal connection); and (3) a favorable decision on the merits likely will redress the injury.  Sprint Commc'ns Co., L.P. v. APPC Servs., Inc., 554 U.S. 269, 273-74 (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

David Klemencic is one of four individual plaintiffs in this suit.[4]  He avers in a declaration – and the government does not dispute – that he expects to earn approximately $20,000 in 2014.  Klemencic Decl. ¶ 4; Third Moulds Decl. ¶ 2.  For ideological reasons, Klemencic does not wish to purchase minimum essential health coverage.  Klemencic Decl. ¶ 8.  Mr. Klemencic also has introduced evidence that the cost of minimum health insurance coverage, if unsubsidized, would exceed eight percent of his income.  See Kessler Decl. ¶ 21.  Thus, if tax credits were unavailable, he would be eligible for an "unaffordability exemption" under the ACA and could forego purchasing health insurance without incurring a tax penalty under Section 5000A.

The effect of the IRS Rule, however, is that the tax credit available to Mr. Klemencic lowers the cost of his insurance premiums so significantly that he no longer qualifies

---

[4]       Both plaintiffs and defendants focus on whether Mr. Klemencic has established injury-in-fact.  The Court therefore does not decide whether the remaining individual plaintiffs have established standing.  As the Court previously stated, Oct. 22, 2013 Tr. at 13, a court may consider a claim so long as at least one plaintiff has established standing as to that claim.  See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981); Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

for the unaffordability exemption.  See Kessler Decl. ¶ 22; Klemencic Decl. ¶ 7.  The Rule

thereby places Klemencic in a position where he has to purchase subsidized health insurance,

estimated at approximately $20 per year, see Third Moulds Decl. ¶ 6, or he will have to pay

some higher amount per year as a Section 5000A tax penalty.  Counterintuitively, by making

health insurance more affordable, the IRS Rule imposes a financial cost on Klemencic.

　　　　Although the economic injury is rather small, defendants cite no authority that

suggests that the amount at issue – only about $1.70 per month, or $20 per year – is too small to

establish injury-in-fact for jurisdictional purposes.  Mr. Klemencic's economic injury, albeit a

non-intuitive one, meets the requirements for Article III standing.  It is "concrete, particularized,

and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable

ruling."  Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013) (internal quotation

omitted).[5]

　　　　2.   The Administrative Procedure Act and the Tax Refund Alternative

　　　　As noted, plaintiffs bring suit under the Administrative Procedure Act, which

provides a "generic cause of action in favor of persons aggrieved by agency action."  Cohen v.

United States, 650 F.3d 717, 723 (D.C. Cir. 2011) (en banc) (quoting Maryland Dep't of

Human Res. v. Dep't of Health & Human Servs., 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985)).

The APA permits judicial review of any "[a]gency action made reviewable by statute," as well

as any "final agency action for which there is no other adequate remedy in a court."  5 U.S.C.

§ 704 (emphasis added).  Section 704 thus excludes from APA review those agency actions for

which there are alternative judicial remedies in place.  As the Supreme Court has explained:

_____

[5]　　　　The Court also previously concluded that Mr. Klemencic has satisfied the
requisites for prudential standing.  See Oct. 22, 2013 Tr. 24-28.

> At the time the APA was enacted, a number of statutes creating administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action . . . . When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies.

Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) (footnotes omitted).

The APA thus "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." Bowen v. Massachusetts, 487 U.S. at 903 (quoting Attorney General's Manual on the Administrative Procedure Act 101 (1947)). Instead, where Congress already has created a separate cause of action for review of agency action, "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute" unless that proceeding is "inadequat[e]." 5 U.S.C. § 703.

Although Section 704 disallows APA review of agency actions when other, *adequate* remedies are provided by statute, the Supreme Court has noted that this provision "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." Bowen v. Massachusetts, 487 U.S. at 903. Therefore, when determining whether alternative remedies are adequate, "the court must give the APA 'a hospitable interpretation' such that 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" Garcia v. Vilsack, 563 F.3d 519, 523 (D.C. Cir. 2009) (quoting El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs., 396 F.3d 1265, 1272 (D.C. Cir. 2005) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967))).

Defendants assert that a special, time-honored statutory procedure exists for challenges to IRS actions: the tax refund suit.  28 U.S.C. § 1346 provides that a district court has original jurisdiction of "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority[.]"  28 U.S.C. § 1346(a)(1).  Under the Internal Revenue Code, however, no such suit may be brought until after the challenged tax has been paid and "a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."  26 U.S.C. § 7422(a); see United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008).[6]

The parties agree that the critical question is whether the tax refund suit provides an adequate judicial remedy in this case.  See Cohen v. United States, 650 F.3d at 731.  In some respects, the tax refund suit clearly provides a path to a potential remedy.  If plaintiffs forego purchasing insurance and face a higher tax burden as a penalty, they will be able to pay the tax and then bring a refund suit under 26 U.S.C. § 7422, like any other taxpayer.  If plaintiffs prevail on their challenge in a tax refund suit, they will be entitled to repayment in full, plus interest, of any overpayment.  26 U.S.C. § 7422; see 28 U.S.C. § 2411 (authorizing payment of interest).

But in other ways, the tax refund mechanism is inferior to an APA suit and fails to provide complete relief to these plaintiffs.  Relegating plaintiffs' claims to a tax refund action would force plaintiffs to make a choice between purchasing insurance, thereby waiving their

---

[6]     Defendants also note that in some circumstances, a plaintiff may refrain from paying the tax, wait to be sued, and allow the issue to be resolved in the United States Tax Court. See Oct. 21, 2013 Tr. 19.  As with the refund suit, resolution of plaintiffs' challenge in that forum would take place only after the tax year had ended.

claims, or foregoing insurance and incurring the tax penalty, which they will recover much later, and only if they prevail.  They also will be deprived of the opportunity to obtain prospective certificates of exemption.  See 45 C.F.R. § 155.605(g)(2).  Such certificates provide a safe harbor to an individual who can establish that he or she likely will meet the requirements of the unaffordability exemption for that tax year; such certificates guarantee that individuals will avoid the tax penalty "notwithstanding any change in an individual's circumstances," such as an unexpected increase in income.  45 C.F.R. § 155.605(g)(2)(vi).

Defendants argue that the tax refund suit is adequate because it is a *de novo* proceeding.  See Democratic Leadership Council v. United States, 542 F. Supp. 2d 63, 70 (D.D.C. 2008) (tax refund actions are *de novo* proceedings).  *When* that proceeding occurs is irrelevant, according to defendants.  As the D.C. Circuit explained in Garcia, "relief will be deemed adequate 'where a statute affords an opportunity for *de novo* district-court review,'" as "Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the review provision] and the APA."  Garcia v. Vilsack, 563 F.3d at 522-23 (alterations in original) (quoting El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs., 396 F.3d at 1270).

But Garcia is distinguishable from the present case in a number of significant ways.  In Garcia, there was no substantive difference between the relief available in the special judicial proceeding and that available in an APA action, and plaintiffs were in fact attempting to pursue both avenues of relief *at the same time*.  See Garcia v. Vilsack, 563 F.3d at 521, 523 (noting that plaintiffs brought claims under Equal Credit Opportunity Act and the APA in the same lawsuit).  By contrast, here prospective relief – including the ability to qualify for a certificate of exemption – is available *only* in the APA action brought by plaintiffs; such relief is

not available in the tax refund suit.  See Cohen v. United States, 650 F.3d at 732 (noting that tax

refund suit appeared to provide only individualized, retroactive relief, and not the ability to

challenge a regulation or policy without penalty).  As in Cohen, the tax refund remedy would not

provide the relief appellants sought because, among other things, it does not allow for

prospective relief.  Id. at 732.[7]

Furthermore, although the tax refund suit provision typically will preclude suits

by parties who bring a tax challenge in federal court without first exhausting their administrative

remedies, see Cohen v. United States, 650 F.3d at 733, this is not a typical case.  As in Cohen,

plaintiffs here bring a pre-enforcement challenge to a final agency rule, rather than

individualized adjudications of tax liability.  The dispute before the Court is purely legal and ripe

for review.  Any administrative challenge would be futile, as the Secretary of the Treasury can be

expected to deny plaintiffs' complaint as contrary to the issued IRS regulations.  Abstaining from

a decision now would simply kick the can down the road until 2015, after the Secretary of the

Treasury reaffirms the view he already has announced in promulgating the Rule.  See Oct. 21,

2013 Tr. 18-20.

---

[7]    Defendants maintain that it is "well-settled that a tax refund action provides an
adequate remedy at law, even though the tax must first be imposed before the suit is brought."
Defs.' SJ Reply 7 (citing Bob Jones Univ. v. Simon, 416 U.S. 725, 742 (1974), and Alexander v.
"Americans United" Inc., 416 U.S. 752, 762 (1974)).  But the cases cited by defendants address
the question of whether pre-collection tax suits are precluded by the Anti-Injunction Act – not
whether an action may proceed under the APA.  Bob Jones Univ. v. Simon, 416 U.S. at 742-46;
Alexander v. "Americans United" Inc., 416 U.S. at 761-62.  These cases do no more than
establish that the tax refund remedy is not so inadequate a remedy as to constitute a clear
violation of a taxpayer's constitutional due process rights.  Bob Jones Univ. v. Simon, 416 U.S.
at 746-47 (finding that relegation of plaintiff to tax refund remedy resulted in serious delay and
possibly irreparable injury, but that these problems did not "rise to the level of constitutional
infirmities"); Alexander v. "Americans United" Inc., 416 U.S. at 761-62 (noting that a showing
of irreparable injury was not sufficient to avoid application of the Anti-Injunction Act).  They
have nothing to say about whether the tax refund suit is an "adequate" alternative remedy to an
APA action.

The Court therefore concludes that the tax refund suit is not an adequate alternative to the judicial review provisions of the APA in this case. The "doubtful and limited relief" possibly available sometime in the future in a tax refund suit is "not an adequate substitute" for APA review here and now. Bowen v. Massachusetts, 487 U.S. at 901; see id. at 904-05 (rejecting federal agency's assertion that an after-the-fact action in the Claims Court was an adequate alternative for prospective relief requested by state plaintiff in APA suit). To the extent that this is a close call, the Court relies on the Supreme Court's directive that the APA's review provisions should be given "a 'hospitable' interpretation," as the APA's underlying purpose is to "remove obstacles to judicial review of agency action." Id. at 904 (internal quotations omitted). The Court therefore concludes that plaintiffs' suit is not barred under the APA.

## B. Employer Plaintiffs and the Anti-Injunction Act

Defendants raise several challenges regarding the justiciability of the employer plaintiffs' claims. Because their challenge under the Anti-Injunction Act is dispositive with respect to the employer plaintiffs, the Court proceeds directly to that issue.[8]

Although the APA waives sovereign immunity for suits against the federal government, 5 U.S.C. § 702, it "preserves 'other limitations on judicial review' and does not 'confer[ ] authority to grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought.'" Cohen v. United States, 650 F.3d at 724 (alterations in original) (quoting 5 U.S.C. § 702). The Anti-Injunction Act (the "AIA") is one such limitation on judicial review.

---

[8]    Individual plaintiffs bring suit for the purpose of avoiding a potential tax penalty under 26 U.S.C. § 5000A, a statute to which the Supreme Court has concluded the Anti-Injunction Act does not apply. Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. at 2583-84. Defendants therefore raise the issue of the Anti-Injunction Act with respect only to the employer plaintiffs, who seek to enjoin tax liability under 26 U.S.C. § 4980H. See Compl. ¶¶ 6, 16-18, 31.

The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The statute acts as a limitation on a court's subject matter jurisdiction, Gardner v. United States, 211 F.3d 1305, 1311 (D.C. Cir. 2000), and generally applies regardless of whether the suit presents a constitutional, statutory, or regulatory challenge. See, e.g., Alexander v. "Americans United" Inc., 416 U.S. at 759-60 (finding AIA barred constitutional challenge to denial of tax-exempt status); Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 3, 7-8 (1962) (applying AIA to statutory challenge).

"The manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund" after the taxes have been paid. Cohen v. United States, 650 F.3d at 724 (quoting Enochs v. Williams Packing & Nav. Co., 370 U.S. at 7). The AIA arose out of a concern by Congress "about the . . . danger that a multitude of spurious suits, or even suits with possible merit, would so interrupt the free flow of revenues as to jeopardize the Nation's fiscal stability." Id. (quoting Alexander v. "Americans United" Inc., 416 U.S. at 769 (Blackmun, J., dissenting)). The AIA "has 'almost literal effect': It prohibits only those suits seeking to restrain the assessment or collection of taxes." Id. (quoting Bob Jones Univ. v. Simon, 416 U.S. at 737). The AIA applies regardless of whether its application results in uncertainty or hardship for the taxpayer. Bob Jones Univ. v. Simon, 416 U.S. at 745; Alexander v. "Americans United" Inc., 416 U.S. at 762.

Although the employer plaintiffs are challenging the legality of a regulation governing tax *credits*, not a tax collection, they do so in order to restrain the IRS from assessing the payments described in 26 U.S.C. § 4980H, which are triggered by the award of tax credits to

their employees.  In fact, their theory of injury hinges on this relationship.  See Pls.' SJ Opp.

38-41.  The Court therefore must address the question of whether the Section 4980H assessment

is a tax for purposes of the Anti-Injunction Act.  See Alexander v. "Americans United" Inc., 416

U.S. at 760 (adopting broad interpretation of AIA's "suit for the purpose of restraining the

assessment or collection of any tax" language).

       In Nat'l Fed'n of Indep. Bus., the Supreme Court held that the label that Congress

gives to an assessment collected by the IRS matters for purposes of the AIA.  Nat'l Fed'n of

Indep. Bus. v. Sebelius, 132 S. Ct. at 2583.  Chief Justice Roberts, writing for a majority of the

Court, explained:  "The Anti-Injunction Act and the Affordable Care Act . . . are creatures of

Congress's own creation.  How they relate to each other is up to Congress, and the best evidence

of Congress's intent is the statutory text."  Id.  He then concluded that the penalty imposed on

individuals who fail to obtain minimum coverage under 26 U.S.C. § 5000A – though a tax for

constitutional purposes – was not a tax for purposes of the Anti-Injunction Act.  Id. at 2583-84.

Why not?  Because Congress consistently used the term "penalty" rather than the term "tax" in

describing the Section 5000H exaction.  Id.  By contrast, other payments imposed under the

ACA were expressly described by Congress as "taxes," id. at 2583, and the statute's "consistent

distinction between the terms 'tax' and 'assessable penalty'" reflected an intent to distinguish

these two exactions for purposes of the AIA.  Id. at 2584.

       Unlike the Section 5000A "assessable penalty" examined by the Supreme Court

in Nat'l Fed. of Indep. Business, the Section 4980H assessment is described at various places in

the statutory text both as an "assessable payment" and as a "tax."  In Section 4980H itself, the

fee is called an "assessable payment" seven times and a "tax" twice.  See 26 U.S.

§ 4980H(b)(1)(B) (referring to "assessable payment"); Section 4980H(c)(2)(D)(i)(I) (same);

Section 4980H(d) (referring to "assessable payment" four times); Section 4980H(b)(2) (referring to the "aggregate amount of tax determined" that an employer must pay); Section 4980H(c)(7) (referring to the "denial of deduction for the tax imposed by this section").  This same assessment is described as a tax at least once elsewhere in the ACA.  42 U.S.C. § 18081(f)(2) ("The Secretary [of HHS] shall establish a separate appeals process for employers who are notified under subsection (e)(4)(C) that the employer may be liable for a *tax* imposed by section 4980H of Title 26[.]") (emphasis added).

The Fourth Circuit recently concluded that the occasional use of the word "tax" in Section 4980H was insufficient to implicate the Anti-Injunction Act.  Liberty Univ., Inc. v. Lew, 733 F.3d at 86-89 (noting that the ACA "does not consistently characterize the exaction as a tax").  That court also found that it would be anomalous to allow individuals to bring pre-enforcement challenges to Section 5000A penalties (the provision considered by the Supreme Court in Nat'l Fed. of Indep. Business) while permitting employers to bring only post-enforcement challenges to Section 4980H assessments.  Id. at 88-89.  The Fourth Circuit therefore reasoned that the AIA did not prohibit a statutory challenge to Section 4980H.  Id. at 89.

This Court is not persuaded by the Fourth Circuit's reasoning.  That court reads the term "assessable payment" as nullifying the effect of the word "tax."  In this Court's view, however, the natural conclusion to draw from Congress's interchangeable use of the terms "assessable payment" and "tax" in Section 4980H is simply that Congress saw no distinction between the two terms.  See Cohen v. United States, 650 F.3d at 731 ("A baker who receives an order for 'six' donuts and another for 'half-a-dozen' does not assume the terms are requests for different quantities of donuts. . . .  Different verbal formulations can, and sometimes do, mean

the same thing.").  Absent a clear indication by Congress, the Court views the term "tax" as used in 26 U.S.C. § 7421(a), the Anti-Injunction statute, as having the same meaning as the term "tax" as used elsewhere in the Internal Revenue Code, including in Section 4980H.  See Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232 (2007) (recognizing "standard principle of statutory construction . . . that identical words and phrases within the same statute should normally be given the same meaning").

Furthermore, there is no other reason to presume that the AIA does not apply. The Section 4980H assessment *acts* like a tax and *looks* like a tax.  The Court therefore embraces a modified version of the "now-infamous 'duck test'":  "WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck," *and WHEREAS it is called a duck by Congress on multiple occasions*, "[THE COURT] THEREFORE HOLD[S] that it is a duck."  Hussain v. Obama, 718 F.3d 964, 968 (D.C. Cir. 2013) (quoting Dole v. Williams Enterprises, Inc., 876 F.2d 186, 188 n.2 (D.C. Cir. 1989)).

Like most classic taxes, the exaction created by Section 4980H serves a revenue-raising function: the fees collected by the employers are based on, and presumably are used to offset, tax credits dispensed to individuals purchasing their own insurance on the Exchanges. There therefore is no reason to treat a Section 4980H assessment as a regulatory penalty, rather than as a tax.  Cf. Korte v. Sebelius, 735 F.3d 654, 669 (7th Cir. 2013) (distinguishing between "severe and disproportionate" penalties which are used to "regulate[] private conduct and make[] noncompliance painful," and taxes that function to raise revenue) (internal quotations omitted); see also Direct Marketing Ass'n v. Brohl, 735 F.3d 904, 916 n.7 (10th Cir. 2013) (noting distinction "between a 'classic tax [that] sustains the essential flow of revenue to the government,' . . .  and a penalty that 'rais[es] money to help defray an agency's regulatory

expenses'") (internal quotations omitted).[9]  Furthermore, Section 4980H is located in the Internal Revenue Code, and the payment is assessed by the Internal Revenue Service.  Cf. Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 558 n.9 (1976) (noting that fees imposed outside of Internal Revenue Code generally are not barred by the AIA).

Nor does it seem anomalous that Congress would have intended to allow pre-enforcement challenges by individuals while prohibiting pre-enforcement suits by employers.  In fact, another provision in Section 4980H confirms that Congress assumed that employers would raise their challenges in post-collection suits.  The statute provides that the Secretary of the Treasury "shall prescribe rules . . . for the *repayment* of any assessable payment . . . if such payment is based on the allowance or payment of an applicable premium tax credit or cost-sharing reduction with respect to an employee, such allowance or payment is subsequently disallowed, and the assessable payment would not have been required to be made but for such allowance or payment."  26 U.S.C. § 4980H(d)(3) (emphasis added).  No such comparable provision exists with respect to individuals.  See generally 26 U.S.C. § 5000A.

In sum, for purposes of the Anti-Injunction Act, the Court concludes that the assessable payment described in 26 U.S.C. § 4980H must be considered a tax.  The Anti-Injunction Act therefore bars the employer plaintiffs' claims, and those plaintiffs will be dismissed from this case.

---

[9]       In Korte, the Seventh Circuit concluded that the AIA did not bar suits relating to penalties under 26 U.S.C. § 4980D, which the court found "meant to penalize employers for noncompliance with the various mandates in the Affordable Care Act and its implementing regulations."  Korte v. Sebelius, 735 F.3d at 670.  After finding that the exaction under Section 4980D was not a tax under the AIA, the Seventh Circuit then stated, without further discussion, that "[b]y parallel reasoning the same is true of the alternative payment in Section 4980H."  Id. at 671.  The Court does not agree with the Seventh Circuit's conclusion.

Because the Court has jurisdiction over at least one of the individual plaintiffs' claims, however, it proceeds to a decision on the merits.

### III.  THE IRS RULE

### A.  *Legal Standards*

As noted above, plaintiffs' principal argument calls into question the IRS's interpretation of the ACA, as set forth in its regulations.  When the action under review involves an agency's interpretation of a statute that the agency is charged with administering, the Court applies the familiar analytical framework set forth in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

"Under step one of Chevron, [the court] ask[s] whether Congress has directly spoken to the precise question at issue."  Sec'y of Labor, Mine Safety & Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d 1066, 1073 (D.C. Cir. 2007) (internal quotation and quotation marks omitted).  In determining whether Congress has directly spoken to the precise question at issue, the Court uses the "traditional tools of statutory construction," including an examination of the statute's text, the structure of the statute, and (as appropriate) legislative history.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9; see Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Meredith v. Fed. Mine Safety & Health Review Comm'n, 177 F.3d 1042, 1053 (D.C. Cir. 1999) (internal quotation omitted).

If, however, the Court concludes that "the statute is silent or ambiguous with respect to the specific issue . . . , [the Court] move[s] to the second step and defer[s] to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'"  In

Def. of Animals v. Salazar, 675 F. Supp. 2d 89, 94 (D.D.C. 2009) (quoting Sec'y of Labor, Mine

Safety & Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074).  At Chevron

step two, the court must uphold the agency's interpretation "if it is reasonable and consistent

with the statutory purpose and legislative history."  Bell Atl. Tel. Cos. v. FCC, 131 F.3d at 1049.

"Unlike [the court's] Chevron step one analysis, [its] review at this stage is 'highly deferential.'"

Vill. of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 665 (D.C. Cir. 2011) (quoting Nat'l

Rifle Assn. of Amer. v. Reno, 216 F.3d 122, 137 (D.C. Cir. 2000)).

       Plaintiffs also object to the IRS Rule as being arbitrary and capricious.  An

agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has

not intended it to consider, entirely failed to consider an important aspect of the problem, offered

an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise."  Agape Church, Inc. v. FCC, --- F.3d ----, 2013 WL 6819158, at *11 (D.C. Cir. 2013)

(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).

As the D.C. Circuit recently noted, "[t]he analysis of disputed agency action under Chevron Step

Two and arbitrary and capricious review is often 'the same, because under Chevron step two,

[the court asks] whether an agency interpretation is arbitrary or capricious in substance.'"  Id. at

*11 (quoting Judulang v. Holder, 132 S. Ct. 476, 483 n.7 (2011)).

       Congress expressly delegated authority to the Secretary of the Treasury to resolve

any ambiguities in Section 36B.  26 U.S.C. § 36B(g) ("The Secretary shall prescribe such

regulations as may be necessary to carry out the provisions of this section."); see also 26 U.S.C.

§ 7805(a).  As plaintiffs note, however, Treasury and HHS share joint responsibility for

administering parts of the Act, including implementation of the tax credit scheme.  HHS, for

example, oversees the advance payments of premium tax credits.  42 U.S.C. § 18082(a) ("The

Secretary [of HHS], in consultation with the Secretary of the Treasury, shall establish a program

under which" advance determinations and payments of tax credits are made).  The two agencies

"work[ed] in close coordination . . . to release guidance related to Exchanges," Health Insurance

Premium Tax Credit, 76 Fed. Reg. 50,931, 50,932 (Aug. 17, 2011), and HHS has promulgated its

own regulations providing that participants on both state and federal Exchanges are eligible for

advance payments of the credits.  See 45 C.F.R. § 155.20.

   Plaintiffs argue that this shared authority precludes Chevron deference, as courts

regularly decline to defer to agencies interpreting statutes that they do not have sole authority in

administering.  See, e.g., Collins v. Nat'l Transp. Safety Bd., 351 F.3d 1246, 1253 (D.C. Cir.

2003) ("For statutes . . . where the agencies have specialized enforcement responsibilities but

their authority potentially overlaps – thus creating risks of inconsistency or uncertainty – de novo

review may . . . be necessary."); Benavides v. U.S. Bureau of Prisons, 995 F.2d 269 (D.C. Cir.

1993) (no Chevron deference to agency interpretation of the Privacy Act, a statute of general

applicability administered by multiple agencies).  But where, as here, "the subject matter of the

statute falls squarely within the agencies' areas of expertise, and the Regulations were issued as a

result of a statutorily coordinated effort among the agencies, Chevron is the governing standard."

Individual Reference Servs. Grp., Inc. v. FTC, 145 F. Supp. 2d 6, 24 (D.D.C. 2001), aff'd, Trans

Union LLC v. FTC, 295 F.3d 42 (D.C. Cir. 2002); see also Nat'l Ass'n of Home Builders v.

Defenders of Wildlife, 551 U.S. 644, 665-66 (2007).[10]  The Court therefore proceeds to Chevron

step one and examines whether the statute is ambiguous.

---

[10]   The Court rejects as meritless plaintiffs' argument that the IRS Rule conflicts with
regulations promulgated by HHS.

*B. Chevron Step One*

1. Plain Language of Section 36B(a)-(c) and Cross-Referenced Provisions

In construing a statute's meaning, the Court "begin[s], as always, with the language of the statute." <u>Duncan v. Walker</u>, 533 U.S. 167, 172 (2001).  The statutory provision that authorizes the premium tax credits provides as follows:

> In the case of an *applicable taxpayer*, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the *premium assistance credit amount* of the taxpayer for the taxable year.

26 U.S.C. § 36B(a) (emphasis added).

The term "applicable taxpayer" is defined as "a taxpayer whose household income for the taxable year equals or exceeds 100 percent but does not exceed 400 percent of an amount equal to the poverty line for a family of the size involved."  26 U.S.C. § 36B(c)(1)(A).  This statutory provision does not distinguish between taxpayers residing in states with state-run Exchanges and those in states with federally-facilitated Exchanges.

Subsection (b) of Section 36B – which sets forth the formula for calculating the premium tax credit – contains the language that plaintiffs say precludes tax credits for taxpayers on federal Exchanges.  This provision directs the Internal Revenue Service to calculate an individual's premium tax credit – or the "premium assistance credit amount" – by adding up the "premium assistance amounts" for all "coverage months" in a given year.  26 U.S.C. § 36B(b)(1).  The "premium assistance amount" is based in part on the cost of the monthly premium for the health plan that the taxpayer purchased "through an Exchange established by the State under [42 U.S.C. § 18031]."  26 U.S.C. § 36B(b)(2).  A "coverage month" likewise is defined as any month during which the taxpayer (or spouse or dependent) is enrolled in, and pays the premium for, a qualified health plan "that was enrolled in through an Exchange established

by the State under [42 U.S.C. § 18031]." 26 U.S.C. § 36B(c)(2)(A)(i).  Thus, the tax credit to a qualifying individual is tied to the cost of insurance purchased "through an Exchange established by the State under [42 U.S.C. § 18031]."  The term "Exchange" is not defined in Section 36B, but the phrase "established by the State under [42 U.S.C. § 18031]" directs the Treasury Secretary and the IRS Commissioner to define "Exchange" with reference to other provisions of the ACA, located in Title 42 of the United States Code.  26 U.S.C. § 36B(b)(2); 26 U.S.C. § 36B(c)(2)(A)(i).

Plaintiffs contend that by using the phrase "established by the State under [42 U.S.C. § 18031]," as opposed to a phrase like "established under this Act," see 42 U.S.C. § 18032(d)(3)(D)(i)(II), Congress intended to refer exclusively to state-run Exchanges, as opposed to federally-facilitated Exchanges, and thus to limit the availability of the Section 36B tax credits to persons residing only in the states that have established their own Exchanges. Under plaintiffs' construction of the Act, a taxpayer in a state with a federal Exchange will never purchase insurance "enrolled in through an Exchange established by the State under [42 U.S.C. § 18031]."  The premium assistance credit amount available to "applicable taxpayers" residing in states with federally-facilitated Exchanges therefore will always be zero.

On its face, the plain language of 26 U.S.C. § 36B(b)-(c), viewed in isolation, appears to support plaintiffs' interpretation.  The federal government, after all, is not a "State," which is explicitly defined in the Act to mean "each of the 50 States and the District of Columbia."  ACA § 1304(d), *codified at* 42 U.S.C. § 18024(d).  The phrase "Exchange established by the State under [42 U.S.C. § 18031]" therefore, standing alone, could be read to refer only to state-run Exchanges.

In making the threshold determination under <u>Chevron</u>, however, "a reviewing court should not confine itself to examining a particular statutory provision in isolation.  Rather, [t]he meaning – or ambiguity – of certain words or phrases may only become evident when placed in context."  <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. at 666 (internal quotations and quotation marks omitted).  As the D.C. Circuit has observed, "the literal language of a provision taken out of context cannot provide conclusive proof of congressional intent, any more than a word can have meaning without context to illuminate its use."  <u>Petit v. U.S. Dept. of Educ.</u>, 675 F.3d 769, 781 (D.C. Cir. 2012) (quoting <u>Bell Atl. Tel. Cos. v. FCC</u>, 131 F.3d at 1047); <u>see also</u> <u>Household Credit Servs., Inc. v. Pfennig</u>, 541 U.S. 232, 239, 241 (2004) (examining surrounding statutory language and related provisions).  So here, one cannot look at just a few isolated words in 26 U.S.C. § 36B, but also must at least look at the other statutory provisions to which it refers.  <u>See</u> <u>United States v. McGoff</u>, 831 F.2d 1071, 1080 (D.C. Cir. 1987) (rejecting construction that isolated disputed statutory provision from expressly cross-referenced statute).

The cross-referenced 42 U.S.C. § 18031 provides that "*[e]ach State shall*, not later than January 1, 2014, *establish* an American Health Benefit Exchange (referred to in this title as an "Exchange")[.]"  42 U.S.C. § 18031(b)(1) (emphasis added).  That section then states that "[a]n Exchange shall be a governmental agency or nonprofit entity that is *established by a State*."  42 U.S.C. § 18031(d)(1) (emphasis added).  In both of these provisions, Congress describes an "Exchange" as necessarily being established by a State.  The definitions section of the ACA, Section 1563(b), clarifies that this description is definitional: Section 1563(b) provides that "[t]he term 'Exchange' means an American Health Benefit Exchange established under [42 U.S.C. § 18031]."  ACA § 1563(b)(21), *codified at* 42 U.S.C. § 300gg-91(d)(21).

Plaintiffs and defendants agree that 42 U.S.C. § 18031 does not mean what it literally says; states are not actually required to "establish" their own Exchanges.  Pls.' SJ Opp. 14 ("*All* agree that states are free *not* to establish Exchanges.") (emphasis in original).  This is because Section 1321 of the ACA provides that a state may "elect" to establish an Exchange and implement federal requirements for that Exchange.  ACA § 1321, *codified at* 42 U.S.C. § 18041.  If a state (i) is not an "electing State," (ii) fails to have "a required Exchange operational by January 1, 2014," or (iii) has not taken the actions necessary to establish an operational Exchange consistent with federal requirements, "the Secretary shall . . . establish and operate *such Exchange* within the State and the Secretary shall take such actions as are necessary to implement such other requirements."  42 U.S.C. § 18041(c) (emphasis added).  In other words, if a state will not or cannot establish its own Exchange, the ACA directs the Secretary of HHS to step in and create "such Exchange" – that is, by definition under the statute, "an American Health Benefit Exchange established under [Section 18031]."  42 U.S.C. § 18041(c); 42 U.S.C. § 300gg-91(d)(21).

Looking only at the language of 26 U.S.C. § 36B(b)-(c), isolated from the cross-referenced text of 42 U.S.C. § 18031, 42 U.S.C. § 18041, and 42 U.S.C. § 300gg-91(d)(21), the plaintiffs' argument may seem the more intuitive one.  Why would Congress have inserted the phrase "established *by the State* under [42 U.S.C. § 18031]" if it intended to refer to Exchanges created by a state *or* by HHS?  But defendants provide a plausible and persuasive answer: Because the ACA takes a state-established Exchange as a given and directs the Secretary of HHS to establish such Exchange and bring it into operation if the state does not do so.  <u>See</u> 42 U.S.C. §§ 18031(b)-(d), 18041(c).  In other words, even where a state does not actually establish an

Exchange, the federal government can create "an Exchange established by the State under [42 U.S.C. § 18031]" *on behalf of* that state.[11]

Because each side provides a credible construction of the language of Section 36B(b)-(c) – though defendants' is the more credible when viewed in light of the cross-referenced provisions – the Court moves on to consider the other "traditional tools of statutory construction" under Chevron step one, including the structure of the statute and the context in which the language of Section 36B is set.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9.

### 2.  Other Provisions of the ACA

Courts have a "duty to construe statutes, not isolated provisions."  Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 568 (1995)); Household Credit Servs., Inc. v. Pfennig, 541 U.S. at 239, 241.  Thus, even beyond Section 36B(b)-(c) and the other provisions of the ACA it specifically cross-references, the Court must "interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'"  FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (internal quotations omitted).

---

[11]      Plaintiffs invoke the canon against surplusage, arguing that deleting the statutory modifier "established by the State" would violate the principle of statutory construction that no word of a statute be superfluous.  See Duncan v. Walker, 533 U.S. at 174 (noting court's duty "to give effect, if possible, to every clause and word of a statute").  But plaintiffs' construction would render superfluous other portions of the ACA, such as the advance payment reporting requirements under Section 36B(f).  See infra at 30-31.  Thus the canon against surplusage is of no use here.  The canon "is not an absolute rule," and "assists only where a competing interpretation gives effect to every clause and word of a statute."  Marx v. Gen. Revenue Corp., 133 S. Ct. 1166, 1177 (2013).

The defendants point to various provisions of the ACA that appear to reflect an intent by Congress to make tax credits available to taxpayers purchasing insurance from the federally-facilitated Exchanges; they also cite provisions that, if construed consistently with plaintiffs' proposed definition, would create numerous anomalies within the statute that Congress could not have intended.  See 26 U.S.C. § 36B(f)(3) (requiring reporting by federally-run Exchanges of advance payments of tax credits); 42 U.S.C. § 18032(f)(1)(A)(ii) (restricting *any* Exchange-based purchase of health insurance to residents of "the State that established the Exchange"); 42 U.S.C. § 1396a(gg) (providing that a state must maintain certain standards in its Medicaid program until "an Exchange established by the State under [42 U.S.C. § 18031] is fully operational"); 42 U.S.C. § 1397ee(d)(3)(B) (requiring HHS to determine, for each state, whether health plans offered through "an Exchange established by the State under [42 U.S.C. § 18031]" provide benefits for children comparable to those offered in the state's CHIP plan).

The Court finds the defendants' arguments compelling and the plaintiffs' counter-arguments unpersuasive.  The Court need not discuss each of the many such provisions highlighted by defendants.  It is sufficient to illustrate the persuasiveness of their arguments to focus on two provisions in the ACA: the reporting requirements for state and federal Exchanges, and the eligibility requirements for individuals purchasing insurance through the Exchanges.

a.  The Advance Payment Reporting Requirements Under 26 U.S.C. § 36B(f)(3)

Subsection (f) of Section 36B – titled "Reconciliation of credit and advance credit" and located in the same section as the disputed statutory phrase – provides that the premium tax credit that a taxpayer receives at the end of the year must be reduced by the amount of any advance payment of such credit.  26 U.S.C. § 36B(f)(1).  In order for the IRS to track these advance payments, the statute mandates that "[e]ach Exchange (or any person carrying out

1 or more responsibilities of an Exchange under [42 U.S.C. § 18031] *or [42 U.S.C. § 18041]*)" provide certain information to the Secretary of the Treasury and to the taxpayer "with respect to any health plan provided through the Exchange."  26 U.S.C. § 36B(f)(3) (emphasis added).  The provision requires the reporting of information on the level of coverage provided to each taxpayer, the price of the insurance premium, and the amount of the advance payment.

By invoking both Section 18031 and Section 18041, this advance payment provision is expressly directed at *every* Exchange, regardless of whether the Exchange is state- or federally-run.  Section 36B(f) would serve no purpose with respect to the federally-facilitated Exchanges, and the language referencing 42 U.S.C. § 18041 would be superfluous, if federal Exchanges were not authorized to deliver tax credits.  Section 36B(f) thus indicates that Congress assumed that premium tax credits would be available on any Exchange, regardless of whether it is operated by a state under 42 U.S.C. § 18031 or by HHS under 42 U.S.C. § 18041.

### b.  Qualified Individuals Under 42 U.S.C. § 18032

Section 1312 of the ACA, codified at 42 U.S.C. § 18032, sets forth provisions regarding which individuals may purchase insurance from the Exchanges.  This section provides that only "qualified individuals" may purchase health plans in the individual markets offered through the Exchanges, and requires that a "qualified individual" be a person who "resides in the State that established the Exchange."  42 U.S.C. § 18032(f)(1)(A)(ii). There is no separate provision defining "qualified individual" for purposes of the federally-facilitated Exchanges.

If this provision were read literally, no "qualified individuals" would exist in the thirty-four states with federally-facilitated Exchanges, as none of these states is a "State that established [an] Exchange."  The federal Exchanges would have no customers, and no purpose.  Such a construction must be avoided, if at all possible.  See Fund for Animals, Inc. v.

Kempthorne, 472 F.3d 872, 877 (D.C. Cir. 2006) ("[C]ourts presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence."). And this absurd construction can be avoided, say defendants, by viewing 42 U.S.C. § 18041 – the provision which grants states flexibility in the operation of Exchanges and permits the Secretary to establish and operate an Exchange when a state declines to do so – as authorizing the federal government to "stand[] in the shoes of the state" for purposes of Section 18032's residency requirement. See Defs.' Reply 13.

Plaintiffs concede that the federally-run Exchanges *must* be able to offer insurance, and suggest that the Court should not interpret the residency requirement literally. According to plaintiffs, the residency provision "*assumes* that a state created the Exchange; so it can quite readily be construed as not prohibiting eligibility [to apply for insurance] where that assumption proves false." Pls.' SJ Opp. 15; see also Dec. 3, 2013 Tr. 24-25. But plaintiffs' concession only proves the defendants' point. Various provisions of the ACA besides the residency provision reflect an assumption that a state-established Exchange exists in each state. See, e.g., 42 U.S.C. § 18032(f)(1)(A)(ii); 42 U.S.C. § 1396a(gg) (requiring state compliance with certain Medicaid standards until "an Exchange established by the State under [42 U.S.C. § 18031] is fully operational"); 42 U.S.C. § 1397ee(d)(3)(B) (directing HHS to assess compliance of certain benefits of health plans offered through "an Exchange established by the State under [42 U.S.C. § 18031]"); see also 42 U.S.C. § 18031(d)(1) ("An Exchange shall be a governmental agency or nonprofit entity that is *established by a State*.") (emphasis added). If construed literally, these provisions would be nullified when applied to states without state-run Exchanges, leading to strange or absurd results. These provisions make far more sense when construed consistently with defendants' interpretation of the Act – *i.e.*, viewing 42 U.S.C.

§ 18041 as authorizing the federal government to create "an Exchange established by the State

under [42 U.S.C. § 18031]" on behalf of a state that declines to establish its own Exchange.

### 3.  Purpose of the Affordable Care Act

In adopting the ACA, Congress believed that the Act would address the lack of

access by many Americans to affordable health care, ACA § 1501(a)(2)(E)-(G), *codified at* 42

U.S.C. § 18091(2)(E)-(G), and would lead to "near-universal coverage." ACA § 1501(a)(2)(D),

*codified at* 42 U.S.C. § 18091(2)(D).  Indeed, Title I of the ACA is titled "Quality, Affordable

Health Care for *All* Americans" (emphasis added).  Plaintiffs' proposed construction in this case

– that tax credits are available only for those purchasing insurance from state-run Exchanges –

runs counter to this central purpose of the ACA: to provide affordable health care to virtually all

Americans.  Such an interpretation would violate the basic rule of statutory construction that a

court must interpret a statute in light of its history and purpose.  See Zuni Pub. Sch. Dist. No. 89

v. Dep't of Educ., 550 U.S. 81, 90-93 (2007); Ragsdale v. Wolverine World Wide, Inc., 535 U.S.

81, 88 (2002) (rejecting Department of Labor rule as "contrary to the [statute's] remedial

design").

Plaintiffs try to explain away the inconsistency between their proposed

construction and the statute's underlying purpose by proposing that Congress had another,

equally pressing goal when it passed the ACA: convincing each state to set up its own health

insurance Exchange.  See Pls.' SJ Opp. 23-24; Dec. 3, 2013 Tr. 8.  According to plaintiffs,

Congress desperately wanted to keep the federal government out of the business of running any

Exchange, and it therefore sought to persuade the states to establish and operate the Exchanges.

Pls.' SJ Opp. 23-24.  As an inducement, say plaintiffs, Congress made premium tax credits

available only to those states that set up their own Exchanges.  Id.; see also Dec. 3, 2013 Tr. 8

(Congress needed to provide states with "a big incentive" to undertake "a thankless, very controversial task"); Dec. 3, 2013 Tr. 12 ("Everyone assumed that the states would take the deal. . . . [T]his deal is free federal money. . . . Who turns down a gift horse like that in the mouth?"). According to plaintiffs, "Congress obviously wanted subsidies in every state, but it wanted something else.  It wanted the states to run it.  And they thought they were getting both because they thought it was a deal nobody could refuse."  Dec. 3, 2013 Tr. 17.

Plaintiffs' theory is tenable only if one accepts that in enacting the ACA, Congress intended to compel states to run their own Exchanges – or at least to provide such compelling incentives that they would not decline to do so.  The problem that plaintiffs confront in pressing this argument is that there is simply no evidence in the statute itself or in the legislative history of any intent by Congress to ensure that states established their own Exchanges.  And when counsel for plaintiffs was asked about this at oral argument, he could point to none.  See Dec. 3, 2013 Tr. 8-18.  Indeed, if anything, the legislative history cuts in the other direction and suggests that Congress intended to provide states with flexibility as to whether or not to establish and operate Exchanges.  See infra at 35-38.

Nor does plaintiffs' theory make intuitive sense.  A state-run Exchange is not an end in and of itself, but rather a mechanism intended to facilitate the purchase of affordable health insurance.  And there is evidence throughout the statute of Congress's desire to ensure broad access to affordable health coverage.  See, e.g., 42 U.S.C. § 18091(2)(D)-(G).  It makes little sense to assume that Congress sacrificed nationwide availability of the tax credit – which plaintiff David Klemencic previously described as critical to the operation of the Exchanges, Brief for Private Petitioners on Severability, Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct.

34

2566 (2012) (Nos. 11-393 & 11-400), 2012 WL 72440, at *51-52 (Defs.' SJ Mot., Ex. 14) – in an attempt to promote state-run Exchanges.[12]

        In sum, while there is more than one plausible reading of the challenged phrase in Section 36B when viewed in isolation, the cross-referenced sections, the surrounding provisions, and the ACA's structure and purpose all evince Congress's intent to make premium tax credits available on both state-run and federally-facilitated Exchanges.  Thus, the intent of Congress is clear at Chevron step one.  See Nat'l Cable & Telecomms. Ass'n v. FCC, 567 F.3d 659, 663, 665 (D.C. Cir. 2009) (employing all "traditional tools of statutory interpretation," including "text, structure, purpose, and legislative history," to ascertain Congress's intent at Chevron step one); Catawba County, North Carolina v. Envtl. Prot. Agency, 571 F.3d 20, 35 (D.C. Cir. 2009).

## 4.  Legislative History

        If there were any remaining uncertainty as to the ACA's meaning – and there is not – the scant relevant legislative history in this case confirms Congress's intent on this point. See, e.g., Nat'l Cable & Telecomms. Ass'n v. FCC, 567 F.3d at 665 (considering legislative

---

[12]    Moreover, the statutory formula for calculating the tax credit seems an odd place to insert a condition that the states establish their own Exchanges if they wish to secure tax credits for their citizens.  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001) ("[Congress] does not, one might say, hide elephants in mouseholes.").  One would expect that if Congress had intended to condition availability of the tax credits on state participation in the Exchange regime, this condition would be laid out clearly in subsection (a), the provision authorizing the credit, or some other provision outside of the calculation formula.  This is particularly so because courts presume that "Congress when it enacts a statute is not making the application of the federal act dependent on state law."  Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 43 (1989) (collecting cases); see also United States v. Irvine, 511 U.S. 224, 238 (1994) ("[T]he revenue laws are to be construed in the light of their general purpose to establish a nationwide scheme of taxation uniform in its application.").

history at <u>Chevron</u> step one); <u>Sierra Club v. Envtl. Prot. Agency</u>, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (same).[13]

Early proposals for comprehensive health insurance reform contemplated that the federal government would establish and operate the Exchanges, and an earlier version of the House Bill so provided.  <u>See</u> Reconciliation Act of 2010, H.R. 4872 §§ 141(a), 201(a) (2010) (version reported in the House on March 17, 2010) (establishing a national exchange within a newly created Health Choices Administration located in the Executive Branch); <u>see</u> <u>also</u> H. REP. NO. 111-443, at 18, 26 (2013).  Ultimately, however, these proposals proved politically untenable and doomed to failure in the Senate, so the Senate passed a bill that provided "flexibility" to each state as to whether it would operate the Exchange.  <u>See</u> 42 U.S.C. § 18041 (titled "State Flexibility in operation and enforcement of Exchanges . . . ").  As the Chairman of the Senate Finance Committee – the committee that considered and reported the bill – described it, the ACA "fundamentally gives States the choice to participate in the exchanges themselves or, if they do not choose to do so, to allow the Federal Government to set up the exchanges."  155 Cong. Rec. S13,832 (Dec. 23, 2009) (Sen. Baucus).  The Senate Finance Committee expressly contemplated that the federal government could "establish state exchanges."  <u>See</u> S. REP. NO. 111-89, at 19 (Oct. 19, 2009) ("If these [state] interim exchanges are not operational within a reasonable period after enactment, the Secretary [of HHS] would be required to contract with a nongovernmental entity *to establish state exchanges* during this interim period.") (emphasis

---

[13]     Because the House and Senate versions of the Act were synthesized through a reconciliation process, rather than the standard conference committee process, no conference report was issued for the Act, and there is a limited legislative record relating to the final version of the bill.  The legislative history that is available, however, supports defendants' argument that Congress intended that state-run and federally-facilitated Exchanges operate identically.

added).  This history reveals an intent to grant states the option of establishing their own

Exchanges, rather than an intent to coerce or entice states into participating.

Furthermore, there is no evidence that either the House or the Senate considered

making tax credits dependent upon whether a state participated in the Exchanges.  To the

contrary, Congress assumed that tax credits would be available nationwide.  See, e.g.,

Congressional Budget Office, *An Analysis of Health Insurance Premiums Under the Patient

Protection and Affordable Care Act*, Defs.' SJ Mot., Ex. 5, at 2, 4-7 (Nov. 30, 2009) (calculating

anticipated subsidies across all states); Letter from Douglas W. Elmendorf, Director, CBO, to

Rep. Darrell Issa, Chairman, House Committee on Oversight and Government Reform, Defs.' SJ

Mot., Ex. 17, at 1 (Dec. 6, 2012) ("To the best of our recollection, the possibility that those

subsidies would only be available in states that created their own exchanges did not arise during

the discussions CBO staff had with a wide range of Congressional staff when the legislation was

being considered.").  Plaintiffs hang much of their argument on the suggestion of one

contemporaneous commentator that Congress could incentivize state participation in the

Exchanges "by offering tax subsidies for insurance only in states that complied with federal

requirements."  Timothy S. Jost, *Health Insurance Exchanges: Legal Issues* 7, O'Neill Institute,

Georgetown Univ. Law Ctr., no. 23, April 27, 2009, http://scholarship.law.georgetown.edu/cgi/

viewcontent.cgi?article=1022&context=ois_papers.  But there is no evidence in the legislative

record that the House, the Senate, any relevant committee of either House, or any legislator ever

entertained this idea.

In sum, the Court finds that the plain text of the statute, the statutory structure,

and the statutory purpose make clear that Congress intended to make premium tax credits

available on both state-run and federally-facilitated Exchanges.  What little relevant legislative

history exists further supports this conclusion and certainly – despite plaintiffs' best efforts to suggest otherwise – it does not undermine it.  The Court therefore concludes that "Congress has directly spoken to the precise question" of whether an "Exchange" under 26 U.S.C. § 36B includes federally-facilitated Exchanges.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842.  And that must be "the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-83.  The IRS has done exactly that by promulgating regulations authorizing the provision of tax credits to individuals who purchase health insurance on federally-facilitated Exchanges as well as to those who purchase insurance on state-run Exchanges.[14]

## IV.  CONCLUSION

For the reasons discussed above, the Court finds that the IRS Rule is consistent with the text, structure, and purpose of the Affordable Care Act.  Section 36B must be read as authorizing the IRS to deliver tax credits to individuals purchasing health insurance on federally-facilitated Exchanges.  The Court therefore denies plaintiffs' motion for summary judgment and

---

[14]     Even if the statute could be characterized as ambiguous – which it cannot – the IRS Rule must be upheld at Chevron step two as a permissible construction of the statute.  For the reasons set forth above, the plain text of the statute, when considered in light of the statutory structure, the statute's purpose, and the limited legislative history, establish that the Secretary's interpretation is, at minimum, a reasonable one.  Similarly, because the Court finds that the IRS Rule comports with the unambiguous meaning of the statute, and, alternatively, the Secretary's interpretation of the statute in promulgating the Rule was at least permissible, it finds no merit in plaintiffs' argument that the agency has failed to demonstrate that it arrived at its interpretation of the statute through reasoned decision-making.

grants defendants' motion for summary judgment.  An Order consistent with this Opinion will issue this same day.

/s/_____
PAUL L. FRIEDMAN

DATE:  January 15, 2014                    United States District Judge